UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| |  |
|---|---|
| **JANE DOES I THROUGH III, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**DISTRICT OF COLUMBIA,**<br><br>Defendant. | Civil Action 01-02398  (HHK) |

**MEMORANDUM OPINION**

Plaintiffs are mentally retarded adult women who receive habilitation services from the District of Columbia through the Mental Retardation and Developmental Disabilities Administration ("MRDDA"), a component of the Department of Human Services.  By their next friends, they bring this action for violations of their constitutional and civil rights under 42 U.S.C. § 1983 ("§ 1983"), alleging that MRDDA employs an unlawful practice of authorizing elective surgical procedures on behalf of retarded persons[1] in its care without adequately attempting to ascertain their wishes or consult with family members.  Plaintiffs assert these claims on their own behalf as well as for a putative class of all mentally retarded persons who have received habilitation services from the District of Columbia and for whom District officials have consented to elective surgical procedures.[2]

---

[1]   Such persons are variously referred to in this memorandum as "patients" (in that they receive medical treatment or undergo surgical procedures) and "consumers" (in that they utilize a range of services provided by MRDDA).

[2]   "Elective" surgical procedures are distinguished from emergency surgical procedures, which do not require the patient's consent "if it is the judgment of one licensed

1

Plaintiffs sought a preliminary injunction requiring MRDDA generally to apply the "substituted judgment standard," and specifically to comply with a provision of the D.C. Code which outlines both who may provide consent for medical treatment or surgeries performed on a legally incompetent person as well as the steps that must be undertaken to establish that consent. D.C. Code § 21-2210(a) – (b).  On April 29, 2005 this court granted the preliminary injunction [#102], indicating that a more complete discussion of its reasoning would follow.  This memorandum provides the court's rationale for its decision.

## I. ANALYSIS

**A.    Standing**

Defendant first maintains that plaintiffs lack standing to obtain preliminary injunctive relief because "plaintiffs' injuries did not occur pursuant to a policy, currently in place or in place at the time the action was filed"; and that defendant's "allegedly unlawful conduct causing harm to plaintiffs occurred before the current legislative scheme providing for consent was put in place."  Def.'s Opp'n at 4-5.  To support this argument, defendant cites to this court's ruling on plaintiffs' motion for class certification.[3]  *Jane Does I Through III v. District of Columbia*, 216

---

physician with the concurring judgment of another licensed physician that delay in obtaining consent for surgery would create a grave danger to the health of the customer," D.C. Code § 7-1305.07; *see also* D.C. Code § 31-2801(3) ("'medical emergency' means the sudden onset or sudden worsening of a medical condition that manifests itself by symptoms of sufficient severity, including severe pain, that the absence of immediate medical attention" could reasonably be expected" by a prudent lay person to "result in: (A) placing the patient's health in serious jeopardy; (B) Serious impairment to bodily functions; or (C) Serious dysfunction of any bodily organ or part.").

[3]    The court refers here to plaintiffs' *first* motion for class certification, filed March 29, 2002, and denied on June 19, 2003.  On February 16, 2004, the court granted plaintiffs' request to file an amended motion for class certification, which plaintiffs then filed on April 1, 2005.  This amended motion is currently pending before the court.

F.R.D. 5, 11-12 (D.D.C. 2003) ("*Jane Does I*"). Defendant's argument is wholly without merit.

In *Jane Does I*, the court noted that, "in order to assert claims for prospective injunctive relief, a plaintiff must demonstrate, not only that she has been harmed in the past, but 'that she is realistically threatened by a repetition [of the violation].'" *Id*. at 10 (quoting *City of Los Angeles v. Lyons,* 461 U.S. 95, 103 (1983)). Plaintiffs' efforts then fell short because they failed to "allege a risk of future injury, [or] introduce evidence to adequately support such a claim," and because "the court knows of no individual harmed by the conduct at issue within the past six years," *Jane Does I*, 216 F.R.D. at 13.

Plaintiffs' amended complaint, however, cures all three deficiencies in standing which the court identified in *Jane Does I*: it asserts that MRDDA replaced the policy in effect at the time of the named plaintiffs' injuries with "another surgical consent policy but did not remedy the constitutional infirmities" of the earlier policy, Am. Compl. at 1-2, ¶ 12; improperly authorized surgical procedures for members of the putative class from 1970 through the present, *id*. ¶¶ 46-49; and continues to authorize such surgeries, placing plaintiffs at risk for future violations of their rights, *id*. ¶ 12. Beyond the allegations in the complaint, plaintiffs state that current MRDDA Administrator Dale Brown has consented to 175 elective invasive procedures pursuant to the allegedly unlawful policy between 2002 and early 2005, Pls.' Mot. for Prelim. Inj. at 2; Brown herself testified that she will continue to apply the agency's policy and practices regarding consent. Brown Dep. at 69, 29. Plaintiffs continue to receive habilitation services from MRDDA, and are therefore subject to application of the policy. Pls.' Mot. for Prelim. Inj. at 1. Plaintiffs, therefore, establish standing sufficient to obtain prospective injunctive relief.[4]

---

[4] It is certainly conceivable that one or more of the named plaintiffs, or members of the putative class, will for whatever reason not actually have surgical procedures performed on

**B.     Legal Standard for Preliminary Injunction**

A preliminary injunction is an "extraordinary remedy" that should only issue "when the party seeking the relief, by a clear showing, carries the burden of persuasion." *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)). A court considering a preliminary injunction request must examine four factors, namely whether: (1) plaintiffs will be "irreparably harmed if an injunction is not granted"; (2) there is a "substantial likelihood" that plaintiffs will succeed on the merits; (3) an injunction will "substantially injure" defendant; and (4) the public interest will be furthered by the injunction. *Serono Labs., Inc., v. Shalala*, 158 F.3d 1313, 1317-18 (D.C. Cir. 1998). These four factors "interrelate on a sliding scale" and must be considered in relation to one another, with the result that "if the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak." *Id.* at 1318 (quoting *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995)).

**C.     MRDDA's Consent Policy**

MRDDA's predecessor, the Bureau of Habilitation Services, adopted a policy in 1990 governing "Permission for Medical, Dental, Surgical Treatment" for wards under its care ("H-18"). Pls.'

---

them for which MRDDA provides consent. For example, a plaintiff might move away from the District of Columbia at some point in the future and therefore no longer receive services from MRDDA, or simply never develop a medical condition that requires surgical intervention. Plaintiffs, however, do not need to demonstrate to a certainty that MRDDA will unlawfully consent to surgeries on behalf of each plaintiff under its current policy. Rather, by showing that the agency's policy *will* be applied to them *when* they are deemed to need elective surgeries, they demonstrate that the risk of rights violations "will increase materially." *Planned Parenthood Fed'n of Am., Inc. v. Schweiker*, 559 F. Supp. 658, 663 (D.D.C. 1983).

Ex. 2.[5]  The policy required that for "treatment and non-invasive diagnostic procedures," "[i]nformed consent must be given by the parent or Superintendent/Guardian," *id*. at 1.  While the policy noted that "[f]amily contact is attempted," H-18 essentially outlined a consent mechanism for the agency's Superintendent alone, who, "on recommendation of the primary care physician, dental officer, or the Chief of Health Services signs the authorization form . . . granting the necessary permission for treatment."  *Id*.

A revised policy, H-6, dated January 15, 1992, replaced H-18.  Pls.' Ex. 3 at 1.  Several changes appeared in H-6.  While the new policy incorporated H-18's language on obtaining consent for "treatment and non-invasive diagnostic procedures," H-6 stated that "[i]nformed consent must be given by the parent or Guardian," eliminating the "Superintendent" as an independent provider of informed consent.  *Id*. at 1.  Unlike its predecessor, H-6 also included provisions for "elective surgery, dental treatment or invasive diagnostic procedures," noting that for such procedures the "MRDDA Administrator is responsible for signing the informed consent form . . . which grants permission for the medical treatment."  *Id.*  The Administrator "will sign" the consent form after being "adequately advised" of the medical need for the procedure, "alternative treatments, expected outcome . . . , [and] nature and degree of risks."  *Id*. at 2.  Without establishing an order of priority for giving consent, or discussing the interrelation between the Administrator's consent authority and the family's, H-6 also provided that "[i]nformed consent obtained from the family must have two staff signatures" on the consent form.  *Id*.

---

[5]   Because plaintiffs have submitted a single set of exhibits in support of three different motions (preliminary injunction, class certification, and summary judgment) the court simply refers to these exhibits by number, without mentioning the accompanying motion in each citation.

H-6 has received considerable scrutiny from this court. In *Boyd v. Howard University,* Civil Action No. 97-02567, Mem. Op. (D.D.C. Dec. 23, 1999), a mentally retarded woman under MRDDA's care brought suit against the agency, alleging that in consenting on her behalf for elective surgical procedures, MRDDA violated her substantive and procedural due process rights. In granting summary judgment for the plaintiffs on their § 1983 claim, the court held that by failing to "incorporate[] any attempt to include [the patient's] desires" in granting consent for surgical procedures, MRDDA "flatly violated" both the substantive and procedural due process rights of the persons under its care. *Id.* at 21-22.

In 1998, however, H-6 was superseded by a policy entitled "Consent for Health Care Decisions," identified by Transmittal Letter Number 357, and dated August 10, 1998 ("1998 Policy"). The replacement of H-6 was a significant and explicit rationale for the court's previous opinion in this case, denying plaintiffs' initial motion for class certification. *Jane Does I*, 216 F.R.D. at 11-12 (noting that "there has been no showing that plaintiffs are likely to be subjected to [H-6] again, because, quite simply, Policy H-6 no longer exists." (citation and internal quotation marks omitted)). In *Jane Does I*, the court found that plaintiffs failed to show that they or any members of the putative class suffered injury under the 1998 Policy, adding that plaintiffs seemed to "not really challeng[e] a 'policy' at all, and are instead challenging isolated decisions by District decision-makers." *Id.* at 12.

The 1998 Policy requires that MRDDA obtain information on a "determination of a customer's incapacity to consent, pursuant to Sec. 21-2204 of the Health Care Decisions Act of 1988,"; identification of known family members; "information on the efforts to locate family members, even if the attempts were unsuccessful"; and information on the physicians and medical procedures involved. Pls.' Ex. 4 at 2. The 1998 Policy then directs that MRDDA case

managers "search, identify and/or verify information on any available family member." *Id*. Once such efforts are exhausted, the 1998 Policy provides different procedures for obtaining consent depending upon two factors: whether MRDDA can locate family members to provide consent, and whether the medical procedures for which consent is needed are "emergency" or "non-emergency." *Id*. at 3-5.  Whether the procedure is emergency or non-emergency, if MRDDA case workers locate family members, the treating physician "will then be advised that he or she should contact the family member for the consent," with MRDDA limiting its own role to "monitor[ing] the situation and [] obtain[ing] the necessary consents to allow MRDDA access to the medical records." *Id*. at 3.  For a non-emergency procedure, if "a family member(s) is not located or refuse to consent to the medical or dental procedure," MRDDA then requests information from the treating physician, including "a statement as to the urgency of the medical or dental procedure," "a confirmation that the health care provider has discussed the procedure with the customer," and copies of two certifications of incapacity. *Id*. at 4.  MRDDA (through the medical staff of its Clinical Services Division) then prepares a package of information including the materials provided by the physician, which it then forwards to the Office of Corporation Counsel for the District of Columbia, "with a cover letter requesting the appointment of a guardian for the customer." *Id*. at 5.

The 1998 Policy was itself replaced by yet another policy, this one titled "Securing Medical and Dental Care for MRDDA Consumers," and dated effective January 1, 2003 ("2003 Policy"). Pls.' Ex. 5.  The 2003 Policy is much more expansive than its predecessors, covering topics such as quality assurance, medical standards, and records retention.  Insofar as the issues raised by plaintiffs complaint are concerned, the relevant section of the 2003 Policy is section VIII, "Consent and Do Not Resuscitate Orders." *Id*. at 9.  The 2003 policy indicates that

"[e]fforts should be made to provide information and explanations at the level of customer comprehension," and that family members should be notified of a contemplated medical procedure and "given an opportunity to grant consent." *Id*. at 9-10. In such instances, the 2003 Policy mirrors the instructions of its immediate predecessor. In cases where the consumer is certified as incapacitated and "there is no family members [sic] or other person available or willing to provide consent," the 2003 Policy indicates that the MRDDA Administrator "is authorized to grant, refuse or withdraw consent on behalf of a consumer" provided that "two (2) licensed physicians have certified, in writing, that the health care service, treatment, or procedure is clinically indicated to maintain the health of the consumer." Brown testified that the 2003 Policy is "the same" as the 1998 Policy, Brown Dep. at 55, 104, and defendant stipulated to that fact. *Id*. at 117. Brown will continue to sign consent forms pursuant to the 2003 Policy, *id*. at 69, which is "in effect today." *Id*. at 29.

Although there are some significant differences between MRDDA's latest policy and H-18/H-6, the 2003 Policy currently in effect is identical to its predecessors in at least one critical respect: it fails, on its face, to incorporate the substituted judgment standard. A significant continuity in MRDDA's approach to providing medical consent on behalf of consumers, then, is the absence of *any* inquiry into their subjective wishes. Defendant readily admits that MRDDA undertakes no such inquiry. *See* Brown Dep. at 27 ("Q: Did you meet with or have any discussions with any of the consumers before you signed [their consent form]? A: No. Q: How about after you signed? A: No. Q: How about after the procedure? A: Not usually.").

D.     **Alleged Infirmities of MRDDA's Consent Policy**

Plaintiffs identify two defects of MRDDA's consent policy which assertedly cause violations of their rights. First, plaintiffs contend that "MRDDA officials regularly consent to

elective surgical procedures on 'consumers' (i.e. individuals like plaintiffs, who receive habilitation services from MRDDA) without following the substituted judgment standard." Pls.' Mot. for Prelim. Inj. at 2.  While defendant conclusively asserts that "plaintiffs fail to make any case whatsoever against MRDDA's current policies and practices," which are "in full compliance with the law," Def.'s Opp'n at 5 (emphasis omitted), it does not refute the fact most central to plaintiffs' claims: that MRDDA's Administrator, Dale Brown, consents to elective surgeries without attempting to speak with or otherwise ascertain the wishes or concerns of the affected consumers.  Brown, the parties agree, provides such consent pursuant to official MRDDA policy.

Second, MRDDA staff allegedly "ignore and override family members who refuse to consent to the consumer's proposed surgery."  *Id*.  MRDDA vigorously denies this charge, and proffers declarations from three MRDDA officials who assert that "no client's, relatives', or guardian's wishes have ever been countermanded," Keita Decl. ¶ 7.

*1. Substituted Judgment*

In the District of Columbia, "every person has the right, under the common law and the Constitution, to accept or refuse medical treatment.  This right of bodily integrity belongs equally to persons who are competent and persons who are not."  *In re A.C.*, 573 A.2d 1235, 1247 (D.C. 1991).[6]  When a person is incompetent, or when the court is unable to determine the

---

[6] *In re A.C.* involved a pregnant woman, close to death from cancer, who fell unconscious.  The hospital treating A.C. sought a declaratory judgment from the trial court to determine what course of treatment to provide, and the court ordered that the hospital perform a caesarean section on A.C.  A.C.'s counsel sought a stay from the D.C. Court of Appeals, which denied the request.  Both A.C. and her baby died shortly after the caesarean.  573 A.2d at 1238.  The court indicated that it was ruling on the issues presented despite their mootness as far as A.C. was concerned because the treating hospital "will in all likelihood again face a situation in which a pregnant but dying patient is either incapable of consenting to treatment or [is]

person's competence, "the substituted judgment procedure must be followed," *id*. at 1247, because it is the procedure which "most clearly respects the right of the patient to bodily integrity." *Id*. at 1249. When applying substituted judgment, a legal concept originating in English common law,[7] "as nearly as possible, the court must ascertain what the patient would do if competent." *Id*. In undertaking this inquiry, which is "primarily a subjective one," *id*. at 1249, "the court must consider the totality of the evidence," including the patient's value system, goals, information provided by the patient's family, and if applicable any past decisions the patient may have made regarding medical care. *Id*. at 1250-51. Finally, if an examination of these sources fails is insufficient "to determine the subjective desires of the patient," the court should "supplement its knowledge about the patient by determining what most persons would likely do in a similar situation." *Id*. at 1251.

The substituted judgment standard has also been incorporated into District of Columbia statute.[8] Section 21-2210 of the D.C. Code provides that "a decision to grant, refuse, or

---

affirmatively refusing treatment." *Id*. at 1242. Despite having different facts (i.e., not implicating the medical care of "a pregnant but dying patient"), courts have recognized that the principles articulated by *In re A.C.* apply beyond the unusual and narrow factual scenario of that case. *See, e.g.*, *In re Walker*, 856 A.2d 579, 586 (D.C. 2004).

[7]    As noted by *In re A.C.*, the substituted judgment standard developed in England to allow family members and other parties to recover property distributions from an incompetent person's estate. *Id*. at 1249 (citing *Strunk v. Strunk*, 445 S.W. 2d 145, 147-48 (Ky. 1969) (discussing *Ex Parte Whitebread* (1816) and *In re Earl of Carysfort* (1840) (citations omitted)). Substituted judgment made its American debut in the same context. *See, e.g.*, *In re Farmers' Loan & Trust Co.*, 168 N.Y.S. 952, 956 (N.Y. App. Div. 1918) ("the court acts for the incompetent in reference to his estate as it supposes the incompetent would have acted if he had been of sound mind."); *Rickel v. Peck*, 2 N.W. 2d 140, 144 (Minn. 1942). *Strunk* appears to be the first case which employed this principle to determine whether a mentally incompetent person would consent to a particular medical procedure.

[8]    While *In re A.C.* refers to "substituted judgment," D.C. Code § 21-2210 is titled "Substituted Consent." Although the court employs both terms, it is most correct to define substituted judgment as the *process* (the inquiry into the patient's wishes) and substituted

10

withdraw consent . . . shall be based on the known wishes of the patient or, if the wishes of the patient are unknown and cannot be ascertained, on a good faith belief as to the best interests of the patient." D.C. Code § 21-2210(b). The statute also provides a hierarchy of the persons who may provide consent for an incompetent person, starting with a court-appointed guardian or conservator, and descending to a spouse or domestic partner, an adult child, a parent, an adult sibling, a "close friend," and the patient's "nearest living relative." *Id*. § 21-2210(a).

In 1998, the Council for the District of Columbia passed Act 12-554, the "Mentally Retarded Citizens Substituted Consent for Health Care Decisions Emergency Amendment Act of 1998" ("Emergency Act"). Pls.' Reply, Ex. 1. Because these enactments are only effective for limited periods of time, usually 90 days, the Council has periodically renewed them; the most recent re-authorization of the Emergency Act took effect on January 19, 2005.[9] The Emergency Act provides that the MRDDA Administrator

> is authorized to grant, refuse, or withdraw consent on behalf of a customer with respect to the provision of any health care service, treatment, or procedure; provided, that 2 licensed physicians have certified in writing that the health care service, treatment, or procedure is clinically indicated to maintain the health of the customer.

Emergency Act A16-0006, § 3(a).

---

consent as the *result* (the approval of a surgical procedure upon making such an inquiry). To avoid any uncertainty, the court notes that the reference to "the substituted consent standard" in its April 29, 2005 order mandates that MRDDA follow the substituted judgment standard in determining whether to provide (substituted) consent for any individual under its care.

    [9]      On January 4, 2005, the D.C. Council passed Resolution 16-8 "to prevent a gap in the legal authority" of the Emergency Act, *available at* <http://www.dccouncil.washington.dc.us/ images/00001/20050107160311.pdf>. On January 19, 2005, the most recently authorized version of the Emergency Act, A16-0006, took effect, *available at* <http://www.dccouncil. washington.dc.us/images/00001/20050111095731.pdf>. Because the January 19, 2005 Emergency Act was only in effect for 90 days, and the parties have not presented any indication that the Act has since been renewed, it is unclear whether the Emergency Act presently remains in effect.

In approaching the admittedly complex issue of providing medical consent for MRDDA consumers, defendant's characterizations of its own legal obligations are conflicted.  On the one hand, it announces that "MRDDA follows the substituted judgment standard," Hr'g Tr. at 12, Def.'s Opp'n at 7, although this assertion is somewhat diluted by the statement that Brown "follows the substituted judgment standard *to the extent that it may be required by the Act*."  *Id*. at 2 (emphasis added).  Brown, however, concedes that MRDDA "has to follow chapter 22 section 21-2201 and the following chapters in providing consent for [its] consumers," Brown Dep. at 105.  MRDDA staff also clearly evidence their awareness that their actions are governed by the statute: "case management staff follows the requirements of D.C. Code § 21-2210 and D.C. Act 13-045 [an earlier version of the Emergency Act] for consumers who lack the capacity to grant or refuse consent for themselves."  King Decl. ¶ 8.  After preparing "consent packages," documents which request "substituted consent for non-emergency medical care," Keita Decl. ¶ 4, MRDDA case managers then go "down the list in § 21-2210, following the statutory priority from top to bottom, looking for someone who is 'reasonably available, mentally capable, and willing to act,' to provide substituted consent for the consumer."  King Decl. ¶ 9.  This search includes a review of the patient's file, followed by "all reasonable steps" to locate a consent provider, including Internet searches, "calling the consumer's living facility to inquire about who has been visiting, and going out into the field."  *Id*.

At the same time, although MRDDA does not so argue explicitly, under its interpretation of its authority the Emergency Act overrides both § 21-2210(b) and *In re A.C.*  In contrast to MRDDA's assertedly vigorous efforts to comply with the provisions of § 21-2210(a), which establishes a hierarchy of consent providers, defendant apparently feels authorized to disregard § 21-2210(b), which requires an inquiry into the patient's wishes and interests: "The administrator

bases her decisions on the information needed to comply with the [Emergency] Act; nothing more can be required of her." Def.'s Opp'n at 2.  Defendant further states that Brown "makes the best substituted decision she can for each consumer," after she "spends time talking to the medical staff to learn about the procedure and why it is medically recommended," Def.'s Opp'n at 7.  This statement reveals the extent to which defendant misapprehends the meaning of "substituted judgment."  The statute directs that *any person* providing substituted consent – whether the patient's court-appointed guardian, relative, close friend, or the MRDDA administrator – shall base her decision "on the known wishes of the patient or, if the wishes of the patient are unknown and cannot be ascertained, on a good faith belief as to the best interests of the patient."  D.C. Code § 21-2210(b).  In other words, the decisionmaker applies determines whether to provide consent by using the substituted judgment standard.  A person providing consent on behalf of a person incompetent to make her own medical decisions, then, may not simply act on the basis of information provided by physicians or on her own independent determination as to what course of action is best for the patient.  This mandate is consistent with the court's determination in *In re A.C.* that "it is the patient's decisional rights which the substituted judgment inquiry seeks to protect."[10]  The Emergency Act contains no language exempting the MRDDA Administrator from following the substituted judgment standard thus announced by *In re A.C.* and incorporated into statute, and the court declines to manufacture such language now.

---

[10]     If anything, the imperative to make the substituted judgment inquiry is even greater for the MRDDA Administrator than for family members, since unlike the other persons who may give substituted consent under § 21-2210(a) (namely court-appointed guardians, spouses, blood relatives, and close friends), the MRDDA Administrator is unlikely to be personally acquainted with the patient or her wishes.

Against the unambiguous language of the statute, defendant asserts that undertaking an inquiry into the wishes or interests of a retarded patient is an impossible charge. They state that because "*all* of the consumers whose consent requests come before Ms. Brown have been certified to lack legal capacity to make consent decisions for themselves . . . by definition, there is no information about what they would want if they were *not* incapacitated." Def.'s Opp'n at 7. Defendant's position assumes that a patient who is legally incompetent to make independent decisions about her medical care is also impervious to any meaningful communication about her wishes, or, as defendant's counsel stated at the preliminary injunction hearing, "there are no prior wishes of these folks." Hr'g Tr. at 15. This argument offends both common sense and the dignity of retarded citizens; "[e]ven a legally incompetent, mentally retarded individual may be capable of expressing or manifesting a choice or preference" regarding medical treatment. *Matter of R.H.*, 622 N.E. 2d 1071, 1077 (Mass. App. Ct. 1993) (citations omitted); *see also Oller v. Oller-Chiang*, 646 A.2d 822, 834-35 (Conn. 1994) (when considering guardianship appointment for mentally retarded individual, court must take reasonable efforts "to ascertain the [individual's] preference"); *Superintendent of Belchertown State School v. Saikewicz*, 370 N.E. 2d 417, 430 (Mass. 1977) (in making medical decisions on behalf of a mentally incompetent patient, state institution should "determine with as much accuracy as possible the wants and needs of the individual involved."). This observation is consistent with Brown's own testimony. *See* Brown Dep. at 96 ("Q: And is [Jane Doe III] able to do that, if she wants something is she able to tell you what her wishes are? A: Yes, she does."). While it seems evident that some MRDDA consumers may be incapable of communication sufficient to allow a conclusive *determination* of their wishes, defendant is not thereby relieved of its legal obligation to at least

undertake an *inquiry* as to those wishes.[11]

In *Boyd*, the court found that MRDDA violated the plaintiff's due process liberty interests, arising under District of Columbia law[12] as announced by *In re A.C.*, by providing "arbitrary and reckless" consent to surgery on her behalf, without taking into account her subjective desires. *Boyd*, Civil Action No. 97-02567, Mem. Op. at 19 (D.D.C. Dec. 23, 1999). It is undisputed that under its current policy (the 2003 Policy), MRDDA continues to provide consent without making any subjective inquiry into the patient's wishes or values, and without attempting to ascertain what the patient *would* do if competent. Plaintiffs thus establish both that they would suffer irreparable harm absent an injunction, and that they have a likelihood of success on the merits.

*2. Consent of Family Members*

In addition to their claims that MRDDA violates their rights by failing to employ substituted judgment in medical consent decisions, plaintiffs also assert that under MRDDA policy agency officials "ignore and override family members who refuse to consent to the consumer's proposed surgery." Pls.' Mot. at 2. Plaintiffs' contention appears to be grounded in the deposition testimony of Dale Brown, who repeatedly indicated that if family members

---

[11]    Defendant attempts to distinguish *In re A.C.* by noting that "unlike A.C., [MRDDA consumers] permanently lack capacity, as a result of their developmental disabilities, so, by definition, there is no information about what they would want if they were *not* incapacitated." Def.'s Opp'n at 7. While ascertaining the wishes and choices of a once-competent, now-incompetent individual might be faster, easier, or more definitive, MRDDA is not thereby relieved of the responsibility of making the substituted judgment inquiry with respect to its consumers.

[12]    A due process liberty interest may arise from two sources – the Due Process Clause of the Fifth Amendment to the United States Constitution, or state law. *See Hewitt v. Helms,* 459 U.S. 460, 466 (1983).

refused to provide consent, MRDDA would do so:

> Q: If you find family members and the family member refuses to sign the consent form, then the process goes on as you've described here, correct?
> A: We have to document that the person has refused to sign the consent.
> Q: So your policy calls for if the family member refuses that you document that and then keep the ball in motion as you've described here this morning?
> A: We keep moving, yes.

* * *

> Q: And if someone is available to provide consent and refuses to consent, then per D.C. policy you consent, correct?
> A: That's correct.

* * *

> Q: In this particular file on page 4 it indicated that Mr. B.[13] had a brother T.B. who refused to consent, is that correct?
> A: That's correct, that's what it says.
> Q: And as per D.C. policy because the family member refused to consent you consented, is that correct?
> A: That's correct.

Brown Dep. at 36, 75, 88-89.

Defendant now contends that Brown's testimony was an unfortunate misstatement, and that MRDDA does not authorize surgeries when a family member "exercises substituted consent by declining the procedure," but only when a family member has been located but "refuses to participate in the consent process." Def.'s Opp'n at 8-9.[14] Defendant seeks to clarify Brown's deposition testimony by submitting a declaration where she attests that in discussing "refusal to consent," she "was talking about the common situation in which family members who *have* been successfully located *refuse to get involved*," and not "the rare situation in which someone who is

---

[13]   The court supplies initials in place of the referenced names to minimize the intrusion into the privacy of the named individuals.

[14]   While acknowledging that MRDDA's use of the term "refusal to consent" in reference to a family member's refusal to participate in the consent process at all represents "a very poor choice of words," Hr'g Tr. at 21, defendant scolds plaintiffs for "conflating or confusing" the two. Keita Decl. ¶ 5. To the extent there is "confusion" it has been sown by MRDDA's use of the same phrase to reference two entirely different concepts.

reasonably available, mentally capable, and willing to act *declines to provide consent* on the consumer's behalf." Brown Decl. ¶¶ 6-7. Two MRDDA officials, the Medical Officer of the Clinical Services Division and the Chief of Case Management Services, reiterate this point. Keita Decl. ¶¶ 5, 7; King Decl. ¶¶ 11-12. Defendant also concedes that providing consent in direct contravention of family members' wishes "would be a very serious violation of the law." Brown Dep. at 21; Def.'s Opp'n at 9.

As the deposition excerpts make clear, though, plaintiffs' counsel specifically asked Brown if MRDDA would authorize a procedure "if someone is *available to provide consent* and refuses to consent," which she answered affirmatively. Brown Dep. at 75 (emphasis added). The record, therefore, remains confused as to whether MRDDA has in fact contravened the express wishes of family members regarding consent, or has simply assumed its responsibilities under the consent hierarchy established by § 21-2210(a). Furthermore, although plaintiffs contend that MRDDA's purported disregard for family members' consent decisions has occurred "per the official policy" of the agency, Pls.' Mot. at 2, the 2003 Policy certainly authorizes no such disregard. Notwithstanding this applicable *written* policy, plaintiffs may still be able to show that MRDDA regularly and deliberately disregards the wishes of family members. Because of the substantial uncertainties concerning whether MRDDA actually does so, though, it is inappropriate for the court to grant preliminary injunctive relief at this time to require the agency "to abide by the expressed wishes of family members of other persons . . . who are authorized to exercise substituted consent," Pls.' Mot. for Prelim. Inj., Motion/Proposed Order.

**E.    Other Factors**

As discussed *supra* at 9-14, plaintiffs meet their burdens of demonstrating irreparable injury and likelihood of success on the merits. The court must also consider both any harm an

injunction would inflict on the defendant, and whether the public interest is served or impaired by issuance of an injunction.

*1. Harm to Defendant*

Defendant fails to demonstrate, or even articulate, any harm it would suffer upon issuance of the preliminary injunction, admitting that "it is unclear what effect plaintiffs' proposed injunction would have upon defendants' operations," Def.'s Opp'n at 10. Instead, defendant merely announces that "the balancing of harms clearly weighs" in its favor. *Id*. The court must reject this unsupported assertion. When denial of a preliminary injunction would threaten a plaintiff with serious injury, while granting the injunction would only impose a slight burden upon the defendant, the court properly grants the injunction. *See Cronin v. Dep't of Agric.*, 919 F.2d 439, 445 (7th Cir. 1990). The present injunction does not prevent MRDDA from consenting to elective surgical procedures on behalf of persons under its care; rather, the court simply requires that in granting consent for such procedures, MRDDA must follow the substituted judgment standard as directed by *In re A.C.* and the D.C. Code. At most, the injunction requires MRDDA to abandon its current practice of providing consent without undertaking the inquiry required by § 21-2210(b), and to establish new policies and practices that do incorporate the substituted judgment standard. Because "[m]ere administrative inconvenience can never justify denial" of a constitutional or civil right, *Murphree v. Winter*, 589 F. Supp. 374, 382 (S.D. Miss. 1984), the balance of hardships clearly favors plaintiffs.

*2. Public Interest*

The public interest in the right to bodily integrity identified by *In re A.C.* is of "constitutional magnitude," 573 A.2d at 1244 (citations omitted), and intruding upon this right requires "a showing of overriding justification and medical appropriateness." *Khiem v. United*

*States*, 612 A.2d 160, 165-66 (D.C. 1992), *cert. denied*, 507 U.S. 924 (1993); *see also Cruzan v. Director, Mo. Dep't of Health*, 497 U.S. 261, 278-79 (1980) (discussing individuals' liberty interest in refusing medical treatment).  While defendant simply asserts that "[a] government agency should not be enjoined from following practices that do not violate anyone's rights," Def.'s Opp'n at 3, MRDDA continues to apply a policy to plaintiffs which, in pertinent part, duplicates the agency's earlier policies – which the court has already determined, in *Boyd*, *did* violate MRDDA consumers' due process rights.  Accordingly, plaintiffs have successfully made the four-part showing required to obtain preliminary injunctive relief.

                                                   Henry H. Kennedy, Jr.
                                                   United States District Judge

Dated: June 16, 2005