**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**JANE DOES I THROUGH III,**

**Plaintiffs,**

**v.**

**DISTRICT OF COLUMBIA,**

**Defendant.**

---

**Civil Action 01-02398  (HHK)**

**MEMORANDUM OPINION AND ORDER**

Plaintiffs are three mentally retarded adult women who receive habilitation services[1] from

the District of Columbia through the Mental Retardation and Developmental Disabilities

Administration ("MRDDA"), a component of the Department of Human Services.  Jane Doe I is

an adult woman in her forties who has received such services from the District of Columbia since

1960.  In 1984, allegedly without either consulting with Jane Doe I's legal representative or

obtaining substituted judgment from a court, District officials gave their consent to have Jane

Doe I's pregnancy aborted.  Jane Doe II is an adult woman in her fifties.  She was diagnosed in

1994 with exotropia, a condition where one eye deviates from the other.  An elective surgical

procedure was proposed and District officials gave their consent for the surgical procedure.

Although she was active in Jane Doe II's care, Jane Doe II's mother and court-appointed

advocate alleges that she was not consulted regarding the procedure.  Jane Doe III became

pregnant in 1978 and, according to plaintiffs, decided to carry the pregnancy to term.  District

---

[1] As plaintiffs explain, habilitation is "the process by which a person with developmental
disabilities is assisted in acquiring and maintaining skills to cope more effectively with the
demands of his or her own person and of his or her environment, and to raise the level of his or
her physical, mental, and social capabilities."  Am. Compl. ¶ 6.

officials, however, allegedly decided that she should have an abortion and gave their consent for the procedure without consulting with Jane Doe III's legal representative and without obtaining substituted judgment from a court.

By their next friends, plaintiffs bring this action under 42 U.S.C. § 1983 asserting that their substantive and procedural due process rights secured by the Fifth and Fourteenth Amendments have been violated by the District's unlawful practice of authorizing elective surgical procedures on retarded persons in its care[2] without adequately attempting to ascertain their wishes or consult with family members. Plaintiffs assert these claims on their own behalf as well as for a putative class of all mentally retarded persons who have received, or will receive, habilitation services from the District of Columbia and for whom District officials have consented to elective surgical procedures.[3] Presently before the court are plaintiffs' amended motion for class certification[4] [#101] and plaintiffs' motion for partial summary judgment

---

[2] Such persons are variously referred to in this memorandum as "patients" (in that they receive medical treatment or undergo surgical procedures) and "consumers" (in that they utilize a range of services provided by MRDDA).

[3] "Elective" surgical procedures are distinguished from emergency surgical procedures, which do not require the patient's consent if "it is the judgment of one licensed physician with the concurring judgment of another licensed physician that delay in obtaining consent for surgery would create a grave danger to the health of the customer." D.C. Code § 7-1305.07; *see also* D.C. Code § 31-2801(3) ("'[m]edical emergency' means the sudden onset or sudden worsening of a medical condition that manifests itself by symptoms of sufficient severity, including severe pain, that the absence of immediate medical attention could reasonably be expected by a prudent lay person" to "result in: (A) Placing the patient's health in serious jeopardy; (B) Serious impairment to bodily functions; or ©) Serious dysfunction of any bodily organ or part.").

[4] This court denied plaintiffs' initial motion seeking class certification because, while seeking injunctive or declaratory relief, they failed to allege a risk of future injury or produce evidence to support such a claim. Consequently, plaintiffs failed to establish their standing. *Jane Does I Through III v. District of Columbia*, 216 F.R.D. 5 (D.D.C. 2003) ("*Jane Does I*"). After discovery, plaintiffs filed an amended complaint on February 16, 2004. In granting plaintiffs' motion for a preliminary injunction, this court ruled that plaintiffs had cured any

[#103].  Upon consideration of the motions, the oppositions thereto, and the record of the case,

the court concludes that the motions should be granted.

## I. BACKGROUND

### A.  History of the District's Consent Policy

Although not the written policy of the District before April 1990, it was the "custom" of

the superintendent of Forest Haven, a MRDDA facility that provides services to the mentally

retarded, to sign consents for elective surgery without having been appointed guardian and

without having consulted with the person having surgery.  Pls.' Ex. 6 at 335.[5]  Rather, the

superintendent would approve elective surgical procedures based on the recommendations of a

medical officer.  This informal policy was in effect since at least 1978.

In April 1990, the longstanding policy of having the Forest Haven superintendent consent

to elective surgery on mentally retarded citizens was set forth in writing in Policy H-18.  Policy

H-18 required that, for "treatment and non-invasive diagnostic procedures," "[i]nformed consent

must be given by the parent or Superintendent/Guardian."  Pls.' Ex. 2 at 1.  While the policy

noted that "[f]amily contact is attempted," Policy H-18, like its informal predecessor policy,

essentially outlined a consent mechanism for the agency's Superintendent alone, who, "on

recommendation of the primary care physician, dental officer, or the Chief of Health Services

signs the authorization form . . . granting the necessary permission for treatment."  *Id.*

---

deficiencies regarding their standing that were identified in *Jane Does I.  Jane Does I Through III v. District of Columbia*, 374 F. Supp. 2d 107,109. (D.D.C. 2005) ("*Jane Does II*").

[5]  Because plaintiffs have submitted a single set of exhibits in support of three different motions (their motions for preliminary injunction, class certification, and summary judgment) the court simply refers to these exhibits by number, without mentioning the accompanying motion in each citation.

A revised policy, Policy H-6, dated January 15, 1992, replaced Policy H-18.  While the new policy incorporated Policy H-18's language regarding obtaining consent for "treatment and non-invasive diagnostic procedures," Policy H-6 stated that "[i]nformed consent must be given by the parent or Guardian," eliminating the "Superintendent" as an independent provider of informed consent.  Pls.' Ex. 3 at 1.  Unlike its predecessor, H-6 also included provisions for "elective surgery, dental treatment or invasive diagnostic procedures," noting that for such procedures the "MRDDA Administrator is responsible for signing the informed consent form . . . which grants permission for the medical treatment." *Id.*  The Administrator "will sign" the consent form after being "adequately advised" of the medical need for the procedure, "alternative treatments, expected outcome . . . , [and the] nature and degree of risks." *Id.* at 2.  Without establishing an order of priority for giving consent, or discussing the interrelation between the Administrator's consent authority and the family's, Policy H-6 also provided that "[i]nformed consent obtained from the family must have two staff signatures" on the consent form. *Id.*

Policy H-6 received considerable scrutiny from this court.  In *Boyd v. Howard Univ.*, Civil Action No. 97-2567, Mem. Op. (D.D.C. Dec. 23, 1999), a suit was brought on behalf of a mentally retarded woman under MRDDA's care against the agency, alleging that in consenting on her behalf for elective surgical procedures, MRDDA violated her substantive and procedural due process rights.  In granting summary judgment for the *Boyd* plaintiffs on their Section 1983 claim, the court held that, by failing to "incorporate[] any attempt to include [the patient's] desires" when granting consent for surgical procedures, MRDDA "flatly violated" both the substantive and procedural due process rights of the persons under its care. *Id.* at 21–22.

4

In 1998, Policy H-6 was superseded by a policy entitled "Consent for Health Care Decisions" ("1998 Policy").  Pls.' Ex. 4.  The 1998 Policy required that MRDDA obtain information regarding:  (1) "a customer's incapacity to consent, pursuant to Sec. 21-2204 of the Health Care Decisions Act of 1988"; (2) the identities of known family members; (3) "the efforts to locate family members, even if the attempts were unsuccessful"; and (4) the physicians and medical procedures involved.  *Id.* at 2.  The 1998 Policy also directed MRDDA case managers to "search, identify and/or verify information on any available family member."  *Id.*  Once such efforts are exhausted, the 1998 Policy provided different procedures for obtaining consent depending upon two factors:  whether MRDDA can locate family members to provide consent, and whether the medical procedures for which consent is needed are "emergency" or "non-emergency."  *Id.* at 3–5.  Whether the procedure is emergency or non-emergency, if MRDDA case workers locate family members, the treating physician "will then be advised that he or she should contact the family member for the consent," with MRDDA limiting its own role to "monitor[ing] the situation and [] obtain[ing] the necessary consents to allow MRDDA access to the medical records."  *Id.* at 3.

For a non-emergency procedure, if "a family member(s) is not located or refuse to consent to the medical or dental procedure," MRDDA then requests information from the treating physician, including "a statement as to the urgency of the medical or dental procedure," "a confirmation that the health care provider has discussed the procedure with the customer," and copies of two certifications of incapacity.  *Id.* at 4.  MRDDA (through the medical staff of its Clinical Services Division) then prepares a package of information including the materials

provided by the physician, which it then forwards to the Office of Corporation Counsel for the District of Columbia, "with a cover letter requesting the appointment of a guardian for the customer." *Id*. at 5.

The 1998 Policy was itself replaced by yet another policy, this one titled "Securing Medical and Dental Care for MRDDA Consumers," and dated effective January 1, 2003 ("2003 Policy"). Pls.' Ex. 5. The 2003 Policy is much more expansive than its predecessors, covering topics such as quality assurance, medical standards, and records retention. Insofar as the issues raised by plaintiffs' complaint are concerned, the relevant section of the 2003 Policy is Section VIII, "Consent and Do Not Resuscitate Orders." *Id*. at 8–9. The 2003 policy indicates that "[e]fforts should be made to provide information and explanations at the level of customer comprehension," and that family members should be notified of a contemplated medical procedure and "given an opportunity to grant consent." *Id*. In such instances, the 2003 Policy mirrors the instructions of its immediate predecessor. In cases where the consumer is certified as incapacitated and "there is no family members [sic] or other person available or willing to provide consent," the 2003 Policy indicates that the MRDDA Administrator "is authorized to grant, refuse or withdraw consent on behalf of a consumer" provided that "two (2) licensed physicians have certified, in writing, that the health care service, treatment, or procedure is clinically indicated to maintain the health of the consumer." The MRDDA Administrator testified that the 2003 Policy is "the same" as the 1998 Policy, Pls.' Ex. 1 at 55, 104, and the District stipulated to that fact. *Id*. at 117. The Administrator also testified that the 2003 Policy is "in effect today." *Id*. at 29.

**B. Substituted Judgment Standard**

"Every person has the right, under the common law and the Constitution, to accept or refuse medical treatment. This right of bodily integrity belongs equally to persons who are competent and persons who are not." *In re A.C.*, 573 A.2d 1235, 1247 (D.C. 1991).[6] When a person is incompetent, or when the court is unable to determine the person's competence, "the substituted judgment procedure must be followed," *id.*, because it is the procedure which "most clearly respects the right of the patient to bodily integrity." *Id.* at 1249. When applying substituted judgment, a legal concept originating in English common law,[7] "as nearly as possible, the court must ascertain what the patient would do if competent." *Id.* In undertaking this inquiry, which is "primarily a subjective one," *id.*, "the court must consider the totality of the

_____

[6] *In re A.C.* involved a pregnant woman, close to death from cancer, who fell unconscious. The hospital treating A.C. sought a declaratory judgment from the trial court to determine what course of treatment to provide. The court ordered that the hospital perform a caesarean section on A.C. A.C.'s counsel sought a stay from the D.C. Court of Appeals, which denied the request. Both A.C. and her baby died shortly after the caesarean. 573 A.2d at 1238. The court indicated that it was ruling on the issues presented despite their mootness, as far as A.C. was concerned, because the treating hospital "will in all likelihood again face a situation in which a pregnant but dying patient is either incapable of consenting to treatment or [is] affirmatively refusing treatment." *Id.* at 1242. Despite having different facts (i.e., not implicating the medical care of "a pregnant but dying patient"), courts have recognized that the principles articulated by *In re A.C.* apply beyond the unusual and narrow factual scenario of that case. *See, e.g.*, *In re Walker*, 856 A.2d 579, 586 (D.C. 2004).

[7] As noted by *In re A.C.*, the substituted judgment standard developed in England to allow family members and other parties to recover property distributions from an incompetent person's estate. *Id.* at 1249 (citing *Strunk v. Strunk*, 445 S.W. 2d 145, 147-48 (Ky. 1969) (discussing *Ex Parte Whitebread* (1816) and *In re Earl of Carysfort* (1840) (citations omitted)). Substituted judgment made its American debut in the same context. *See, e.g.*, *In re Farmers' Loan & Trust Co.*, 168 N.Y.S. 952, 956 (N.Y. App. Div. 1918) ("the court acts for the incompetent in reference to his estate as it supposes the incompetent would have acted if he had been of sound mind."); *Rickel v. Peck*, 2 N.W. 2d 140, 144 (Minn. 1942). *Strunk* appears to be the first case which employed this principle to determine whether a mentally incompetent person would consent to a particular medical procedure.

evidence," including the patient's value system, goals, information provided by the patient's family, and, if applicable, any past decisions the patient may have made regarding medical care. *Id*. at 1250–51.  Finally, if an examination of these sources is insufficient "to determine the subjective desires of the patient," the court may "supplement its knowledge about the patient by determining what most persons would likely do in a similar situation." *Id*. at 1251.

District of Columbia law, D.C. Code § 21-2210, also might be read to incorporate the substituted judgment standard.[8]  Section 21-2210 provides that "[a] decision to grant, refuse, or withdraw consent . . . shall be based on the known wishes of the patient or, if the wishes of the patient are unknown and cannot be ascertained, on a good faith belief as to the best interests of the patient."  D.C. Code § 21-2210(b).[9]  The statute also provides a hierarchy of the persons who may provide consent for an incompetent person, starting with a court-appointed guardian or conservator, and descending to a spouse or domestic partner, an adult child, a parent, an adult sibling, a "close friend," and the patient's "nearest living relative."  *Id*. § 21-2210(a).

In 1998, the Council for the District of Columbia passed Act 12-554, the "Mentally Retarded Citizens Substituted Consent for Health Care Decisions Emergency Amendment Act of 1998" ("Emergency Act").  Because these emergency enactments are only effective for 90 days, the Council has periodically renewed them; the most recent re-authorization of the Emergency

---

[8]  While *In re A.C.* refers to "substituted judgment," D.C. Code § 21-2210 is titled "Substituted Consent."  Although the court employs both terms, it is most correct to define substituted judgment as the *process* (the inquiry into the patient's wishes) and substituted consent as the *result* (the approval of a surgical procedure upon making such an inquiry).

[9]  As the court reads this provision, if the wishes of the patient are unknown and cannot be ascertained, the decisionmaker must act on her good faith belief as to what the patient would want.  It is presumed that the patient would want what is in "the best interests of the patient."

Act took effect on January 19, 2005.[10]  The Emergency Act provided that the MRDDA

Administrator

> is authorized to grant, refuse, or withdraw consent on behalf of a customer
> with respect to the provision of any health care service, treatment, or
> procedure; provided, that 2 licensed physicians have certified in writing that
> the health care service, treatment, or procedure is clinically indicated to
> maintain the health of the customer.

Emergency Act A16-0006, § 3(a).  Given the sunset provision in all emergency legislation passed

by the D.C. Council, the January 19, 2005 Emergency Act is no longer valid.  The parties have

not presented any indication that the Act has since been renewed, nor has the court been able to

find any such indication on its own.  Accordingly, this legislation does not currently affect the

District's legal obligations.

## II.  ANALYSIS

### A.  Class Certification

Plaintiffs seek class certification and  the following relief for themselves and for the

putative class:  (1) monetary relief; (2) injunctive relief "barring the District of Columbia from

any further utilization of the current policy or any other policy that allows city officials to consent

to elective surgical procedures for plaintiffs and their fellow Class members, without due process

of law"; and (3) declaratory relief, in the form of a declaration providing "that the policy of the

District of Columbia which authorizes city officials to consent to elective surgical procedures for

developmentally disabled individuals violates plaintiffs' and Class members' liberty interest to

---

[10]  On January 4, 2005, the D.C. Council passed Resolution 16-8 "to prevent a gap in the
legal authority" of the Emergency Act, *available at* http://www.dccouncil.washington.dc.us/
images/00001/20050107160311.pdf.  On January 19, 2005, the most recently authorized version
of the Emergency Act, A16-0006, took effect, *available at* http://www.dccouncil.
washington.dc.us/images/00001/20050111095731.pdf.

accept or refuse medical treatment and is therefore an unconstitutional infringement of the

substantive and procedural due process rights of plaintiffs and their fellow Class members." Am.

Compl. at 16, ¶¶ 2-5.

As the party moving for class certification, plaintiffs bear the burden of establishing that

the requirements for class certification, as set forth in Rule 23 of the Federal Rules of Civil

Procedure, have been satisfied. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997).

Plaintiffs, therefore, must show that they satisfy all four prerequisites of Fed. R. Civ. P. 23(a).

*Hartman v. Duffey*, 19 F.3d 1459, 1468 (D.C. Cir. 1994); *In re Vitamins Antitrust Litig.*, 209

F.R.D. 251, 256 (D.D.C. 2002).  These requirements are:  (1) that the class is so numerous that

joinder of all members is impracticable; (2) that there are questions of law or fact common to the

class; (3) that the claims or defenses of the representative parties are typical of the claims or

defenses of the class; and (4) that the representative parties will fairly and adequately protect the

interests of the class.  FED. R. CIV. P. 23(a).  In addition, plaintiffs also bear the burden to show

that the class falls within at least one of the three categories set forth in Rule 23(b).  A district

court exercises broad discretion in deciding whether plaintiffs have carried their burden.

*Hartman,* 19 F.3d at 1471 (citing *Bermudez v. United States Dep't of Agric.*, 490 F.2d 718, 725

(D.C. Cir. 1973)).

The question of class certification is a preliminary question distinct from the merits of the

case.  *Eisen v. Carlisle & Jacquelin*, 417 US 156, 178 (1974).  As the Supreme Court pointed out

in *Eisen*, when "determining the propriety of a class action, the question is not whether the

plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether

the requirements of Rule 23 are met."  417 U.S. at 178 (internal quotation omitted).  While courts

may not conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action, *id.* at 177, the court may consider matters beyond the pleadings to ascertain whether the asserted claims or defenses are susceptible of resolution on a class-wide basis. *McCarthy v. Kleindienst*, 741 F.2d 1406, 1419 n.8 (D.C. Cir. 1984).

## 1. Existence of a Class

Although not an explicit requirement under Fed. R. Civ. P. 23, this jurisdiction has recognized the "common-sense requirement" that plaintiffs establish the existence of a class. *Pigford v. Glickman*, 182 F.R.D. 341, 346 (D.D.C. 1998); *Franklin v. Barry*, 909 F. Supp. 21, 30 (D.D.C. 1995). While "not designed to be a particularly stringent test," plaintiffs must at least establish that "'the general outlines of the membership of the class are determinable at the outset of the litigation.'" *Pigford*, 182 F.R.D. at 346 (quoting 7A WRIGHT, MILLER & KANE, FEDERAL PRACTICE & PROCEDURE § 1760 at 136–37 (3d ed. 2005)).

Plaintiffs seek to certify the following class:

> Persons with mental retardation or other developmental disabilities who receive, will receive, or have in the past received, habilitation services from the District of Columbia, and for whom District of Columbia officials have consented to or will consent to any elective surgical procedure since 1970.

Pls.' Cert. Mot. at 28. Plaintiffs claim that it will be "administratively feasible for this Court to determine whether a particular person is a member of the class, because class members, as customers of MRDDA, and being under the control of the District of Columbia, will have individual case files, including medical records." *Id.* Those records, according to plaintiffs, "will indicate whether any particular person had surgery, whether the surgery was elective, and whether the consent to surgery was given by the District of Columbia official." *Id.*

Plaintiffs' position has merit.  The proposed class is sufficiently discrete and identifiable so as to make management of the class administratively feasible.  The class members will share several defining characteristics:  (1) they all have mental or other developmental disabilities; (2) they all have received habilitation services from the District; and (3) they all have had consent to an elective surgical procedure given on their behalf by a District official.  These characteristics are specific and immutable.  Significantly, in its opposition, the District does not dispute that its records can be used to establish, definitively, whether a person is a member of the class.

### 2.  Rule 23(a) Requirements

#### a.  Numerosity

The first prerequisite for certification under Rule 23 is that the putative class be so large that joinder of all class members would be impracticable.  FED. R. CIV. P. 23(a)(1).  There is no specific threshold that must be surpassed in order to satisfy the numerosity requirement; rather, each decision turns on the particularized circumstances of the case.  *Franklin*, 909 F. Supp. at 30. That said, courts in this jurisdiction have observed that a class of at least forty members is sufficiently large to meet this requirement.  *Thomas v. Christopher*, 169 F.R.D. 224, 237 (D.D.C. 1996); *see also Committee of Blind Vendors v. District of Columbia*, 695 F. Supp. 1234, 1242 (D.D.C. 1988) (class of 63 members satisfies numerosity requirement).  While conjecture alone is not sufficient to establish numerosity, plaintiffs need not "provide an exact number of putative class members in order to satisfy the numerosity requirement."  *Pigford*, 182 F.R.D. at 347.

Plaintiffs present evidence establishing that the District has consented to over 1880 elective surgical procedures since 1970.  Pls.' Ex. 18 & 19.  Of these, approximately 440 are identified to have occurred since August 1998.  *Id.*  Moreover, plaintiffs provide a compilation of

175 consent forms signed by Dale Brown, the current MRDDA Administrator, since 2002 alone. Pls.' Ex. 12.  In light of this evidence, the court concludes that proposed class meets the numerosity requirement of Rule 23(a).

The District contends that the numerosity requirement is not satisfied in this case because "claims of most putative class members . . . are barred by the statute of limitations and the doctrine of laches."  Def.'s Cert. Opp'n at 5–7.  According to the District, after the relevant limitations period is considered, there will only be "a relative handful of consumers who have an actionable claim."  *Id.* at 7–8.  This argument is meritless.  Supreme Court precedent precludes the "resolution of the statute of limitations issue at the class certification stage" because doing so "would impermissibly intrude upon the merits of [plaintiffs'] claims."  *Kifafi v. Hilton Hotels Ret. Plan*, 189 F.R.D. 174, 178 (D.D.C. 1999) (citing *Eisen*, 417 U.S. at 177–78); *see also Foltz v. U.S. News & World Report, Inc.*, 106 F.R.D. 338, 341 (D.D.C. 1984).  Moreover, as the court later explains, the statute of limitations does not bar plaintiffs' or the class members' claims.

### b.  Commonality

Rule 23(a)(2) requires that there be questions of fact or law common to the class.  FED. R. CIV. P. 23(a)(2).  This rule does not require commonality on every fact or on each issue of law. *Franklin*, 909 F. Supp. at 30; *Forbush v. J.C. Penney & Co. Inc.*, 994 F.2d 1101, 1106 (5th Cir. 1993).  Rather, "[t]he commonality test is met when there is at least one issue, the resolution of which will affect all or a significant number of the putative class members."  *Coleman v. Pension Benefit Guar. Corp.*, 196 F.R.D. 193, 198 (D.D.C. 2000) (internal quotation omitted).  Because the commonality requirement may be satisfied by a single common issue, courts have noted that

it is "often easily met." *In re Vitamins Antitrust Litig.*, 209 F.R.D. at 259; *Jenkins v. Raymark Indus., Inc.*, 782 F.2d 468, 472 (5th Cir. 1986) ("The threshold of 'commonality' is not high.").

Here, plaintiffs argue that the common issue affecting the entire class is that all are "victims of the same illegal policy and practice of the defendant, whereby the defendant gave its consent to elective surgeries on the plaintiffs and putative class members without following the substituted judgment standard." Pls.' Cert. Mot. at 30. Thus, plaintiffs argue, the common issue of fact is that "every class member had or will have at least one elective surgery that was consented to in writing by MRDDA officials acting pursuant to official D.C. policy," *id.*, and the common issue of law is "that every written consent to elective surgery was a violation of the plaintiffs' (and each class member's) constitutional rights." *Id.* Plaintiffs also correctly note that the necessity of determining monetary damages on an individual basis does not preclude a commonality finding. *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 428 (4th Cir. 2003) ("Rule 23 contains no suggestion that the necessity for individual damage determinations destroys commonality."); *see also* 5 MOORE'S FEDERAL PRACTICE § 23.23[2] (2004) ("The need for an individualized determination of damages suffered by each class member generally does not defeat commonality.").

The District responds by contending that commonality is defeated here because neither Policy H-6 nor Policy H-18 are currently in existence, and therefore the claims of current MRDDA customers are materially different than those of customers who were injured by these previous policies. Def.'s Cert. Opp'n at 8–10. The District also argues that commonality is lacking by suggesting that Policy H-6 is not unconstitutional on its face, but rather was only

applied unconstitutionally in some instances.  Therefore, because each unconstitutional

application involved unique facts, there can be no commonality amongst the putative class.  *Id.*

The District's arguments are easily dismissed.  This court has held that the policy

currently in effect is "identical to its predecessor in at least one critical respect: it fails, *on its*

*face*, to incorporate the substituted judgment standard," *Jane Does II*, 374 F. Supp. 2d at 112

(emphasis added).  Moreover, this court has determined that "MRDDA continues to apply a

policy to plaintiffs which, in pertinent part, duplicates the agency's earlier policies—which the

court . . . determined, in *Boyd*, *did* violate MRDDA customers' due process rights."  *Id.* at 118

(emphasis in original).  Finally, it is commonly understood that class actions seeking injunctive

and declaratory relief, as here, "by their very nature" present common questions of law and fact.

7A WRIGHT, MILLER & KANE, FEDERAL PRACTICE & PROCEDURE § 1763 at 226.

### c.  *Typicality*

The third requirement under Rule 23(a) is that plaintiffs establish that the claims of the

class representatives are typical of those of their class.  FED. R. CIV. P. 23(a)(3).  This

requirement is intended to ensure that "the class representatives have suffered injuries in the

same general fashion as absent class members."  *In re Vitamins Antitrust Litig.*, 209 F.R.D. at

260 (internal quotation omitted).  It is satisfied if "each class member's claim arises from the

same course of events that led to the claims of the representative parties and each class member

makes similar legal arguments to prove the defendant's liability."  *Pigford*, 182 F.R.D. at 349

(citing *Baby Neal v. Casey*, 43 F.3d 48, 58 (3d Cir. 1994)).  Courts have liberally construed this

requirement.  *In re Vitamins Antitrust Litig.*, 209 F.R.D. at 260.

Plaintiffs contend that they meet the typicality requirement because the claims of

plaintiffs and the claims of the putative class members all arise from the District's long-

established policy of having MRDDA officials consent to elective surgery in violation of their

due process rights.  Pls.' Cert. Mot. at 33.  In response, the District merely recycles arguments

that this court has already rejected, *e.g.*, statute of limitations, dissimilar consent policies, etc.

The court does not hesitate to conclude that the claims of the plaintiffs are typical of those

presented on behalf of the putative class members, for all involve allegations that the District's

consent policy over the years has consistently failed to implement the constitutionally required

substituted judgment standard.

### d. *Adequacy of Representation*

The final prerequisite under Rule 23(a) is that the named representatives must "fairly and

adequately represent the interests of the class."  FED. R. CIV. P. 23(a)(4).  The prerequisite

"necessitates an inquiry into the adequacy of representation, including the quality of counsel, any

disparity of interest between class representatives and members of the class, communication

between class counsel and the class and the overall context of the litigation."  *Pigford*, 182

F.R.D. at 350 (citing *Twelve John Does v. District of Columbia*, 117 F.3d 571, 575 (D.C. Cir.

1997)).

As for the quality of their counsel, plaintiffs state that their counsel are "fully able to

prosecute this action vigorously on behalf of the class," and that they "have extensive experience

representing plaintiffs in complex federal civil rights litigation, as well as class actions."  Pls.'

Cert. Mot. at 34.  Defendants do not dispute that plaintiffs' counsel are qualified.[11]  This,

---

[11]  The District did, however, "reserve[] the right to challenge the adequacy of plaintiffs' counsel."  Def.'s Cert. Opp'n at 12 n.11.

combined with the fact that plaintiffs' counsel represented the successful plaintiffs in *Boyd*

before this court, leads the court to conclude that plaintiffs are represented by experienced and

competent counsel who will adequately protect the interests of the class.

Plaintiffs also assert that the interests of the class and the interests of the named plaintiffs

are the same, for both seek to prove the existence of an illegal policy of the District of Columbia.

*Id.*  Moreover, all of the named plaintiffs, like the members of the putative class, have had the

District consent to elective surgery on their behalf without application of the substituted

judgment standard.  The District responds by stating that "the claims of all three Plaintiffs are

pre-emergency act, pre-July 1998."  Def.'s Cert. Opp'n at 12.  This argument is meritless given

the court's previous holding that the current MRDDA policy resembles MRDDA's previous

policies by not providing for the exercise of substituted judgment, *Jane Does II*, 374 F. Supp. 2d

at 112, and that the Emergency Act, even if it were in effect, does not exempt the MRDDA

Administrator from following the substituted judgment standard.  *Id.* at 115.  Accordingly, the

court is satisfied that the interests of the plaintiffs and the interests of the putative class are

aligned.

### 3.  Rule 23(b) Requirements

In addition to satisfying the four prerequisites stated in Rule 23(a), plaintiffs must also

establish that the action falls within one of three categories of class action suits described in Rule

23(b).  FED. R. CIV. P. 23(b).  Plaintiffs seek certification as a hybrid class under Rule 23(b)(2)

and 23(b)(3), or, in the alternative, seek certification under Rule 23(b)(3) alone.  While the court

finds that plaintiffs have met the requirements of Rule 23(b)(2), and will certify the claims for

equitable relief pursuant to that provision, it cannot conclude at this time that either hybrid

certification or Rule 23(b)(3) certification is appropriate for the putative class's monetary claims.

### a. Rule 23(b)(2)

In order to satisfy Rule 23(b)(2), plaintiffs must show that "the party opposing the class

has acted or refused to act on grounds generally applicable to the class, thereby making

appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a

whole." FED. R. CIV. P. 23(b)(2).  There are two basic factors that must be present in order to

certify a class under Rule 23(b)(2):  (1) the defendant's action or refusal to act must be "generally

applicable to the class"; and (2) plaintiffs must seek final injunctive relief or corresponding

declaratory relief on behalf of the class.  7AA WRIGHT, MILLER & KANE, FEDERAL PRACTICE &

PROCEDURE § 1775 at 41; *Bynum v. District of Columbia*, 217 F.R.D. 43, 48 (D.D.C. 2003).

Plaintiffs have satisfied both factors and therefore certification pursuant to Rule 23(b)(2) for the

determination of their equitable claims is appropriate.  First, the District's action—failure to

follow the substituted judgment standard when consenting to elective surgical procedures—

constitutes an action "generally applicable to the class."[12]  The second requirement is met as well,

because plaintiffs' first amended complaint plainly seeks declaratory and injunctive relief.  Am.

Compl. at 16,  ¶¶ 2–3.

Citing the Advisory Committee Notes on Rule 23, the District argues that certification

pursuant to Rule 23(b)(2) is improper because money damages predominate over injunctive or

---

[12]  An inquiry into whether the defendant acted on grounds generally applicable to the 23(b)(2) class is often considered to be encompassed by the commonality requirement of Rule 23(a), which the court has already found to have been met.  *Diaz v. Taylor*, 165 F.R.D. 689, 695 (M.D. Fl.1996); *Hariss v. Pan American World Airways, Inc.*, 74 F.R.D. 24, 45-46 (N.D. Cal. 1977).

declaratory relief as the appropriate final remedy.  Def.'s Cert. Opp'n at 12.[13]   According to the

District,  plaintiffs seek an injunction against a policy that no longer exists.  Therefore, once the

possibility of injunctive relief is removed, the possible declaratory relief that remains is

"minuscule."  Def.'s Cert. Opp'n at 12–14.  As a result,  the District argues, the "legal relief

predominates in this case," thereby precluding Rule 23(b)(2) certification.  *Id.* at 14.  The

District's  argument must be rejected primarily because it is grounded on the faulty premise that

there is no basis for a permanent injunction in this case.[14]   That premise fails in light of this

court's decision granting plaintiffs a preliminary injunction—which necessarily included a

holding that the plaintiffs' claims were likely to succeed on the merits, *Jane Does II*, 374 F.

Supp. 2d at 116—and by its holding today granting permanent injunctive relief.

Furthermore, plaintiffs are seeking class certification under Rule 23(b)(2) solely for the

determination of whether injunctive and declaratory relief is appropriate.  Because plaintiffs

propose to deal with the claims for money damages at a later stage of the litigation, those claims

are not presently relevant and cannot predominate so as to preclude Rule 23(b)(2) certification.

*See* 2 NEWBERG & CONTE, NEWBERG ON CLASS ACTIONS § 4.14, at 93–95 (4th ed. 2002);

*Eubanks*, 110 F.3d at 96; *see also Keepseagle v. Veneman*, 2001 U.S. Dist. LEXIS 25220, at *42

---

[13]   The pertinent Note states that Rule 23(b)(2) certification "does not extend to cases in which the appropriate final relief relates *exclusively or predominantly* to money damages."  FED. R. CIV. P. 23 (advisory committee notes) (emphasis added).

[14]   To support this argument, the District suggests that plaintiffs do not have standing to seek an injunction because none face injury under the current policy.  This argument was soundly rejected by the court when it held that plaintiffs have "establish[ed] standing sufficient to obtain prospective injunctive relief," *Jane Does II*, 374 F. Supp. 2d at 109, and that the current policy "is identical to its predecessors in at least one critical respect: it fails, on its face, to incorporate the substituted judgment standard."  *Id.* at 112.

n.11 (D.D.C. 2001) (noting that the court is empowered to limit certification of a class to the

particular type of remedy sought). Accordingly, the court is satisfied that certification under Rule

23(b)(2) is appropriate for purposes of determining injunctive and declaratory relief.

### b.  The Possibility of Certification as a Hybrid Class

A hybrid class is one in which the case is certified pursuant to Rule 23(b)(2) for equitable

relief and pursuant to Rule 23(b)(3) for legal relief. Under such an approach, during the

equitable relief "phase," the class members are precluded from "opting out" in order to pursue

their own remedies. However, all members with damage claims will be granted all of the due

process rights afforded to members of a Rule 23(b)(3) class action, including the right to notice

and to opt out of the class. Such an approach has been specifically endorsed in this jurisdiction,

provided that:  (1) the requirements of both Rule 23(b)(2) and 23(b)(3) are met, and (2) "the

variations in individual class members' monetary claims . . . lead to divergences of interest that

make unitary representation of a class problematic in the damages phase." *Eubanks v. Billington*,

110 F.3d 87, 95–96 (D.C. Cir. 1987); *Bynum*, 217 F.R.D. at 48–50. In *Eubanks*, the D.C. Circuit

recognized that "the assumption of cohesiveness for purposes of injunctive relief that justifies

certification as a (b)(2) class [may be] unjustified as to claims that individual class members may

have for monetary damages." 110 F.3d at 96. In such circumstances, a district court may adopt a

hybrid approach and certify "a (b)(2) class as to the claims for declaratory or injunctive relief,

and a (b)(3) class as to the claims for monetary relief, effectively granting (b)(3) protections

including the right to opt out to class members at the monetary relief stage." *Id.*; *see also*

*Thomas v. Albright*,139 F.3d 227 (D.C. Cir. 1998).

Therefore, before it can certify a hybrid class, the court is required to find that the

"assumption of cohesiveness" underlying its Rule 23(b)(2) certification for purposes of equitable

relief does not apply to the class members' individual claims for monetary damages.[15]  Because

neither of the parties have addressed this issue in their pleadings, the court is not in a position to

make a finding that claims for individual compensatory relief will destroy class cohesion.  *See*

*Keepseagle*, 2001 U.S. Dist. LEXIS 25220, at *45–46.  Other courts in this jurisdiction, in

similar situations, have certified a class pursuant to Rule 23(b)(2) for determining equitable relief

only and have left for a later day a determination of the most appropriate mechanism for

resolving the class members' monetary relief claims.  *Id.*; *Pigford*, 182 F.R.D. at 346.[16]  The

court will adopt this approach and, at this time, certify a Rule 23(b)(2) class for resolution of

plaintiff's injunctive and declaratory claims only.[17]

---

[15]  This is so because certification under Rule 23(b)(3) is only appropriate if the class cannot be certified under either Rule 23(b)(1) or 23(b)(2).  WRIGHT, MILLER & KANE, FEDERAL PRACTICE & PROCEDURE § 1784.1 at 343–47 ("When a particular action qualifies under another portion of Rule 23(b) as well as Rule 23(b)(3), it should be treated as if it had been brought exclusively under the other provision."); *Thomas v. Powell*, 247 F.3d 260, 265 n.2 (D.C. Cir. 2001).  Therefore, if plaintiffs' money damage claims do not undermine the assumption of cohesiveness and do not predominate over the equitable relief claims—thereby precluding certification under Rule 23(b)(2)—it would be appropriate to certify both the claims for equitable relief and the claims for monetary relief as a Rule 23(b)(2) class, rather than certify the class as a hybrid action.

[16]  Three possible avenues exist for resolution of plaintiffs' monetary damage claims. First, the court could determine that certification of this action as a hybrid class is appropriate. Second, the court could also determine that the facts compel that a class be certified under Rule 23(b)(2) for all of plaintiffs' requested relief, including their claims for money damages.  Finally, the court could decide that plaintiffs' and the putative class members' request for monetary relief does not lend itself to class-wide resolution at all.  In their pleadings, plaintiffs offer to "present the Court with a suitable plan for trying any claims for compensatory damages after class-wide relief is determined."  Pls.' Cert. Mot. at 7

[17]  Rule 23(c)(2)(A) authorizes—but does not require—the court to direct appropriate notice to any class certified pursuant to Rule 23(b)(2).  The advisory notes to the 2003

## B. Partial Summary Judgment

In addition to seeking class certification, plaintiffs also seek partial summary judgment,[18] requesting the court to (1) find the District liable, pursuant to 42 U.S.C. § 1983, for violations of plaintiffs' and the class members' substantive due process and procedural due process rights; (2) enjoin permanently the current MRDDA policy of consenting to elective surgeries on MRDDA customers; and (3) declare that the policy of the District of Columbia consenting to elective surgeries on MRDDA customers has been and remains illegal. Pls.' Summ. J. Mot. at 1–2.

---

amendments to Rule 23 state that "[t]he authority to direct notice to class members in a (b)(1) or (b)(2) class action should be exercised with care" in light of the costs associated with giving notice as well as the reduced need for notice in light of the inability to opt out of the class. FED. R. CIV. P. 23 (advisory notes). The court is uncertain what benefits notice would serve at this stage, given that plaintiffs' claims for equitable relief are fully resolved in this memorandum opinion. As such, the court declines to exercise its discretion to mandate that notice be sent to all class members at this point. If either party believe that notice regarding the equitable claims in this action would be beneficial, they are welcome to file a motion indicating as such with the court.

[18] Under Fed. R. Civ. P. 56, summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions on file and affidavits show that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law. Material facts are those "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In considering a motion for summary judgment, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. But the non-moving party's opposition must consist of more than mere unsupported allegations or denials and must be supported by affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue for trial. FED. R. CIV. P. 56(e); *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986). To establish the existence of a genuine dispute, the non-moving party is "required to provide evidence that would permit a reasonable jury to find" in its favor. *Laningham v. United States Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987). However, if the evidence is "merely colorable" or "not significantly probative," summary judgment may be granted. *Anderson,* 477 U.S. at 249–50.

### 1.  Statute of Limitations and Doctrine of Laches

The District contends that most of the class members' claims, as well as the claims of all three plaintiffs, are barred by the statute of limitations and the doctrine of laches, and as such, summary judgment is inappropriate.  Like many federal statutes, 42 U.S.C. § 1983 does not contain a statute of limitations.  In such situations, it is well settled that federal courts may "borrow" a limitations period from an analogous state cause of action to the extent that the state limitations period is not inconsistent with the underlying federal interests at stake.  *Wilson v. Garcia*, 471 U.S. 261, 266–67 (1985); *Spiegler v. District of Columbia*, 866 F.2d 461, 463–64 (D.C. Cir. 1989).  The District contends that plaintiffs' Section 1983 claims are most analogous to an action in battery, and therefore the one-year limitation in D.C. Code § 12-301(4) should be applied.  Def.'s Summ. J. Mot. at 4.  This argument misconstrues plaintiffs' complaint; the thrust of the complaint in this action is not that the District inflicted an unlawful touching on each of the named plaintiffs and the class members, but rather that the District violated their constitutional due process rights.  Accordingly, the court finds that D.C. Code § 12-301(8), which imposes a three-year statute of limitations on actions where "a limitation is not otherwise prescribed," is the relevant District of Columbia limitations period.  *See Carney v. American Univ.*, 151 F.3d 1090, 1096 (D.C. Cir. 1998)) (citing *Owens v. Okure*, 488 U.S. 235, 243–50 (1989) (stating that three-year residual statute of limitations applies to Section 1983 claims).

Moreover, under D.C. Code § 12-302(a), the statute of limitations in a civil action is tolled for a person who is *non compos mentis*.  While the D.C. Code does not define *non compos mentis*, "the phrase . . .  generally refers to someone incapable of handling his own affairs or unable to function [in] society."  *Hendel v. World Plan Executive Council*, 705 A.2d 656, 665

(D.C. 1997) (internal quotation omitted).  Another court in this jurisdiction has previously stated that "the universally applied standard for determining when a person is mentally unsound for purposes of tolling civil statute [sic] of limitations" is whether the "disability is of such a nature as to show [the plaintiff] is unable to manage his business affairs or estate, or to comprehend his legal rights or liabilities."  *Speiser v. Dept. of Health & Human Servs.*, 670 F. Supp. 380, 384 (D.D.C. 1986) (internal quotation and citations omitted).

The District argues that the court cannot apply this tolling provision to plaintiffs' Section 1983 claims because none of the named plaintiffs and "very few" of the class members "have been adjudicated legally incompetent."  Def.'s Summ. J. Opp'n at 5–6.  The District misstates the applicable law, for legal adjudication of incompetency is not a requirement for a finding of *non compos mentis*.  Rather, courts will consider a wide range of evidence when determining the issue, including whether he or she has been legally adjudicated to be incompetent, as well as whether he or she "signed a power of attorney, had a guardian or caretaker appointed, or otherwise took measures to let someone else handle her affairs such as might be done for someone who is *non compos mentis*."  *Speiser*, 670 F. Supp. at 385.

Here, the named plaintiffs were all adjudicated to lack capacity by the D.C. Superior Court.  Pls.' Reply, Ex. A, B, C.[19]  In the process of making such a determination, the Superior

---

[19]  The District is correct that a determination that a person is incapacitated for purposes of receiving habilitation by MRDDA is not an adjudication of legal incompetence.  D.C. Code § 21-2004.  This, however, does not preclude a determination that the plaintiffs and class members, all of whom receive habilitation, are *non compos mentis*.  Rather, as stated in *Speiser*, an evaluation of whether a litigant is *non compos mentis* involves analysis of a wide range of evidence.  670 F. Supp. at 385.

Moreover, the D.C. Court of Appeals has indicated that the premise underlying D.C. Code § 21-2004 is to "to ensure that the court receives and weighs the views of the incapacitated individual."  *In re Orshansky*, 804 A.2d 1077, 1093 (D.C. 2002).  The purpose of D.C. Code § 21-

Court found that all three plaintiffs are adults whose "ability to receive and evaluate information

effectively or to communicate decisions is impaired to such an extent that he or she lacks the

capacity to take actions necessary to obtain, administer, and dispose of real and personal

property, intangible property, business property, benefits, and income." *Id.*  Jane Does I and II

were further found to be incapable of taking actions necessary to "acquire and maintain those life

skills that enable him or her to cope more effectively with the demands of his or her own person

and of his or her physical, intellectual, social, emotional, and economic efficiency or meet all or

some essential requirements for his or her therapeutic needs." *Id.*, Ex. A, B.  Further, the

Superior Court appointed conservators for all three named plaintiffs.  In light of this evidence,

the court is satisfied that the three named plaintiffs have taken "measures to let someone else

handle [their] affairs such as might be done for someone who is *non compos mentis*." *Speiser*,

670 F. Supp. at 385.  Accordingly, the statute of limitations period should be tolled under D.C.

Code § 12-302(a) for the named plaintiffs.[20]

　　　The court also finds that the class members are all *non compos mentis*.  As stated earlier,

the class is composed of individuals who are mentally retarded, who receive or have received

habilitation services from the District, and who have had consent given by the District for

elective surgical procedures pursuant to MRDDA's consent policies.  To receive habilitation

---

2004 is not, as the District suggests, to increase the burden on litigants seeking to toll the statute
of limitations because of their *non compos mentis* status.  Rather, the goals of D.C. Code § 21-
2004—to ensure that the court receives the views of incapacitated individuals—would be most
furthered by interpreting *non compos mentis* broadly.

　　[20]  Moreover, the reasons cited below for determining that the class as a whole is *non
compos mentis* further support the court's conclusion that the named plaintiffs are *non compos
mentis* as well.

services in the District of Columbia, one must be mentally retarded, which D.C. Code § 7-1301.03(19) defines as having a "substantial limitation in capacity that manifests before 18 years of age and is characterized by significantly subaverage intellectual functioning."  Furthermore, the District concedes that all members of the class, due to the fact that they have had consent forms signed for them, must lack legal capacity.  Def.'s Summ. J. Opp'n at 9 ("*All* of the consumers whose consent requests come before the Administrator have been certified to lack legal capacity to make consent decision [sic] for themselves") (emphasis in original).  The District also maintains that the class members' known wishes cannot be determined because they have often been retarded since birth and have never been competent to make medical decisions.  *Id.* at 10–12.[21]  These statements severely undercut any assertion by the District that, despite their lack of capacity, the class members are somehow capable of understanding their legal rights and remedies so as to be bound by the statute of limitations.  In light of the statutory requirements necessary to receive habilitation services in the District of Columbia and the admissions by the District, the court is satisfied that the class members are *non compos mentis* and the statute of limitations should be tolled.  As such, the District's statute of limitations argument is rejected.

The District also argues that the equitable doctrine of laches bars plaintiffs claims' because the plaintiffs unreasonably delayed the filing of their complaint.  *Id.* at 4.  The court disagrees and concludes that the laches defense is defeated for the same reason that the statute of limitations was tolled—because plaintiffs and the class members are *non compos mentis* and are

---

[21]  The District also claims that most MRDDA consumers have "profound mental retardation."  Profound mental retardation is defined as having an I.Q. below 20–25. AMERICAN PSYCHIATRIC ASS'N, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 42 (4th ed. 2003)

unable to comprehend their legal rights and remedies.  *See, e.g.*, *Barnett v. Riggs Nat'l Bank*, 154

F. Supp. 75, 78 (D.D.C. 1957) (the "defense of laches" is unavailable when "it can be shown that

the delay was due to incompetency"); *see also Buxton v. Buxton*, 770 A.2d 152, 159 (Md. 2001)

("It is generally well established that the kind of mental disability that will toll the statute of

limitations will also prevent operation of laches."); *McDaniel v. Gulf & South American S.S. Co.*,

228 F.2d 189, 193 (5th Cir. 1955) ("Even statutes of limitation are customarily tolled during

periods of mental incapacity and the considerations which lie behind that salutary rule will be

applied generously by a court dealing with the equitable doctrine of laches.").

### 2.  Merits of Plaintiffs' Section 1983 Claim

The court's prior order granting plaintiffs' motion for preliminary injunction affects its

consideration of the present motion for partial summary judgment.  Specifically, a court may

grant summary judgment where it carefully fits its previous findings of law or fact from a

preliminary injunction to the summary judgment standard.  *See Malcolm v. Reno*, 129 F. Supp.

2d 13, 13 (D.D.C. 2000) (granting summary judgment where "[n]othing in the summary

judgment pleadings effectively challenge[d] the findings supporting the . . . preliminary

injunction or the reasons for it").  The conversion is especially appropriate if the party requesting

summary judgment does not adduce new evidence suggesting that the court should revisit its

grant of a preliminary injunction.  *ReMed Recovery Care Ctrs. v. Township of Williston*, 36 F.

Supp. 2d 676, 682 n.5 (E.D. Pa. 1999) ("Absent presentation of new evidence, a district court

may convert an opinion granting a preliminary injunction into one granting a permanent

injunction . . . by expressly recasting its findings and conclusions in terms of the proper legal

standard applicable to a permanent injunction.").

Here, plaintiffs make the same arguments and present the same evidence in support of partial summary judgment as they did when seeking a preliminary injunction.  The District's arguments and evidence likewise remain unchanged, save the addition of a statute of limitations and laches argument, which has already been rejected.  Presented with no new arguments or evidence as to the merits of plaintiffs' claims, the court makes the same findings today as it did when it granted plaintiffs' motion for a preliminary injunction.  Those findings adequately serve as the basis for determining that partial summary judgment is appropriate.

As before, the gravamen of the District's defense is that undertaking an inquiry into the wishes or interests of a retarded patient is an impossible charge.  *See* Def.'s Summ. J. Opp'n at 9–10 ("*All* of the consumers whose consent requests come before the Administrator have been certified to lack legal capacity to make consent decisions for themselves. . . .  [B]y definition, there is no information about what they would want if they were *not* incapacitated.") (emphases in original).  The court has already rejected these arguments, noting that it "offends both common sense and the dignity of retarded citizens."  374 F. Supp. 2d at 115.  Specifically, the court concluded that, "[w]hile it seems evident that some MRDDA consumers may be incapable of communication sufficient to allow a conclusive *determination* of their wishes, defendant is not thereby relieved of its legal obligation to at least undertake an *inquiry* as to those wishes."  *Id.* at 116 (emphasis in original).

The District also argues that summary judgment is inappropriate because there is a genuine factual dispute as to whether "the wishes of putative class members are routinely ascertained by the treating physician and the psychiatrist for the specific medical procedure recommended."  Def.'s Summ. J. Opp'n at 2.  As the court noted in *Jane Does II*, this argument

demonstrates a fundamental misunderstanding by the District as to the requirements of the

substituted judgment standard.  When granting a preliminary injunction in this matter, the court

rejected this argument and held that "[a] person providing consent on behalf of a person

incompetent to make her own medical decisions . . . may not simply act on the basis of

information provided by physicians or on her own independent determination as to what course

of action is best for the patient."  374 F. Supp. 2d at 115.  Instead, she must consider the totality

of the evidence to attempt to determine, *for herself*, the subjective desires of the patient.  *Id.* at

113.  As such, a dispute as to whether the physicians or psychiatrists ascertain the wishes of the

class members is irrelevant to the ultimate issue in this case—whether the MRDDA

Administrator applies the substituted judgment standard when she signs the consent forms on

behalf of plaintiffs and the class members.  There is no dispute that she does not.  *See id.* at 116

("[I]t is undisputed that under its current policy (the 2003 policy), MRDDA continues to provide

consent without making any subjective inquiry into the patient's wishes or values, and without

attempting to ascertain what the patient *would* do if competent") (emphasis in original).[22]

Accordingly, summary judgment as to whether the District violated the plaintiffs' and the class

members' due process rights by not adhering to the substituted judgment standard is appropriate.

---

[22]  Moreover, there is no genuine dispute as to the remaining elements of plaintiffs'
Section 1983 claims.  It is uncontroverted that when District officials sign consent forms on
behalf of plaintiffs and the class members, they act under color of District law.  Also, because the
MRDDA Administrator acted pursuant to official District policy when she signed the consent
forms, suit against the District is also proper.  *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690
(1978); *see also, e.g., Warren v. District of Columbia*, 353 F.3d 36, 38 (D.C. Cir. 2004) (applying
*Monell* municipal liability standard to the District of Columbia).

### III.  CONCLUSION

For the aforementioned reasons, it is this 21st day of November, 2005, hereby

**ORDERED** that the plaintiffs' amended motion for class certification [#101] is

**GRANTED**; and it is further

**ORDERED** that the following class is **CERTIFIED** pursuant to Fed. R. Civ. P. 23(b)(2)

for purposes of determining plaintiffs' and the class members' claims for declaratory and

injunctive relief

> All persons with mental retardation or other developmental disabilities who
> receive, will receive, or have in the past received, habilitation services from
> the District of Columbia, and for whom District of Columbia officials have
> consented to or will consent to any elective surgical procedure since 1970;

and it is further

**ORDERED** that Jane Doe I, Jane Doe II, and Jane Doe III be, and hereby are, certified as

the named representatives of the class defined above; and it is further

**ORDERED** that Henry S. Williams, Irvin V. Cantor, and Robert A. Dybing shall serve as

class counsel in this action; and it is further

**ORDERED** that the plaintiffs shall file a motion regarding the proper treatment of the

compensatory damage claims in this case by no later than December 21, 2006; and it is further

**ORDERED** that plaintiffs' motion for partial summary judgment [#103] is **GRANTED**;

and it is further

**ORDERED** that the District of Columbia is hereby permanently enjoined (1) from

consenting to elective surgical procedures for MRDDA consumers under its present policy; (2) to

follow the substituted consent standard, as provided by D.C. Code § 21-2210, in determining

whether to grant, refuse, or withdraw consent for any elective surgery on any MRDDA consumer;

and (3) to comply with the specific requirements of § 21-2210(b).  Before granting, refusing, or withdrawing consent for any elective surgery on any MRDDA consumer, the District of Columbia must attempt to ascertain "the known wishes of the patient," an inquiry which is not limited to but which must include documented reasonable efforts to communicate with that person regarding her wishes.  If after such an inquiry "the wishes of the patient are unknown and cannot be ascertained," the District of Columbia must then make a good faith determination of "the best interests of the patient," a determination that requires consideration of the totality of that person's circumstances; and it is

**DECLARED** that the policy of the District of Columbia of consenting to elective surgeries on MRDDA customers without following the substituted judgment standard, as provided by D.C. Code § 21-2210 and by *In re A.C.*, violates plaintiffs' and the class members' liberty interest to accept or refuse medical treatment and is therefore an unconstitutional infringement of the substantive and procedural due process rights of plaintiffs and their fellow class members.


Henry H. Kennedy, Jr.
United States District Judge