## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

<table>
<tr><td>

**JANE DOES I THROUGH III,**

**Plaintiffs,**

**v.**

**DISTRICT OF COLUMBIA,**

**Defendant.**

</td><td>

**Civil Action 01-2398 (HHK)**

</td></tr>
</table>

### MEMORANDUM OPINION AND ORDER

Plaintiffs are three mentally disabled adult women who have received habilitation services from the District of Columbia.[1]  They bring this action under 42 U.S.C. § 1983, alleging that the District consented to the performance of non-emergency surgical procedures on plaintiffs without authority to do so.[2]  Before the Court is plaintiffs' motion for leave to file a second amended complaint [Dkt. # 213].  Upon consideration of the motion, the opposition thereto, and the record of this case, the Court concludes that leave to file a second amended complaint should be granted.

### I. BACKGROUND

**A.     Factual Background**

Plaintiffs were institutionalized in District of Columbia facilities beginning in the 1960s.

They have received habilitation services from the District of Columbia through its Mental

---

[1] "'Habilitation' is the process by which a person with developmental disabilities is assisted in acquiring and maintaining skills to cope more effectively with the demands of his or her own person and of his or her environment, and to raise the level of his or her physical, mental and social capabilities."  Am. Compl. ¶ 6.

[2] Jane Doe I proceeds by her next friend, Linda Tarlow.  Jane Does II and III have passed away over the course of this litigation.  Their estates proceed by their personal representatives.

Retardation and Developmental Disabilities Administration (now known as the Department of Disability Services, but still commonly referred to as the MRDDA).  Am. Compl. [Dkt. # 91] ¶ 6.

In 1984, Jane Doe I became pregnant.  She had previously given birth to a healthy boy without developmental disabilities.  According to plaintiffs, District of Columbia officials requested that she have an abortion, but Jane Doe I refused.  Nevertheless, those officials gave their consent for the abortion, which was performed.  Plaintiffs assert that the officials neither consulted with Jane Doe I's legal representative nor obtained authorization from a court.  *Id.* at ¶¶ 14–17.

Jane Doe II was diagnosed in 1994 with exotropia, a condition in which one eye deviates from the other.  According to plaintiffs, District of Columbia officials gave their consent for an elective surgical procedure which was performed without consulting Jane Doe II's mother, who was her daughter's court-appointed advocate.  *Id.* at ¶¶ 18–20.

Jane Doe III became pregnant in 1978 and, according to plaintiffs, desired to carry her pregnancy to term.  Plaintiffs contend that District of Columbia officials gave consent for an abortion, which was performed, without consulting Jane Doe III's legal representative and without obtaining authorization from a court.  *Id.* at ¶¶ 21–23.

**B.     District of Columbia Law**

The Mentally Retarded Citizens Constitutional Rights and Dignity Act of 1978, D.C. Law 2-137, codified as amended at D.C. Code § 7-1301.02 *et seq.*, took effect on March 3, 1979. Among other things, the law promised that mentally disabled residents of the District would enjoy their full rights as citizens and would receive habilitation services "suited to the needs of the person" and "humanely provided with full respect for the person's dignity and personal integrity."

2

D.C. Code § 7-1301.02(a)(1)–(2).  The law also declared that those receiving care from District of Columbia habilitation facilities would not "be sterilized by any employee of a facility or by any other person acting at the direction of, or under the authorization of, the Director or any other employee of a facility."  D.C. Code § 7-1305.08.

The Health-Care Decisions Act of 1988, D.C. Law 7-189, codified as amended at D.C. Code § 21-2201 *et seq.*, took effect on March 16, 1989.  The law established a procedure for the certification of incapacity to make health care decisions and provided a list of persons authorized to make those decisions for someone certified as incompetent.  D.C. Code § 21-2210.  The Act also provided that those it empowered to make health care decisions for the incompetent could not "consent to an abortion, sterilization or psycho-surgery, unless authorized by a court."  D.C. Code § 21-2211(a).[3]

## C.      Procedural Background

In 2005, this court held that the District of Columbia's policy of consenting to elective surgeries on behalf of incompetent MRDDA consumers without considering their wishes was unlawful.  The Court enjoined the District from consenting to elective procedures under the policy then in force, and required that the District attempt to ascertain the "known wishes of the patient," D.C. Code § 21-2210(b), before consenting to elective surgery on her behalf.  The order required the District to make documented reasonable efforts to communicate with the patient regarding her wishes, and to make a good faith determination of the best interests of the patient when her wishes could not be ascertained.  Order of Apr. 29, 2005 [Dkt. # 112] at 2.  This court

---

[3] The Court notes but does not address the apparent conflict between D.C. Code § 7-1305.08, which prohibits the performance and authorization of sterilizations, and D.C. Code § 21-2211, which allows for sterilizations pursuant to court order.

then granted partial summary judgment to plaintiffs, holding that the District of Columbia was liable pursuant to 42 U.S.C. § 1983 for violating the liberty interests established by the Health-Care Decisions Act of 1988. *Does I through III v. District of Columbia*, 232 F.R.D. 18, 33 (D.D.C. 2005); *see also Does I through III v. District of Columbia*, 374 F. Supp. 2d 107, 116 n.12 (D.D.C. 2005) ("A due process liberty interest may arise from two sources—the Due Process Clause of the Fifth Amendment to the United States Constitution, or state law.") (citing *Hewitt v. Helms*, 459 U.S. 460, 466 (1983)).

The Court of Appeals reversed this court's grant of partial summary judgment, vacated this court's injunction, and directed the entry of judgment for the District of Columbia with respect to plaintiffs' demand for a declaratory judgment. *Doe ex rel. Tarlow v. District of Columbia*, 489 F.3d 376, 384 (D.C. Cir. 2007). The Court of Appeals held that the challenged consent policy complied with both District of Columbia law and the constitutional requirements of procedural and substantive due process. *Id*. The Court of Appeals further held that the MRDDA Administrator need not attempt to ascertain the wishes of those who lack the capacity to make health care decisions. *Id*. at 381–82. Because plaintiffs have never been able to make informed choices regarding their medical treatment, the Court of Appeals reasoned, their wishes on that subject are unknown and cannot be ascertained. *Id*. The Court of Appeals did not address plaintiffs' claims for damages stemming from their surgical procedures, which pre-dated the challenged consent policy. *Id*. at 384.

On cross-motions for summary judgment after remand from the Court of Appeals, this court granted partial summary judgment to the District of Columbia on the question of whether the MRDDA Administrator was authorized to consent to elective medical procedures during the

4

period at issue in this suit. *Does I through III v. District of Columbia*, 593 F. Supp. 2d 115, 125 (D.D.C. 2009). Relying on the law of the case doctrine, this court ruled that "the Court of Appeals decided that the District of Columbia was legally authorized to consent to MRDDA consumers' surgeries" at all times relevant to this suit, rejecting plaintiffs' argument that the Administrator did not gain that authority until 1998. *Id.* However, the Court denied summary judgment to either side on "the question of whether the District of Columbia violated MRDDA consumers' liberty interests in bodily integrity by failing to obtain consent from, or ignoring or overriding the wishes of, those persons authorized by District of Columbia law to consent on MRDDA consumers' behalf." *Id.* The Court ordered the parties to submit a joint proposal for further proceedings. Order of Jan. 7, 2009 [Dkt. # 183]. Unable to agree, the parties submitted separate proposals [Dkt. ## 206, 207], and this motion followed.

## II. ANALYSIS

Under Federal Rule of Civil Procedure 15, a party must obtain either "the opposing party's written consent or the court's leave" to amend a pleading a second time. FED. R. CIV. P. 15(a)(2). "The decision to grant or deny leave to amend . . . is vested in the sound discretion of the trial court," *Doe v. McMillan*, 566 F.2d 713, 720 (D.C. Cir. 1977), which should "determine the propriety of amendment on a case by case basis, using a generous standard." *Harris v. Sec'y, U.S. Dep't of Veterans Affairs*, 126 F.3d 339, 344 (D.C. Cir. 1997). "Leave to amend a complaint should be freely given in the absence of undue delay, bad faith, undue prejudice to the opposing party, repeated failure to cure deficiencies, or futility." *Richardson v. United States*, 193 F.3d 545, 548–49 (D.C. Cir. 1999) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

Plaintiffs would amend their complaint to allege that all three surgeries at issue here were

batteries, and that they all violated the Mentally Retarded Citizens Constitutional Rights and

Dignity Act of 1978.  Pls.' Mem. in Supp. of Mot. for Leave to File Second Am. Compl. ("Pls.'

Mem. in Supp.") [Dkt. # 213] at 3–5.  Plaintiffs would also argue that the abortions performed on

Jane Does I and III were unauthorized because, they assert, only a court can properly consent to

the performance of an abortion on an incompetent woman.  *Id.* at 3–4.  They would allege that the

District of Columbia had a policy or custom of authorizing abortions without such an order.  Pls.'

Mot. for Leave to File Second Am. Compl., Ex. A (proposed "Second Am. Compl.") [Dkt. # 213]

at ¶ 25.  Finally, plaintiffs would maintain, as they have throughout this suit, that Jane Doe II's

surgery was performed under an illegal policy or custom of failing to obtain consent from or

ignoring the wishes of family members and guardians.  Pls.' Mem. in Supp. at 2.  They would

continue to seek certification of the putative class of incompetent individuals who had elective

surgery performed on them pursuant to that purported policy or custom.  *Id.* at 5.

Plaintiffs argue that their motion should be granted because (1) their seven-year delay in

seeking to amend the complaint is not undue given the course of proceedings in this case, (2) the

District cannot demonstrate that it would suffer any prejudice from the amendment, and (3) the

amendment would not be futile because no court has ruled on the merits of the claims that

plaintiffs seek to add.  Pls.' Reply in Supp. of Mot. for Leave to File Second Am. Compl. ("Pls.'

Reply in Supp.") [Dkt. # 216] at 4–10.  The District of Columbia rejoins that plaintiffs' delay in

seeking amendment has been both undue and unduly prejudicial because, it says, discovery in this

case has closed and the District would therefore be unable to respond to plaintiffs' new

allegations.  Def.'s Mem. in Opp. to Pls.' Mot. for Leave to File Second Am. Compl. ("Def.'s

Mem. in Opp.") [Dkt. # 214] at 6–7.  The District further argues that all of the claims that

plaintiffs would add have either already been resolved against them or else would not survive a motion to dismiss.  *Id.* at 4, 5 n.5.  The Court will address each of its contentions in turn.

### A. Undue Delay

"Rule 15(a) does not prescribe any time limit within which a party may apply to the court for leave to amend."  *Carribean Broad. Sys., Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080, 1084 (D.C. Cir. 1998) (quoting WRIGHT, MILLER & KANE, FEDERAL PRACTICE & PROCEDURE 2D § 1488); *see also Nwachukwu v. Karl*, 222 F.R.D. 208, 212 (D.D.C. 2004).  Although undue delay can be grounds for denial, *see Atchinson v. District of Columbia*, 73 F.3d 418, 426 (D.C. Cir. 1996), "[i]n most cases delay alone is not a sufficient reason for denying leave."  *Carribean Broad. Sys.*, 148 F.3d at 1084 (quoting WRIGHT, MILLER & KANE at § 1488); *see also Nwachukwu*, 222 F.R.D. at 212.

More than seven years have elapsed since plaintiffs filed the current complaint, and more than three since they were faced with a motion for summary judgment.  "Once confronted with [a] motion[] for summary judgment, plaintiffs approached the limits of the liberal pleading regime's indulgence by failing promptly to tender any alternate" theory of their case.  *Alley v. Resolution Trust Corp.*, 984 F.2d 1201, 1208 (D.C. Cir. 1993) (nonetheless granting leave to amend). Plaintiffs argue that they had no need to amend their complaint to state alternative grounds for liability until partial summary judgment entered against them, since their initial claim might have succeeded until then.  Pls.' Reply in Supp. at 4.  This argument is not persuasive.

Pleading in the alternative is expressly authorized by Rule 8(e)(2) of the Federal Rules of Civil Procedure, which "recognize[s] that a person may not be sure in advance upon which legal theory she will succeed, and so permit[s] parties to 'set forth two or more statements of a claim or

defense alternately or hypothetically,' and to 'state as many separate claims or defenses as the party has regardless of consistency.'"  *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 805 (1999) (quoting FED. R. CIV. P. 8(e)(2)).  Plaintiffs would now assert that the statutory or constitutional requirements for consenting to an abortion differ from the requirements for consenting to elective surgery generally, but there is no reason that they could not have advanced that argument years ago.

However, this court is mindful of "the policy of hearing cases on their merits," *Carribean Broad. Sys.*, 148 F.3d at 1084, rather than resolving them on technical grounds.  Moreover, "[c]onsideration of whether delay is undue . . . should generally take into account the actions of other parties and the possibility of any resulting prejudice" to those parties if leave to amend were granted.  *Atchinson*, 73 F.3d at 426; *see also Clark v. Feder Semo & Bard, P.C.*, 560 F. Supp. 2d 1, 5 (D.D.C. 2008) (noting that "the contention of undue delay is less persuasive in light of the lack of any prejudice").  Here, the District of Columbia concedes that it contributed to the delay in the filing of this motion, as the parties attempted to resolve their dispute outside of court.  Def.'s Mem. in Opp. at 7.  The Court goes on to consider whether the District would be unduly prejudiced if plaintiffs were granted leave to amend.

### B. Undue Prejudice

"Undue prejudice is not mere harm to the non-movant but a denial of the opportunity to present facts or evidence which would have been offered had the amendment been timely."  *Dove v. Wash. Metro. Area Transit Auth.*, 221 F.R.D. 246, 248 (D.D.C. 2004) (quoting in part *Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 1988 WL 122568 at *4 (D.D.C. Nov. 8, 1998), *aff'd* 905 F.2d 438, 440 n.2 (D.C. Cir. 1990)) (internal brackets and quotation marks

omitted).  Undue prejudice may exist when a party would have chosen different counsel or

employed a different litigation strategy had the amendment been made in a timely manner.  *See*

*Atchinson v. District of Columbia*, 73 F.3d 418, 427 (D.C. Cir. 1996).  Courts have also

considered whether a long-delayed amendment would require the parties to conduct substantial

additional discovery.  *See, e.g.*, *Alley v. Resolution Trust Corp.*, 984 F.2d 1201, 1208 (D.C. Cir.

1993) (granting leave to amend and noting that "[w]e consider it important . . . that plaintiffs have

represented in their briefs on appeal the absence of any need to . . . engage in additional

discovery"); *Williamsburg Wax Museum v. Historic Figures, Inc.*, 810 F.2d 243, 247 (D.C. Cir.

1987) (affirming a district court's denial of leave to amend, over seven years after the filing of the

initial complaint, where new discovery would be necessary).

   The District of Columbia argues that it would be unduly prejudiced by the proposed

amendment because it could have sought or provided discovery on plaintiffs' new allegations if

they had been made in a timely fashion, but can no longer do so.[4]  Def.'s Mem. in Opp. at 5–7, 9.

--------

   [4] The District also argues that the proposed amendment would substantially broaden
plaintiffs' theory of the case and would therefore alter the District's defenses.  It relies on
*Atchinson v. District of Columbia*, 73 F.3d 418, 427 (D.C. Cir. 1996), for the proposition that
leave to amend a complaint may be denied where the amendment would alter the opposing
party's defenses.  This reading of *Atchinson* is substantially too broad.  In that case, the plaintiff
brought a section 1983 suit against a police officer in his official capacity.  Because government
officials are not personally liable for damages when sued in their official capacities, such claims
are treated as though brought against the municipality itself.  *Id.* at 424 (citing *Kentucky v.
Graham*, 473 U.S. 159, 165–66 (1985)).  Shortly before trial, the plaintiff sought leave to amend
his complaint to name the officer in his personal capacity.  *Id.*  The Court of Appeals noted that
"[a] municipality and its officials may have mutually exclusive defenses.  For example, officials
sued individually may find it advantageous to agree with a plaintiff that [their] training was
inadequate," since doing so might convince a jury to hold the municipality rather than the
official liable.  *Id.* at 427.  Because the interests of municipal officials sued individually could be
adverse to those of the municipality, they might wish to seek separate counsel.  Moreover, those
officials might not volunteer information to municipal counsel that they would freely share if
sued only in their official capacities.  Such officials would therefore be unduly prejudiced by an

Plaintiffs rejoin that the District would suffer no undue prejudice from the proposed amendment because, although it would posit new legal theories, the amended complaint would concern the same medical procedures that have always been at issue in this case.  Moreover, plaintiffs say, all relevant evidence is and always has been in the possession of the District.  Pls.' Reply in Supp. at 4–10.  Plaintiffs' argument is persuasive.

Plaintiffs are right to point out that the proposed amendment would merely add new theories for the alleged illegality of the acts at the center of this case: the District's consent to the abortions performed upon Jane Does I and III, and to the eye surgery performed upon Jane Doe II.  The Court of Appeals has suggested that a change in legal theory is permissible where it is not prejudicial.  *See Alley*, 984 F.2d at 1208 (granting leave to amend where plaintiffs plan to change "the legal theory supporting their request for relief"); *Hanson v. Hoffman*, 628 F.2d 42, 53 n.11 (D.C. Cir. 1980) ("Unless a defendant is prejudiced on the merits by a change in legal theory, a plaintiff is not bound by the legal theory on which he or she originally relied.").

The Court is not persuaded that this alteration in the theory of plaintiffs' case would unduly prejudice the District of Columbia.  As a preliminary matter, the Court notes that although discovery related to class certification closed on March 1, 2005, *see* Order of Jan. 1, 2005 [Dkt. # 99], no scheduling order has ever been issued with regard to the merits of plaintiffs' claims.  Discovery on the merits is not closed, and the District of Columbia is mistaken to suggest

---

amendment that sought to name them in their individual capacities, especially if "a significant amount of time has passed during which the parties have conducted discovery and prepared for trial."  *Id.  Atchinson* thus stands for the proposition that a party may be unduly prejudiced when it would have pursued a substantially different litigation strategy if the complaint had been amended in a timely fashion.  The case does not suggest that the mere altering of a defendant's legal defenses—which must occur whenever a new claim is added—constitutes undue prejudice.

otherwise.  Even if the proposed amendment would require the District to conduct some

discovery that the current complaint does not, the District's argument for prejudice is much

weaker when discovery has not yet begun.  *See Djourabchi v. Self*, 240 F.R.D. 5, 13 (D.D.C.

2006) (granting leave to amend where "the amendment is not proposed so late in the litigation

that defendant will be required to engage in significant new preparation, because the Court has

yet to order discovery").

However, the Court does not believe that the proposed amendment would substantially

alter the District's discovery.  Plaintiffs would maintain their core allegation: that these surgical

procedures were improperly authorized.  Discovery would therefore focus on the circumstances

surrounding the procedures and the MRDDA's consent to them.  The District would require the

same facts to defend against the new battery claims as to defend against the old claims of

unconstitutional consent.  In both cases, the facts to be discovered are the Administrator's actions

with respect to a given surgery.  Because plaintiffs' new claims would require essentially the

same discovery as their old ones, the proposed amendment would not prejudice the District.

The Court goes on to consider whether that amendment would be futile.

## C.      Futility

"[F]utility of amendment" is among the reasons that a district court may deny a motion for

leave to amend.  *Foman v. Davis*, 371 U.S. 178, 182 (1962).  A futile amendment is commonly

said to be one that could not withstand a motion to dismiss, *see, e.g.*, *James Madison Ltd. v.*

*Ludwig*, 82 F.3d 1085, 1099 (D.C. Cir. 1996), but a district court may also find a proposed

amendment futile if it "merely restates the same facts as the original complaint in different terms,

reasserts a claim on which the court previously ruled, [or] fails to state a legal theory."  *Childers*

*v. Mineta*, 205 F.R.D. 29, 31 (D.D.C. 2001) (quoting 3 MOORE'S FEDERAL PRACTICE § 15.15[3]

(3d ed. 2000)); *see also Mittleman v. United States*, 997 F. Supp. 1, 10 (D.D.C. 1998) (noting that

an amendment can be futile for reasons other than its inability to survive a motion to dismiss),

*aff'd sub nom. Mittleman v. King*, 1998 WL 796300 at *1 (D.C. Cir. Oct. 15, 1998).  The Court

will assess each count of the proposed amendment for potential futility.

    The first count of plaintiffs' proposed amendment asserts that the District of Columbia

lacked authority to consent to abortions on behalf of Jane Does I and III but, pursuant to District

custom or policy, nonetheless did so without "any legal process whatever," Second Am. Compl.

at ¶ 23, and in violation of plaintiffs' due process rights.  *Id.* at ¶ 29.  Plaintiffs would argue that

the District is therefore liable under 42 U.S.C. § 1983.[5]  The District of Columbia responds that

this claim is futile, citing this court's previous ruling that, per the Court of Appeals, the District

was legally authorized to consent to elective surgeries for incompetent patients in its care at all

times relevant to this litigation.[6]  *See Does I through III v. District of Columbia*, 593 F. Supp. 2d

115, 125 (D.D.C. 2009).  To escape that ruling, plaintiffs would have to show that abortions are

different from ordinary elective surgeries—that the MRDDA Administrator's authority to consent

---

    [5] Although not originally subject to suits under section 1983, *see District of Columbia v. Carter*, 409 U.S. 418, 432 (1973), the District of Columbia was brought within its ambit in 1979. *See* Pub. L. No. 96-170, 93 Stat. 1284 (1979).  As a municipal corporation, the District is a "person" within the meaning of the statute and therefore subject to liability "when an official policy or custom causes [a] complainant to suffer a deprivation of constitutional right."  *Carter v. District of Columbia*, 795 F.2d 116, 122 (D.C. Cir. 1986) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)).

    [6] The District invokes the principle of *res judicata*, now commonly referred to as claim preclusion, but plaintiffs correctly point out that this doctrine only functions to bar a second lawsuit on a claim that has already been litigated to final judgment, *see Smalls v. United States*, 471 F.3d 186, 192 (D.C. Cir. 2006), which the claims before this court have not.

to elective surgeries does not empower her to consent to abortions.  To that end, plaintiffs argue that under District of Columbia and federal constitutional law, only a court can authorize the performance of an abortion on an incompetent woman.  Second Am. Compl. at ¶ 8, 23–24, 28–30.

Plaintiffs are certainly correct about current District law.  As the Court of Appeals noted, "[t]he D.C. Code . . . explicitly provides that abortions, sterilizations, and psycho-surgeries may not be authorized, at least absent a court order."  *Doe ex rel. Tarlow v. District of Columbia*, 489 F.3d 376, 379 (D.C. Cir. 2007) (citing D.C. Code § 21-2211).  Those provisions were enacted as part of the Health-Care Decisions Act of 1988; plaintiffs' abortions took place years before.  They therefore cannot rely on that law.  Perhaps realizing this, plaintiffs also cite the Mentally Retarded Citizens Constitutional Rights and Dignity Act of 1978, which declared that patients of District of Columbia habilitation facilities would not "be sterilized by any employee of a facility or by any other person acting at the direction of, or under the authorization of, the Director or any other employee of a facility."  D.C. Code § 7-1305.08.  Plaintiffs argue that this provision, which does not mention abortions but purports to completely prohibit sterilizations,[7] instead allows both procedures to be authorized and performed, but only pursuant to court order.

This court must reject that interpretation.  A statutory prohibition on sterilizations does not deprive the MRDDA Administrator of the authority to consent to abortions.  Having no statutory basis on which to ground their claim,[8] plaintiffs can only argue that constitutional due process requires a court order before an abortion can be performed upon a woman incompetent to consent.

---

[7] *See supra*, note 3.

[8] The Court emphasizes that no plaintiff was sterilized, nor was an abortion performed on any plaintiff after the date on which statutory law mandated consent for such procedures by court order.  Either situation would present a different case.

13

This argument appears to raise a question of first impression in the federal courts. The Court is aware of two state court cases presenting the issue of a third party's authority to consent to an abortion for an incompetent woman; both authorize that consent, but neither addresses any potential constitutional objection. *In re Estate of D.W.*, 481 N.E.2d 355, 357 (Ill. App. Ct. 1985) (granting a mother's petition to be appointed temporary guardian with authority to approve any appropriate medical procedure, including an abortion, with regard to the pregnancy of her severely mentally disabled daughter); *In re Barbara C.*, 455 N.Y.S.2d 182, 183 (N.Y. Sup. Ct. 1982) (holding that, under New York law, a father has the right to consent to an abortion for his severely mentally disabled daughter). The leading commentators on this issue acknowledge that "[t]here is little law on the question of third-party consent to abortion." MARTHA A. FIELD & VALERIE A. SANCHEZ, EQUAL TREATMENT FOR PEOPLE WITH MENTAL RETARDATION: HAVING AND RAISING CHILDREN 139 (1999); *see also* NORMAN L. CANTOR, MAKING MEDICAL DECISIONS FOR THE PROFOUNDLY MENTALLY DISABLED 96 (2005) (noting that "[t]he allocation of decision-making responsibility for abortions [performed on the mentally disabled] appears to be quite uneven").

However, because decisions regarding fertility and child-bearing implicate especially strong and constitutionally-protected interests, *see, e.g.*, *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 851 (1992), some courts have found a federal constitutional right to judicial oversight of involuntary sterilizations of the mentally ill and mentally disabled. *Vaughn v. Ruoff*, 253 F.3d 1124, 1130 (8th Cir. 2001) (citing many cases for the proposition that "pre-sterilization procedures are constitutionally required" in such circumstances); *Mich. Prot. & Advocacy Serv. v. Kirkendall*, 841 F. Supp. 796, 801 (E.D. Mich. 1993) ("[A]s a matter of federal law, this court

14

finds that the due process and equal protection clauses of the United States Constitution demand

that any involuntary sterilization of [a mentally ill person] or others similarly situated, occur only

after a full evidentiary hearing has been held . . . ."); *In re C.D.M.*, 627 P.2d 607, 612 n.16

(Alaska 1981) ("The United States Supreme Court has recently held that the due process clause of

the Fourteenth Amendment to the United States Constitution requires that the 'clear and

convincing' standard of proof be applied to civil commitment proceedings.  We are convinced

that this standard is equally applicable to a petition for sterilization.") (citing *Addington v. Texas*,

441 U.S. 418, 433 (1979)) (internal citation omitted); *Motes v. Hall Cnty. Dep't of Family &

Children Servs.*, 306 S.E.2d 260, 262 (Ga. 1983) ("We find that involuntary sterilization is akin to

termination of parental rights.  We therefore conclude that the seriousness of an individual's

interest at stake in a state initiated sterilization proceeding is such that due process requires 'clear

and convincing evidence' to authorize the sterilization of an individual.") (citing *Santosky v.

Kramer*, 455 U.S. 745, 758–59 (1982)) (internal citation omitted); *In re Hillstrom*, 363 N.W.2d

871, 876–77 (Minn. 1985) (holding, on federal constitutional grounds, that the sterilization of an

incompetent, mentally disabled woman must be preceded by proof by clear and convincing

evidence that the procedure is in her best interests) (citing *Addington* and *Santosky*); *see also* 53

AM. JUR. 2D *Mentally Impaired Persons* § 119 (2011) ("Before a person may be sterilized,

procedural due process protection . . . [has] been deemed mandatory.").[9]  Although an abortion

---

[9] Other state courts have also mandated procedural protections before sterilization, but
have not been clear as to whether they were doing so on federal constitutional or state law
grounds.  *In re A.W.*, 637 P.2d 366, 370 (Colo. 1981); *In re P.S.*, 452 N.E.2d 969, 976 (Ind.
1983); *Wentzel v. Montgomery Gen. Hosp.*, 447 A.2d 1244, 1254 (Md. 1982); *In re Grady*, 426
A.2d 467, 475 (N.J. 1981); *In re Truesdell*, 329 S.E.2d 630, 635 (N.C. 1985); *In re Terwilliger*,
450 A.2d 1376, 1382 (Pa. Super. Ct. 1982); *In re Hayes*, 608 P.2d 635, 641 (Wash. 1980).

does not, as sterilization does, deprive a woman of her fertility, "if [a] caretaker is going continually to supervise and to opt for abortion . . . the effect on the subject's ability to reproduce is the same." FIELD & SANCHEZ, *supra* at 140.

The Court does not adopt the rulings cited above, nor does it decide their applicability to the constitutional claim that plaintiffs' would raise in their second amended complaint. But given the unsettled state of the law and the fact that neither party has briefed this novel question in any depth, the Court finds that Count One of the proposed amendment may state a legal theory, and therefore grants leave to amend the complaint as to Count One. The viability of plaintiffs' claim will be better tested when fully briefed.

The second count of the proposed amendment would assert that the abortions performed upon Jane Does I and III constituted batteries, because there was no lawful consent for the touching. Second Am. Compl. at ¶¶ 34–37. As explained above, plaintiffs argue that the consent provided by the MRDDA Administrator was constitutionally inadequate. If this is so, plaintiffs may be able to make out a claim of battery. The Court therefore grants leave to amend the complaint as to Count Two.

The third and fourth counts of the proposed amendment would assert violations of the Mentally Retarded Citizens Constitutional Rights and Dignity Act of 1978. *Id.* at ¶¶ 38–45. In addition to that law's prohibition on sterilization, discussed above, plaintiffs cite its guarantee that intellectually disabled residents of the District of Columbia will enjoy their rights as citizens and will receive habilitation services "suited to the needs of the person" and "humanely provided with full respect for the person's dignity and personal integrity," D.C. Code § 7-1301.02(a)(1)–(2), as well as its apparent provision of a private right of action for the enforcement of that guarantee.

16

D.C. Code § 7-1305.13–14; *but see Karaahmetoglu v. Res-Care, Inc.*, 480 F. Supp. 2d 183, 187 (D.D.C. 2007).  If plaintiffs prevail on their claim that the consent for their abortions was constitutionally inadequate, they might be able to show that this deprivation of constitutional rights also violated their statutorily-protected right to habilitation services "provided with full respect for the person's dignity and personal integrity."  The Court grants leave to amend the complaint as to Counts Three and Four.

The fifth count of the proposed amendment realleges that the District of Columbia did not properly obtain consent for Jane Doe II's surgery from her family, and that this failure was pursuant to a custom or policy of arranging for fictitious consents to be signed on behalf of developmentally disabled individuals.  Second Am. Compl. at ¶¶ 57–60.  As this court has repeatedly noted, "the question of whether the District of Columbia violated MRDDA consumers' liberty interests in bodily integrity by failing to obtain consent from, or ignoring or overriding the wishes of, those persons authorized by District of Columbia law to consent on MRDDA consumers' behalf" remains in this case.  *Does I through III v. District of Columbia*, 593 F. Supp. 2d 115, 125 (D.D.C. 2009).  Count Five restates that claim, and in doing so it causes no undue prejudice to the defendant.  The Court therefore grants leave to amend the complaint as to Count Five.

The sixth, seventh, and eighth counts allege that because Jane Doe II's family did not consent to her surgery that procedure constituted a battery (Count Six) and violated the Mentally Retarded Citizens Constitutional Rights and Dignity Act of 1978 (Counts Seven and Eight). Second Am. Compl. at ¶¶ 68–78.  If plaintiffs prevail on their claim that there was no proper consent for the surgery performed on Jane Doe II (and, if class certification is granted, on

17

similarly situated individuals) they may be able to show that the procedure was therefore a battery or a violation of her statutorily-protected rights to habilitation services.  For that reason, the Court grants leave to amend the complaint as to Counts Six, Seven, and Eight.

### III.  CONCLUSION

For the foregoing reasons, it is this 30th day of September 2011, hereby

**ORDERED** that plaintiffs' motion for leave to file a second amended complaint [Dkt. # 213] is **GRANTED**; and it is further

**ORDERED** that the second amended complaint attached to plaintiffs' motion is deemed filed this day; and it is further

**ORDERED** that by October 21, 2011, the parties shall submit a joint case management report which shall include their proposal as to how the Court should proceed in order to resolve the remaining issues in this case.  If the parties are unable to agree, each side shall submit its own report.

Henry H. Kennedy, Jr.
United States District Judge