**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| JANE DOE I, by her conservator, Linda Tarlow, et al., |
| |
| **Plaintiffs,** |
| |
| v. |
| |
| DISTRICT OF COLUMBIA, |
| |
| **Defendant.** |

Civil Action 01-2398  (RC)

**MEMORANDUM OPINION**

In 2001, three women with significant intellectual disabilities brought this case against the District of Columbia, which cared for them through the agency now known as the Department on Disability Services.  The plaintiffs alleged that the District improperly authorized elective medical procedures to be performed on them, and thereby violated their constitutional rights.  After many years and the death of two plaintiffs, whose estates have maintained the action, the District now moves to dismiss the second amended complaint.  For the reasons stated below, that motion will be denied and this case brought to a close as expeditiously as the court can fairly manage.

**I.  BACKGROUND**

The plaintiffs in this case, who are proceeding by pseudonym, each allege that the District illegally authorized elective surgical procedures to be performed on them, in violation of their constitutional rights.  Two plaintiffs, known as Jane Does I and III, had their pregnancies aborted in 1984 and 1978, respectively.  2d Am. Compl. ¶¶ 14–20.  In 1994, Jane Doe II underwent eye surgery to correct her extropia, a condition in which one eye deviates from the other.  *Id.* ¶¶ 47–49.  Jane Does I and III chiefly contend that their abortions were illegally

authorized because constitutionally-required procedural protections were not observed.  *Id.* ¶¶ 28, 30.  Jane Doe II primarily argues that the District was required to obtain consent from her mother, who was her court-appointed advocate.  *Id.* ¶¶ 48, 57.[1]

The plaintiffs began this suit as a challenge to the policies under which the District provided substituted consent to medical procedures for intellectually disabled patients who were under its care and unable to make their own medical decisions.  Proceeding under 42 U.S.C. § 1983, the plaintiffs sought both damages and an injunction barring the District from continuing to use the substituted consent policy that was then in force.  The Honorable Henry H. Kennedy, Jr. granted the injunction, concluding that D.C. Code § 21-2210(b) required the District to make an effort to determine the wishes of an incompetent patient with regard to an elective surgery, rather than simply acting in the patient's best interests.  Because the District did not, under its then-current policy, inquire into the subjective wishes of incompetent patients in its care, Judge Kennedy found that it violated those patients' constitutionally-protected liberty interests in bodily integrity, as established by local law.  *See Doe v. District of Columbia*, 374 F. Supp. 2d 107, 112–16 (D.D.C. 2005) (preliminary injunction); *Doe v. District of Columbia*, 232 F.R.D. 18, 32–34 (D.D.C. 2005) (permanent injunction).

On appeal, the D.C. Circuit vacated the injunction.  After plaintiffs' counsel represented that their clients "lack the mental capacity to make healthcare decisions," the Circuit set out to determine whether local statutory law, on the one hand, or federal constitutional law, on the other, requires the District "to consider the healthcare wishes of intellectually disabled patients (such as the plaintiffs here) who have always lacked mental capacity to make healthcare

---

[1]  Jane Doe I proceeds by her conservator, Linda Tarlow.  Jane Does II and III have passed away over the course of this litigation.  Their estates proceed by their personal representatives.

decisions for themselves." *Doe ex rel. Tarlow v. District of Columbia*, 489 F.3d 376, 378, 380 (D.C. Cir. 2007). The Circuit found that the answer to both inquiries is "No." It explained that, under District law,

> a "decision to grant, refuse or withdraw consent" on behalf of a patient who lacks the mental capacity to make medical decisions "shall be based on the known wishes of the patient" if those wishes are ascertainable. D.C. Code § 21-2210(b). But "if the wishes of the patient are unknown and cannot be ascertained," the decision " shall be based on . . . a good faith belief as to the best interests of the patient." *Id.* It is undisputed here that plaintiffs have always lacked "sufficient mental capacity to appreciate the nature and implications of a health-care decision, make a choice regarding the alternatives presented or communicate that choice in an unambiguous manner." *Id.* § 21-2202(5); *see also Does I Through III v. District of Columbia*, 232 F.R.D. 18, 32 (D.D.C.2005); Tr. of Oral Arg. at 21, 27. Because plaintiffs have never been able to make informed choices regarding their medical treatment, their true wishes with respect to a recommended surgery "are unknown and cannot be ascertained" for purposes of § 21-2210(b). Therefore, the District of Columbia is correct that the "best interests" standard applies to the . . . plaintiffs in this case.

*Id.* at 381 (citations altered and emphases deleted) (first ellipsis in original). The Circuit went on to hold that the then-current consent policy complied with both § 21-2210(b) and the constitutional guarantee of due process. *Id.* at 382–84. It therefore directed the entry of judgment for the District "with respect to plaintiffs' claims for declaratory and injunctive relief." *Id.* at 384. The Circuit concluded by noting that "damages claims brought by Jane Doe I, Jane Doe II, and Jane Doe III based on alleged incidents that occurred more than a decade ago, before the adoption of the [then-current substituted consent] policy" were still pending before the district court. *Id.* The Circuit recognized that the damages claims were not before it, and "therefore [did] not address them." *Id.*

On remand, Judge Kennedy granted summary judgment to the District on most of the damages claims. Although the plaintiffs argued that the District only acquired the authority to

provide substituted consent for incompetent patients in 1998,[2] Judge Kennedy found that the contrary holding was implicit in the Circuit's opinion denying injunctive relief.  Relying on the law-of-the-case doctrine, he ruled that, although the Circuit had not addressed the plaintiffs' "damages claims . . . based on alleged incidents that occurred more than a decade ago, before the adoption" of the then-current substituted consent policy, *Doe*, 489 F.3d at 384, it nonetheless "decided that the District of Columbia was legally authorized to consent to [intellectually disabled patients'] surgeries" during that time period, *Doe v. District of Columbia*, 593 F. Supp. 2d 115, 125 (D.D.C. 2009).  Judge Kennedy therefore granted summary judgment to the District on the question of its authority to consent to elective surgery for the patients in its care.  *Id.*  But he found that "[a] genuine issue of material fact remains in dispute as to whether the District of Columbia had a custom or policy of failing to obtain consent from, or ignoring or overriding the wishes of" family members who were authorized to give or withhold consent to surgeries under D.C. Code § 21-2210, as Jane Doe II alleged.  *Id.*

Judge Kennedy later granted the plaintiffs leave to amend their complaint to add the claim that "the abortions performed on Jane Does I and III were unauthorized because . . . only a court can properly consent to the performance of an abortion on an incompetent woman."  *Does v. District of Columbia*, 815 F. Supp. 2d 208, 214 (D.D.C. 2011).  Noting that current District law prohibits the authorization of abortions without a court order, *id.* at 218 (citing *Doe*, 489 F.3d at 379 (citing D.C. Code § 21-2211)), but that the plaintiffs' abortions took place years before that law was enacted, Judge Kennedy turned to the argument "that constitutional due

---

[2]  *See In re Gillis*, 849 A.2d 1015, 1019 (D.C. 2004) (discussing the Mentally Retarded Citizens Substituted Consent for Health Care Decisions & Emergency Care Definition Temporary Amendment Act of 1998, D.C. Act 12-588, § 3(a), 46 D.C. Reg. 1115 (1998)).  That authority has since been revoked.  *See* D.C. Code § 21-2210(g)–(h).

process requires a court order before an abortion can be performed upon a woman incompetent to consent," *id.*  Observing that the question was a matter of first impression in the federal courts and citing federal and state cases that have found "a federal constitutional right to judicial oversight of involuntary sterilizations of the mentally ill and mentally disabled," Judge Kennedy concluded that "given the unsettled state of the law" in this area, the novel claim would "be better tested when fully briefed."  *Id.* at 219–20.  The second amended complaint also reiterated the claims brought by Jane Doe II regarding the District's alleged failure to obtain the consent (or, alternatively, its decision to override the wishes) of her mother, and added claims for battery and violations of the Mentally Retarded Citizens Constitutional Rights and Dignity Act of 1978, D.C. Code §§ 7-1301.01 *et seq.*, on behalf of all plaintiffs.  The District has moved to dismiss the new complaint and that motion is now before the court.

## II.  LEGAL STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a complaint.  *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).  Such motions allege that a plaintiff has not properly stated a claim; they do not test a plaintiff's ultimate likelihood of success on the merits.  *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974).  The complaint is only required to set forth a short and plain statement of the claim, in order to give the defendant fair notice of the claim and the grounds upon which it rests. *Kingman Park Civic Ass'n v. Williams*, 348 F.3d 1033, 1040 (D.C. Cir. 2003) (citing FED. R. CIV. P. 8(a)(2) and *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

A court considering this type of motion presumes the factual allegations of the complaint to be true and construes them liberally in the plaintiff's favor. *See, e.g.*, *United States v. Philip Morris, Inc.*, 116 F. Supp. 2d 131, 135 (D.D.C. 2000).  It is not necessary for the plaintiff to

plead all elements of his prima facie case in the complaint, *Swierkiewicz v. Sorema N.A.*, 534

U.S. 506, 511–14 (2002), or to plead law or match facts to every element of a legal theory,

*Krieger v. Fadely*, 211 F.3d 134, 136 (D.C. Cir. 2000) (internal citations omitted).  Nonetheless,

"[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as

true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009) (internal quotation marks omitted); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 562 (2007).

A claim is facially plausible when the pleaded factual content "allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at

678 (citing *Twombly*, 550 U.S. at 556).  "The plausibility standard is not akin to a 'probability

requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."

*Id.* (citing *Twombly*, 550 U.S. at 556).

The court need not accept as true inferences unsupported by facts set out in the complaint

or legal conclusions cast as factual allegations. *Warren v. District of Columbia*, 353 F.3d 36, 39

(D.C. Cir. 2004); *Browning*, 292 F.3d at 242.  "Threadbare recitals of the elements of a cause of

action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citing

*Twombly*, 550 U.S. at 555).

## III.  ANALYSIS

The intellectually disabled, like others, "have and retain their substantive constitutional

rights," *City of Cleburne v. Cleburne Ctr.*, 473 U.S. 432, 447 (1985), including the right not to

"be deprived of life, liberty, or property, without due process of law," U.S. Const. amend. V.  In

guarding that right, "[t]he Due Process Clause guarantees more than fair process, and the

'liberty' it protects includes more than the absence of physical restraint." *Washington v.

Glucksberg*, 521 U.S. 702, 719 (1997).  Among other rights, "the 'liberty' specially protected by

the Due Process Clause includes the right[ ]. . . to have children," *id.* at 720, which is "one of the basic civil rights of man," *Skinner v. Oklahoma*, 316 U.S. 535, 541 (1942); *see also Parker v. Hurley*, 514 F.3d 87, 102 (1st Cir. 2008); *Russ v. Watts*, 414 F.3d 783, 790 (7th Cir. 2005); *United States v. Williams*, 124 F.3d 411, 422 (3d Cir. 1997); *City of New York v. U.S. Dep't of Commerce*, 34 F.3d 1114, 1128 (2d Cir. 1994) (all recognizing a right to procreate founded on *Skinner*).

Of course, even rights so fundamental as the right to have children are not absolutely immune from government infringement.  "Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action," but the government may nonetheless confine someone "if it shows 'by clear and convincing evidence that the individual is mentally ill and dangerous'" to himself or others.  *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992) (quoting *Jones v. United States*, 463 U.S. 354, 362 (1983)). To confine a person who is only mentally ill or only dangerous violates his right to substantive due process, *id.*; to confine him on proof of mental illness and dangerousness by less than clear and convincing evidence denies him procedural due process, *Addington v. Texas*, 441 U.S. 418, 424 (1979).

By the same token, the Supreme Court has never reconsidered its holding that compulsory sterilization can comport with the requirements of substantive due process—that the public interest may sometimes justify involuntary sterilization.  *See Buck v. Bell*, 274 U.S. 200, 206–07 (1927).  But such a significant deprivation of liberty must be preceded by significant procedural protections.  *See, e.g.*, *Buck*, 274 U.S. at 206 (procedural due process satisfied where superintendent of state institution submits a sworn petition, notice is served upon patient and guardian, a hearing is held and a written record made, appeal to a state trial court is available,

with the opportunity to offer new evidence and receive de novo review, and a final appeal may be made to the state supreme court, which reviews the record de novo); *Vaughn v. Ruoff*, 253 F.3d 1124, 1129 (8th Cir. 2001) (involuntary sterilization "must be preceded by procedural protections"); *Mich. Protection & Advocacy Serv. v. Kirkendall*, 841 F. Supp. 796, 801 (E.D. Mich. 1993) ("[A]s a matter of federal law, this court finds that the due process . . . clause[ ] of the United States Constitution demand[s] that any involuntary sterilization . . . occur only after a full evidentiary hearing has been held to determine the propriety of such an extreme measure in relation to the rights of the patient."); *In re Hendrickson*, 123 P.2d 322 (Kan. 1942) (en banc) (sterilization statute violates 14th Amendment where inadequate notice of sterilization proceeding provided); *Brewer v. Valk*, 167 S.E. 638, 639 (N.C. 1933) (sterilization statute violated 14th Amendment because "it failed to give this plaintiff notice and a hearing of the proposed operation [as well as] an opportunity to present witnesses and be heard"); *see also In re C.D.M.*, 627 P.2d 607, 612 (Alaska 1981); *Motes v. Hall Cty. Dep't of Family & Children Servs.*, 306 S.E.2d 260, 262 (Ga. 1983); *In re Hillstrom*, 363 N.W.2d 871, 876–77 (Minn. Ct. App. 1985) (all holding that 14th Amendment requires sterilization petitions to be evaluated under a clear and convincing evidence standard).

Jane Does I and III allege that no procedural protections were provided before the District authorized their abortions.  Like sterilization, compulsory abortion infringes on a woman's right to have children.  Although it may be a lesser infringement, it is still a significant one.  As the leading scholars on the subject have noted:

> On the one hand, when a young woman has an abortion, that does not mean she can never have any children . . . .  On the other hand, . . . abortion . . . is a final, irreversible procedure in one sense: It ends the fetus's potential life. . . .

> Abortion can also effectively be permanent in another sense. When contrasted with sterilization, the reversibility of abortion is stressed . . . . But in fact if the caretaker is going continually to supervise and to opt for abortion . . . the effect on the subject's ability to reproduce is the same.

MARTHA A. FIELD & VALERIE A. SANCHEZ, EQUAL TREATMENT FOR PEOPLE WITH MENTAL RETARDATION: HAVING AND RAISING CHILDREN 140 (1999). Such an infringement of a fundamental right may, sometimes, be sufficiently justified to satisfy the requirements of substantive due process. But it must *always* be attended by procedural protections "appropriate to the nature of the case." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950); *see also Zinermon v. Burch*, 494 U.S. 113, 127 (1990) ("Due process, as this Court often has said, is a flexible concept that varies with the particular situation."); *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972) (noting that "due process is flexible and calls for such procedural protections as the particular situation demands").

 In its motion to dismiss, the District argues that the only procedural protection to which Jane Does I and III were entitled was to have a competent professional exercise appropriate judgment as to whether an abortion was in each patient's best interests. The District cites *Youngberg v. Romeo*, 457 U.S. 307 (1982), for this proposition. But *Youngberg* is not nearly so broad.

In *Youngberg*, the Supreme Court "consider[ed] . . . for the first time the substantive rights of involuntarily committed mentally retarded persons under the Fourteenth Amendment to the Constitution." *Id.* at 314 (footnote omitted).[3] Pennsylvania, which had ordered the

---

[3] As the District notes, the Fourteenth Amendment does not apply to the District of Columbia, *see District of Columbia v. Carter*, 409 U.S. 418, 423–24 (1973), but "[t]he Supreme Court has consistently applied the same standards to determine deprivation of liberty without due process under the fifth and fourteenth amendments," *Doe v. U.S. Dep't of Justice*, 753 F.2d 1092, 1105 n.13 (D.C. Cir. 1985). The complaint's occasional careless references to the Fourteenth Amendment are not fatal to the plaintiffs' case.

commitment of Nicholas Romeo, conceded that he had "a right to adequate food, shelter, clothing, and medical care," but disputed his right to "safety, freedom of movement, and training." *Id.* at 315. The Court first addressed the question of safety. Having previously held that it was cruel and unusual punishment to hold convicted criminals in unsafe conditions, the Court deduced that it must therefore also "be unconstitutional to confine the involuntarily committed—who may not be punished at all—in unsafe conditions," *Youngberg*, 457 U.S. at 316 (citing *Hutto v. Finney*, 437 U.S. 678 (1978)). The "right to freedom from bodily restraint" was similarly implicit in earlier decisions about criminal confinement; the Court reasoned that if such a right "survives criminal conviction and incarceration" then "it must also survive involuntary commitment." *Id.* The Court also concluded that, on the facts before it, the "respondent's liberty interests require the State to provide minimally adequate or reasonable training to ensure safety and freedom from undue restraint." *Id.* at 319.[4]

But the existence of those rights was not the end of the analysis, because a patient's "liberty interests in safety and freedom from bodily restraint . . . . are not absolute; indeed to some extent they are in conflict." *Id.* at 319–20. The *Youngberg* Court explained:

> In operating an institution [for the intellectually disabled], there are occasions in which it is necessary for the State to restrain the movements of residents—for example, to protect them as well as others from violence. . . .  And an institution cannot protect its residents from all danger of violence if it is to permit them to have any freedom of movement. The question then is not simply whether a liberty interest has been infringed but whether the extent or nature of the restraint or lack of absolute safety is such as to violate due process.

*Id.* at 320. To answer that question requires "balancing [a patient's] liberty interests against the relevant state interests." *Id.* at 321. And "[i]f there is to be any uniformity in protecting these

---

[4] Mr. Romeo argued that training would allow him to reduce his aggressive behaviors, thereby increasing his physical safety and reducing the need for bodily restraints. *Youngberg*, 457 U.S. at 316–19.

interests, this balancing cannot be left to the unguided discretion of a judge or jury." *Id.*  Instead,

"decisions made by the appropriate professional are entitled to a presumption of correctness," *id.*

at 324, and "liability may be imposed only when the decision by the professional is such a

substantial departure from accepted professional judgment, practice, or standards as to

demonstrate that the person responsible actually did not base the decision on such a judgment,"

*id.* at 323; *see also id.* at 323 n.30 ("By 'professional' decisionmaker, we mean a person

competent, whether by education, training or experience, to make the particular decision at

issue.").  The *Youngberg* Court held that "the Constitution only requires that the courts make

certain that professional judgment in fact was exercised," *id.* at 321 (quoting *Romeo v.

Youngberg*, 644 F.2d 147, 178 (3d Cir. 1980) (en banc) (Seitz, C.J., concurring)), in establishing

reasonably safe conditions of confinement, authorizing bodily restraints when necessary to

assure safety or provide training, and providing the training that "an appropriate professional

would consider reasonable to ensure . . . safety and to facilitate [the] ability to function free from

bodily restraints," *id.* at 324.

 In *DeShaney v. Winnebago County Social Services Department*, 489 U.S. 189 (1989), the

Court explained the source of the rights that *Youngberg* announced.  *Youngberg*, it said,

> . . . stand[s] . . . for the proposition that when the State takes a person into its
> custody and holds him there against his will, the Constitution imposes upon it a
> corresponding duty to assume some responsibility for his safety and general well-
> being.  The rationale for this principle is simple enough: when the State by the
> affirmative exercise of its power so restrains an individual's liberty that it renders
> him unable to care for himself, and at the same time fails to provide for his basic
> human needs . . . it transgresses the substantive limits on state action set by . . .
> the Due Process Clause.  The affirmative duty to protect arises . . . from the
> limitation which it has imposed on his freedom to act on his own behalf.  In the
> substantive due process analysis, it is the State's affirmative act of restraining the
> individual's freedom to act on his own behalf—through incarceration,
> institutionalization, or other similar restraint of personal liberty—which is the
> 'deprivation of liberty' triggering the protections of the Due Process Clause, not

its failure to act to protect his liberty interests against harms inflicted by other means.

*Id.* at 199–200 (citations omitted).

Many circuits have read this language to imply that *voluntarily* committed mental patients are not entitled to the "*Youngberg* rights" of food, shelter, clothing, medical care, safety, and training because the state has not affirmatively acted to restrain their freedom. *Campbell v. State of Washington Dep't of Soc. & Health Servs.*, 671 F.3d 837, 843 (9th Cir. 2011) ("Mere custody . . . will not support a [due process] claim where a 'person *voluntarily resides* in a state facility under its custodial rules.'" (quoting *Walton v. Alexander*, 44 F.3d 1297, 1305 (5th Cir. 1995) (en banc)); *Torisky v. Schweiker*, 446 F.3d 438, 446, 448 (3d Cir. 2006) ("[A] custodial relationship created merely by an individual's voluntary submission to state custody is not a 'deprivation of liberty' sufficient to trigger the protections of *Youngberg*. . . . We hold that the District Court erred in concluding that the state owes an affirmative due process duty of care to residents of a state institution who are free to leave state custody."); *Walton*, 44 F.3d at 1305 ("Although Walton's freedom was curtailed, it was he who voluntarily subjected himself to the rules and supervision of the School officials. Walton's willful relinquishment of a small fraction of liberty simply is not comparable to that measure of almost total deprivation experienced by a prisoner or involuntarily committed mental patient."); *Monahan v. Dorchester Counseling Ctr., Inc.*, 961 F.2d 987, 991 (1st Cir. 1992) ("Because the state did not commit Monahan involuntarily, it did not take an 'affirmative act' of restraining his liberty, an act which may trigger a corresponding due process duty to assume a special responsibility for his protection."); *Higgs v. Latham*, 1991 WL 216464, at *4 (6th Cir. Oct. 24, 1991) (unpublished opinion) ("Mrs. Higgs signed all the necessary papers for a *voluntary* admission, and the hospital did in fact

admit her on that basis. . . .  Thus, there was no 'affirmative act' by the hospital to deprive her of liberty, and therefore no triggering of the state's constitutional duty to protect those it renders helpless by confinement.").[5, 6]

Most circuits regard the voluntary or involuntary nature of confinement as a question of fact rather than formality, determined by whether a patient is actually free to leave.  *See, e.g.*, *Campbell*, 671 F.3d at 843–45 (concluding that state did not restrict the liberty of a mental patient so as to "convert [her] voluntary custody into involuntary custody"); *Lanman v. Hinson*, 529 F.3d 673, 681 (6th Cir. 2008) (confinement voluntary where "there is no evidence to suggest that Lanman expressed a desire to leave the hospital and defendants refused to allow him to do so"); *Torisky*, 446 F.3d at 446, 447 (noting that "even commitments formally labeled as 'voluntary' may arguably amount to *de facto* deprivations of liberty" and that "[c]ourts of

---

[5]  The Sixth Circuit has since noted that "*Higgs* is an unpublished opinion that does not bind this court in the way that a published opinion does."  *United States v. Tennessee*, 615 F.3d 646, 653 (6th Cir. 2010); *see also Lanman v. Hinson*, 529 F.3d 673, 682 n.1 (6th Cir. 2008) ("At this time, we do not need to decide whether the State owes the same affirmative constitutional duties of care and protection to its voluntarily admitted residents as it owes to its involuntarily committed residents under *Youngberg*." (discussing *Higgs* as an unpublished opinion)).

[6]  It is unclear whether the Second Circuit accepts this line of authority.  Before *DeShaney*, it held that voluntary residents of a state school for the mentally retarded were entitled to certain *Youngberg* rights.  *See Society for Good Will to Retarded Children, Inc. v. Cuomo*, 737 F.2d 1239, 1245 (2d Cir. 1984) ("We need not decide whether . . . residents are at [the state school] 'voluntarily' or 'involuntarily' because in either case they are entitled to safe conditions and freedom from undue restraint.").  Since *DeShaney*, it has distinguished that holding on the grounds that "*Society for Good Will* dealt with the level of care required by the Due Process Clause, but the state's obligation to provide care and funding in that case was undisputed.  When, however, the government disclaims any entitlement to continued funding, and then ends this funding, the reach of *Society for Good Will* is controlled by the Supreme Court's subsequent holding in *DeShaney* . . . ."  *Brooks v. Giuliani*, 84 F.3d 1454, 1466 (2d Cir. 1996); *accord Suffolk Parents of Handicapped Adults v. Wingate*, 101 F.3d 818, 824 (2d Cir. 1996).  The law of the Second Circuit therefore seems to be that when a state has committed itself to care for voluntary patients, it cannot provide care below *Youngberg* standards—but that circuit has not had occasion to reconsider the core holding of *Society for Good Will* in light of *DeShaney*.

appeals have looked to the particular facts of an individual's custody and, in particular, to whether the individual is free to leave state custody"); *Suffolk Parents of Handicapped Adults v. Wingate*, 101 F.3d 818, 823–24 (2d Cir. 1996) (commitment voluntary where plaintiffs would be released on their request or the request of a parent or guardian); *Kennedy v. Schafer*, 71 F.3d 292, 295 (8th Cir. 1995) (remanding for factual determination whether a patient admitted voluntarily "effectively bec[a]me an involuntary patient"); *Walton*, 44 F.3d at 1305 (student was at a state institution voluntarily where he had "the option of leaving at will, an option that was never withdrawn"); *Monahan*, 961 F.2d at 992 (commitment voluntary where "Monahan's complaint did not allege that he would have been barred from leaving [the state facility] upon request").[7]  Patients who are not free to leave a state facility are involuntarily committed to the custody of the state and therefore entitled to the substantive rights set out in *Youngberg*.[8]

Patients who are voluntarily confined do not enjoy *Youngberg* rights, but they "nevertheless possess other substantive due process rights to be free of certain state interference in their lives."  *Torisky*, 446 F.3d at 443.  To begin with, as the cases cited above establish, the state may not deprive voluntary patients of their liberty by confining them without or in excess of their consent—to do so would render the confinement involuntary.  And because the state's

---

[7]  Although this circuit has not addressed the question directly, it has noted the importance of "formal indicia in assessing whether custody attaches for *DeShaney* purposes." *Smith v. District of Columbia*, 413 F.3d 86, 94 (D.C. Cir. 2005) (citing *Harris v. District of Columbia*, 932 F.2d 10, 14 (D.C. Cir. 1991) ("Harris had not been formally committed, either by conviction, involuntary commitment, or arrest, to the charge of the District; therefore, unlike . . . *Youngberg* . . . the government had not entered into a special relationship with Harris . . . .")); *see also Butera v. District of Columbia*, 235 F.3d 637, 648 (D.C. Cir. 2001) ("In this circuit, the custody exception is narrowly construed . . . .").

[8]  Because none of these cases concerned an individual who was in fact held against his will without the benefit of a formal commitment proceeding, the courts did not have occasion to note the serious *procedural* due process concerns that such a situation would raise.

authority to confine a voluntary patient is defined by the scope of his consent, so too is its authority to impose physical restraints.  Of course, "when a patient provides valid consent to enter a state mental treatment facility, there is no deprivation of liberty at all."[9]  And "a voluntarily confined individual who is bodily restrained by State actors, related to his consented-to medical treatment," has not had his constitutional rights violated "so long as a reasonable person in the patient's position would believe that he was free to leave the State's care." *Lanman*, 529 F.3d at 681.  But "the Due Process Clause would protect a voluntarily confined individual from deprivations of liberty by state actors that exceed those authorized by his consent to treatment."  *Id.* at 682–83; *see also Torisky*, 446 F.3d at 443 n.3 ("Clearly, voluntarily committed persons have substantive due process rights to be free from unjustified or unauthorized government interference with their fundamental rights, such as the right to court access, to vote, and to marry."); *cf. Skinner*, 316 U.S. at 541 (right to have children).  Such involuntary deprivations of liberty can only be imposed pursuant to constitutionally adequate procedures.

---

[9]  *Id.* at 446 (citing *Zinermon*, 494 U.S. at 117 n.3).  As the Supreme Court has recognized, there are obvious "risks created by the application of the informed-consent requirement to the special context of mental health care."  *Zinermon*, 494 U.S. at 134.  The chief "risk is that some persons who come into . . . mental health facilities will . . . be willing to sign forms authorizing admission and treatment, but will be incompetent to give" informed consent.  *Id.* at 133.  "Such a person thus is in danger of being confined indefinitely without benefit of the procedural safeguards of the involuntary placement process, a process specifically designed to protect persons incapable of looking after their own interests."  *Id.*; *see also id.* at 133 n.18 ("The characteristics of mental illness thus create special problems regarding informed consent.  Even if the State usually might be justified in taking at face value a person's request for admission to a hospital for medical treatment, it may not be justified in doing so, without further inquiry, as to a mentally ill person's request for admission and treatment at a mental hospital.").  This is especially troubling as "[p]ersons who are mentally ill and incapable of giving informed consent to admission would not necessarily" qualify for involuntary commitment—they might, for instance, not be a danger to themselves or others.  *Id.* at 133.  An incompetent individual cannot give constitutionally adequate consent to his confinement or restraint, *see id.* at 135–36, but a duly appointed guardian may consent in his place.

To sum up: under *Youngberg*, the involuntarily committed enjoy the right to a minimum level of care and safety, and the state may (sometimes and for some reasons) physically restrain them. Seen one way, the state's authority to impose bodily restraints is the necessary consequence of its obligation to ensure reasonable safety. *See Youngberg*, 457 U.S. at 320; *id.* at 324 (emphasizing that the state "may not restrain residents except when and to the extent professional judgment deems this necessary to assure [their] safety or to provide needed training"). From another perspective, the minimal procedural protections to which an involuntary patient is entitled before being restrained—the exercise of appropriate professional judgment, and nothing more—are constitutionally tolerable only because he has necessarily had the benefit of "a prior due process proceeding that significantly curtail[ed] his basic liberty interest." *United States v. Charters*, 863 F.2d 302, 306 (4th Cir. 1988) (en banc); *see Addington*, 441 U.S. at 424. The state has proven by clear and convincing evidence that the patient is both mentally ill and a danger to himself or others, *see Foucha*, 504 U.S. at 80; the imposition of bodily restraint when necessary to ensure his safety or that of others therefore "bear[s] some reasonable relation to the purpose for which the individual is committed," *Jackson v. Indiana*, 406 U.S. 715, 738 (1972); and in that "particular situation," *Morrissey*, 408 U.S. at 481, the exercise of professional judgment provides all the process that is due. But *Youngberg*'s limited holding does not diminish the fact that "the protections of the Due Process Clause, both *substantive and procedural*, may be triggered when the State, by the affirmative acts of its agents, subjects an involuntarily confined individual to deprivations of liberty which are not among those generally authorized by his confinement." *DeShaney*, 489 U.S. at 200 n.8 (emphasis added).

By contrast, the state may physically restrain a voluntarily committed individual if—and

only if—he has consented to the restraint. It may not confine or restrain him against his will without affording him the benefit of a constitutionally adequate hearing. *See Foucha*, 504 U.S. at 80; *Addington*, 441 U.S. at 424. Nor can the state infringe on other liberty interests unless the patient has given his consent, *Torisky*, 446 F.3d at 443 n.3, or the state has demonstrated an adequate justification by means of a fair procedure, *see, e.g.*, *Zinermon*, 494 U.S. at 125.

With that framework in mind, the court returns to the District's argument that, under *Youngberg*, it had the power to authorize the abortions of Jane Does I and III, limited only by the requirement that it employ appropriate professional judgment when exercising its authority. As discussed above, *Youngberg* governs cases of involuntary commitment, and provides the government with the explicit authority to impose physical restraints pursuant to professional judgment. The District's argument from *Youngberg* has three fatal flaws. First, Jane Does I and III do not allege that they were involuntarily committed. To the contrary, in their motion papers they claim that they were committed *voluntarily*. Pltfs.' Opp. at 15. Although the court must confine itself to the pleadings on this motion to dismiss, it must also draw any reasonable inferences in the plaintiffs' favor. The court therefore assumes that the plaintiffs' commitment was voluntary, in which case the *Youngberg* regime simply does not apply. *See Campbell*, 671 F.3d at 843; *Torisky*, 446 F.3d at 446, 448; *Walton*, 44 F.3d at 1305; *Monahan*, 961 F.2d at 991. Secondly—and centrally—even if *Youngberg* somehow applied in full, the District has offered no argument that elective abortion is analogous to physical restraint in the ways that led the *Youngberg* Court—which emphasized that the question of "severe intrusions on individual dignity, such as . . . surgical intervention" was not before it, 457 U.S. at 313 n. 14—to conclude that mere professional judgment provided procedural due process. It is not obvious that purely elective abortion would ever be—as bodily restraint sometimes is—necessary to ensure the

safety of the patient or others.  *Cf.* Def.'s Mot. at 12 (discussing *Rennie v. Klein*, 720 F.2d 266, 269 (3d Cir. 1983) (en banc) (Garth, J.) (approving of the administration of antipsychotic drugs to involuntary patients where "such an action is deemed necessary *to prevent the patient from endangering himself or others*" (emphasis added))).  As the District makes no argument in this vein, the court will not take up the question itself but only note that a simple citation to *Youngberg* does not prove that any patients, much less those committed voluntarily, must allow the state to abort their pregnancies whenever its professional judgment dictates.  Finally, even if *Youngberg* did prove that proposition, the plaintiffs do not concede that professional judgment was in fact exercised in authorizing their abortions.  *See* Pltfs.' Opp. at 15. The court obviously cannot resolve that question against them on a motion to dismiss.

Although *Youngberg* does not prove its case, the District could still prevail by showing either that Jane Does I and III in fact consented to their abortions, or that those procedures were ordered for adequate reasons, pursuant to constitutionally acceptable procedures.  Here, those inquiries—usually separate—are bound up in each other.  No one suggests that Jane Does I and III were competent to consent to their abortions; indeed, their counsel conceded their incompetence on appeal.  *See Doe*, 489 F.3d at 378.  What the District argues instead is that *it* was lawfully entitled to consent to the plaintiffs' abortions.  For that to be so, the District must have acquired its authority by means of a procedure adequate to protect the plaintiffs' right to have children against unjustified government infringement.  As the Second Circuit has explained, "state procedures for obtaining consent . . . serve . . . to protect the substantive, federal liberty interests" implicated by the authorization of medical procedures.  *Blouin ex rel. Estate of Pouliot v. Spitzer*, 356 F.3d 348, 363 (2d Cir. 2004).  It goes without saying that "federal law, not state regulations, determines the procedures necessary to protect that liberty

18

interest." *Id.*; *see also Vitek v. Jones*, 445 U.S. 480, 491 (1980) (noting that the minimum requirements of procedural due process are "a matter of federal law").  As Judge Kennedy noted in granting the plaintiffs leave to amend their complaint, there is reason to think that even if the District had provided procedures for determining incompetency and authorizing surgery that were sufficiently protective of the plaintiffs' right to bodily integrity, greater protections may attach to decisions regarding their right to have children.  *Compare Doe*, 593 F. Supp. 2d at 125, *with Doe*, 815 F. Supp. 2d at 219–20.

And in any case, the court cannot determine the adequacy of the procedural protections provided to Jane Does I and III in the course of determining their incompetency and authorizing their abortions without knowing what those procedures were—information that is not currently before the court.  For that reason and others discussed above, the court will not dismiss the plaintiffs' claims that their rights to have children were unlawfully infringed.

Nor will the court dismiss the claim of Jane Doe II that her constitutional rights were violated when the District ignored or overrode the wishes of her mother with respect to her surgery.  The validity of that claim is the law of this case.  *See Doe*, 593 F. Supp. 2d at 125.

The District's remaining arguments can be discussed in brief.  The District argues that the plaintiffs' right to decline medical treatment was not violated, and the plaintiffs concede the point.  *See* Pls.' Opp. at 15.  The District also notes, correctly, that despite the complaint's discussion of sterilization, *see, e.g.*, 2d Am. Compl. ¶¶ 24–26, no plaintiffs allege that they have been sterilized.[10]  Next, the District argues that the plaintiffs' claims for violations of the

---

[10]  The court understands that the complaint's references to sterilizations and putative classes may presage a motion to join additional parties or to re-certify a class action.  The court will of course consider any such motions when made, but notes that the Circuit has held injunctive relief to be unavailable, *see Doe*, 489 F.3d at 384, and that Judge Kennedy has held class certification for damages claims to be inappropriate, *see Doe v. District of Columbia*, 2006

Mentally Retarded Citizens Constitutional Rights and Dignity Act of 1978, D.C. Code §§ 7-

1301.01 *et seq*., should be dismissed.  Under that law, "any person who violates or abuses any

rights or privileges protected by this chapter *shall be liable for damages as determined by law*,

for court costs and for reasonable attorneys' fees."  *Id.* § 7-1305.14(c) (emphasis added).  One

judge in this district has found that this language does not create a private right of action,

reasoning that "[a]lthough the statute may create a statutory duty, the fact that it allows for

damages 'as determined by law' suggests that the statute creates only a common law remedy,"

*Karaahmetoglu v. Res-Care, Inc.*, 480 F. Supp. 2d 183, 187 (D.D.C. 2007), the court agrees that

"[t]he phrase 'as determined by law' merely specifies how the monetary damages available

under the statute are to be calculated" and that "the availability of a common law remedy does

not preclude the availability of a statutory cause of action," *Harvey v. Mohammed*, 841 F. Supp.

2d 164, 190 (D.D.C. 2012); *see also Doe*, 815 F. Supp 2d at 220 (noting the "apparent provision

of a private right of action" in D.C. Code § 7-1305.14(c)).[11]  And, contrary to the District's

argument, supplemental jurisdiction can be exercised over claims grounded in local law.  The

District argues that the battery claims should be dismissed because the District's consent to the

surgeries was substantively and procedurally proper, and so there was no harmful or offensive

touching.  The court has already rejected that premise.  Finally, the court declines to revisit

Judge Kennedy's holding—which is, of course, the law of this case—that the statute of

limitations and the doctrine of laches do not bar these claims.  *See Doe*, 232 F.R.D. at 30–32.

WL 2864483, at *5 (D.D.C. Oct. 5, 2006).

[11]  In its reply brief, the District for the first time raises the argument that the plaintiffs'
claims based on D.C. Code § 7-1305.13 should be dismissed, because that law only provides for
prospective relief.  The court will not consider those arguments on this motion. *See Am.
Wildlands v. Kempthorne*, 530 F.3d 991, 1001 (D.C. Cir. 2008); *Jones v. Mukasey*, 565 F. Supp.
2d 68, 81 (D.D.C. 2008) (both refusing to consider arguments first raised in a reply brief).

## IV.  CONCLUSION

This case involves weighty allegations that have long awaited resolution.  For the reasons discussed above, the court concludes that they must remain unresolved somewhat longer, and will therefore deny the District's motion to dismiss.

Rudolph Contreras
United States District Judge

Date: February 1, 2013