**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| JANE DOE I, *by her conservator and next friend, Robert Dinerstein, et al.*, | : | | |
| | : | | |
| | : | | |
| Plaintiffs, | : | | |
| | : | Civil Action No.: | 01-2398 (RC) |
| v. | : | | |
| | : | Re Document Nos.: | 326, 328 |
| DISTRICT OF COLUMBIA, | : | | |
| | : | | |
| Defendant. | : | | |

<u>**MEMORANDUM OPINION**</u>

GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT,
AND GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR
PARTIAL SUMMARY JUDGMENT

## I. INTRODUCTION

Plaintiffs Jane Doe I, Jane Doe II, and Jane Doe III, who brought suit against Defendant

the District of Columbia in 2001, were women with intellectual disabilities committed to the

District's care. Plaintiffs' original complaint alleged that the District denied them constitutional

due process by consenting, against their wishes, to elective surgeries they received—which, for

Jane Doe I and Jane Doe III, were elective abortions. After fifteen years of litigation, those

claims' core allegations remain unresolved and are reiterated in Plaintiffs' Second Amended

Complaint, which brings additional common law battery and District of Columbia statutory

claims against the District.

The parties now move for summary judgment on the District's liability for the due

process and battery claims, as well as for Plaintiffs' claims brought under D.C. Code

§ 7-1305.14, which provides a statutory cause of action for civil rights deprivations based on an

individual's intellectual disability. The District also moves for summary judgment on Plaintiffs'

claims brought under D.C. Code § 7-1305.13, which provides a statutory cause of action to compel the District to provide any rights guaranteed to intellectually disabled individuals under the District's Mentally Retarded Citizens Constitutional Rights and Dignity Act of 1978.

On review of the parties' filings and the record presented, the Court determines that the undisputed facts require the Court to conclude, as a matter of law, (1) that the District did not provide Jane Doe I and Jane Doe III with constitutionally adequate procedures before the District authorized abortions on their behalf, (2) that the District followed its official policies when doing so, (3) that the resulting abortions were therefore violations of Jane Doe I and Jane Doe III's procedural due process rights, (4) that the District is also liable for battery by failing to obtain valid consent for Jane Doe I and Jane Doe III's abortions; and (5) that the abortions violated Jane Doe I and Jane Doe III's rights under D.C. Code § 7-1305.14. The Court accordingly will enter judgment for Plaintiffs on Jane Doe I and Jane Doe III's due process claims, on their battery claims, and on their claims under D.C. Code § 7-1305.14. But because D.C. Code § 7-1305.13 provides a cause of action for only prospective relief, which Plaintiffs do not seek, the Court will enter judgment for the District on Plaintiffs' claims brought under that section. And because, for Jane Doe II, Plaintiffs do not assert a liberty interest protected by the substantive component of the Fifth Amendment's Due Process Clause, the Court will enter judgment for the District on Jane Doe II's due process claim to the extent that it alleges a substantive due process violation and not a procedural due process violation.

Genuine issues of material fact persist regarding whether the District denied Jane Doe II's family members the right to give or withdraw consent for Jane Doe II's surgery in accordance with the expectation created by a District statute. Accordingly, the Court will deny the parties' motions for summary judgment (1) on Jane Doe II's due process claim, to the extent

that it alleges a procedural due process violation and not a substantive due process violation;

(2) on Jane Doe II's battery claim; and (3) on Jane Doe II's claim under D.C. Code § 7-1305.14.[1]

## II. BACKGROUND

### A. Care for the Intellectually Disabled in the District of Columbia

Forest Haven was a District institution located in Laurel, Maryland that served the

District's intellectually disabled population. *See Does I Through III v. District of Columbia*, 216

F.R.D. 5, 7 (D.D.C. 2003) (describing Forest Haven).[2] Plaintiffs in this case were all residents at

Forest Haven for some period of time before its closure. *See* First Am. Compl. ¶ 7, ECF No. 91;

Answer to the First Am. Compl. ¶ 7, ECF No. 90. In 1978, the District consented to a judgment

that found that the care provided at Forest Haven violated residents' federal constitutional rights,

that prohibited any further admissions to Forest Haven, and that set an initial schedule for

gradually deinstitutionalizing residents. *Evans v. Washington*, 459 F. Supp. 483, 484, 487–88

(D.D.C. 1978).

Later that year, the District Council enacted the Mentally Retarded Citizens

Constitutional Rights and Dignity Act of 1978, which sought "[t]o secure constitutional rights to

[intellectually disabled] persons" and "to provide and define rights of procedural due process . . .

---

[1] The Court also denies as moot Plaintiffs' request for oral argument on their motion for partial summary judgment. *See* Pls.' Mot. Partial Summ. J. 1, ECF No. 328.

[2] Although the record in this case uses the terms "developmentally disabled," "feeble-minded," "intellectually disabled," and "mentally retarded" interchangeably, the Court—like the current D.C. Code—uses the term "intellectually disabled" to refer to Plaintiffs and similar persons in the District's care. *See generally, e.g.*, D.C. Code § 7-1301.02 (referring to "residents of the District of Columbia with intellectual disabilities" and to "persons with intellectual disabilities" when stating the purpose of the present codification of the Mentally Retarded Citizens Constitutional Rights and Dignity Act of 1978); *id.* § 21-2203(2) (noting that a "diagnosis of an intellectual disability" is not a reason to infer mental incapacity to make a health-care decision).

for such persons." Mentally Retarded Citizens Constitutional Rights and Dignity Act of 1978, pmbl., No. 2-297, 25 D.C. Reg. 5094, 5094 (Nov. 8, 1978) (act codified as amended at D.C. Code §§ 7-1301.01 to 7-1306.05). For intellectually disabled individuals residing in the District's care, the Act created procedures that allowed relatives or medical officers to consent on the individuals' behalf to essential surgeries in medical emergencies, but it did not enact similar procedures for elective surgeries. *See id.* § 507, 25 D.C. Reg. at 5130–31 (originally codified at D.C. Code § 7-1305.07) (repealed 2008).

The District nonetheless had a policy in place from 1978 until 1990 for elective surgeries: a District official would "sign consent forms . . . for elective surgery without having been appointed guardian and without consulting with the person having surgery." *Does I Through III v. District of Columbia*, No. 01-2398, 2006 WL 2864483, at *1 (D.D.C. Oct. 5, 2006); *accord* Def.'s Statement of Undisputed Material Facts ¶¶ 5–6, ECF No. 326-30 [hereinafter Def.'s Statement]; Pls.' Statement of Undisputed Material Facts ¶¶ 4–6, ECF No. 328-1 [hereinafter Pls.' Statement].[3] This policy remained in place even after the District of Columbia Council enacted the Health-Care Decisions Act of 1988, which declared that

> "[a]n individual shall be presumed capable of making health-care decisions unless certified otherwise under . . . this act";
>
> "[m]ental incapacity to make a health-care decision shall not be inferred from the fact that an individual . . .[i]s [intellectually disabled] or has been determined by the court to be incompetent to refuse commitment";

---

[3] The District objects to Plaintiffs' Statement of Undisputed Material Facts as a whole and contends that it "liberally mixes immaterial facts with arguments and legal conclusions." *See* Def.'s Resp. Pls.' Statement of Undisputed Material Facts 1, ECF No. 335-1 [hereinafter Def.'s Opp'n Statement]. Because the District has not filed a motion to strike Plaintiffs' Statement, the Court will not analyze the merits of the District's objection. In this opinion, the Court cites to Plaintiffs' Statement to support only facts on which the parties agree or descriptions of Plaintiffs' contentions.

"[m]ental incapacity to make a health-care decision shall be certified by 2 physicians"; and

"[i]n the absence of a durable power of attorney for health care and provided that the incapacity of the principal has been certified," consent to a health-care service, treatment, or procedure may be given, in the order of priority below, by

> "(1) [a] court-appointed guardian or conservator of the patient, if the consent is within the scope of the guardianship or conservatorship;
> (2) [t]he spouse of the patient;
> (3) [a]n adult child of the patient;
> (4) [a] parent of the patient;
> (5) [a]n adult sibling of the patient; or
> (6) [t]he nearest living relative of the patient."

Health-Care Decisions Act of 1988, §§ 4, 5(a), 11(a), No. 7-189, 35 D.C. Reg. 8653, 8654, 8660–61 (Dec. 1, 1988) (codified as amended at D.C. Code §§ 21-2203, 21-2204(a), 21-2210(a)).

Indeed, despite how it differed from the Health-Care Decisions Act's requirements, the District's policy for intellectually disabled individuals' elective surgeries was put in writing in 1990. *See Does I Through III*, 2006 WL 2864483, at *1 ("In April 1990, [the District's] longstanding policy was put in writing."); *accord* Def.'s Statement ¶ 6; Pls.' Statement ¶ 7. In Forest Haven's written Policy H-18, the District detailed procedures for granting permission for residents' medical, dental, or surgical treatment, including elective surgeries: although either a resident's parent or the Forest Haven Superintendent could give informed consent for a resident's elective surgery, the Superintendent could also give consent alone, after discussing the matter with a medical officer. *See* Def.'s Statement ¶ 7; Pls.' Statement of Disputed Material Facts ¶ 7, ECF No. 337-20 [hereinafter Pls.' Opp'n Statement]; Pls.' Statement ¶¶ 7–8.[4] The

---

[4] Policy H-18, dated April 10, 1990, appears to have replaced another written Policy H-18, dated September 9, 1988, that addressed the same subject matter. *See* Def.'s Ex. 4, ECF No. 326-4 (reproducing the 1990 version of Policy H-18, which declares in a concluding paragraph that "Policy Directive No. H-18 . . . , dated September 9, 1988, is hereby revised and should be removed from the policy manual and/or record file and destroyed"). Because the

record shows that, in implementing Policy H-18, the District's staff would not always make

contact with residents' family members or guardians before a medical procedure. *See generally*

Hubbard Dep. 124:2–20, Def.'s Ex. 5, ECF No. 326-5 (indicating that the District would look for

a parent or relative to sign a consent form, but estimating that two-thirds of intellectually

disabled people in the District's care lacked a "next of kin" or guardian); Washington Dep.

61:5–67:1, 122:15–18, Pls.' Ex. 53, ECF No. 337-15 (explaining how one District employee

attempted without success to contact a resident's family members).

Meanwhile, between 1978 and Forest Haven's ultimate closure in 1991, the District

moved former Forest Haven residents out of Forest Haven and into community-based facilities,

though the institution continued to house individuals during the transition period. *See Evans v.*

*Fenty*, 701 F. Supp. 2d 126, 131 (D.D.C. 2010) ("By October 1991, all plaintiffs had been moved

from Forest Haven and the institution was closed."). Throughout the period before Forest

Haven's 1991 closure, the District's Mental Retardation and Developmental Disabilities

Administration (MRDDA) operated Forest Haven. *See generally id.* at 137 (noting that the

MRDDA served *Evans* class members, who were all Forest Haven residents); Pls.' Ex. 35, ECF

No. 330-2 (reproducing a medical consent form showing in the header that Forest Haven was run

under MRDDA's authority); Pls.' Ex. 60, ECF No. 342-3 (reproducing a Forest Haven policy

---

parties agree that between 1978 and 1990 the District's policy for elective surgeries was to sign
consent forms without having been appointed guardian and without consulting with the person
having surgery, the Court will assume that the 1988 version of Policy H-18, if it existed,
memorialized the 1978–1990 policy on which the parties agree. *See* Def.'s Statement ¶ 6; Pls.'
Statement ¶ 7.

In addition, the parties have produced copies of Policy H-18 that each appear to have at
least one missing page. *See* Def.'s Ex. 4, ECF No. 326-4 (reproducing Policy H-18's first page,
which concludes with paragraph A.3, followed by another Policy H-18 page that appears to
begin with paragraph C.2); Pls.' Ex. 7, ECF No. 328-6 (same). Because the parties'
representations about Policy H-18's contents largely agree, the Court adopts those
representations.

manual showing the same). After intellectually disabled individuals left Forest Haven, MRDDA remained responsible for their care. *See generally* Pls.' Ex. 13, ECF No. 328-12 (noting that, as MRDDA's Administrator, Reginald Wells managed the District's human services system for individuals with intellectual disabilities, in which "[s]ervices were rendered in a variety of community settings").

Even after Forest Haven closed in 1991, however, the District's policy for elective surgeries remained largely the same. The District's written policy from 1992, Policy H-6, provided that

> "[t]he MRDDA Administrator is responsible for signing the informed consent form";

> "[t]he Administrator will sign the Informed Consent Form after being adequately advised of the need for the elective . . . surgical . . . treatments, expected outcome . . . , nature and degree of risks . . . , and the impact of abstaining from treatment procedure by the primary care physician";

> "[f]amily contact is attempted by the physician or nurse at the most current or last telephone number listed";

> "[i]f the family cannot be reached at [the most current or last telephone] number, permission to send a mailgram, to the most current or last known address, is obtained";

> "[i]nformed consent obtained from the family must have two staff signatures on the Informed Consent Form"; and

> "[t]he primary care physician . . . is re[s]ponsible for providing family with detailed information concerning the treatment or procedure planned for the customer."

Def.'s Ex. 7, ¶¶ B.1–4, ECF No. 326-7 (reproducing Policy H-6); Pls.' Ex. 11, ¶¶ B.1–4, ECF No. 328-10 (same). The policy did, however, state that "[i]nformed consent must be given by the parent or [g]uardian." Pls.' Ex. 11 (stating so in the introduction to the policy). But despite that apparent change to the previous policy, the 1992 policy reiterated that a District official (now the MRDDA Administrator, previously the Forest Haven Superintendent) could sign informed

consent forms for elective surgeries, even if the intellectually disabled individual or her family members had not consented. *See* Def.'s Statement ¶ 13; Pls.' Statement ¶¶ 9–10.

The record identifies three key District employees who were, in the 1980s and 1990s, responsible for the care of the intellectually disabled population residing in Forest Haven and other District facilities. Reginald Wells was Forest Haven's Superintendent from May 1984 until January 1986. *See* Pls.' Ex. 13, ECF No. 328-12 (reproducing Mr. Wells's resume). Succeeding Mr. Wells, Clifford Hubbard was Forest Haven's Superintendent from 1986 until 1991, when Forest Haven closed. Hubbard Dep. 295:22–296:2, Pls.' Ex. 4, ECF No. 328-5. Afterward, he served for a time as MRDDA's Acting Administrator. *See id.* at 350:1–6; Pls.' Ex. 12, ECF No. 328-11 (reproducing a consent form from 1994, in which the title "Acting Administrator, MRDDA" appears below Mr. Hubbard's name). Lastly, Francis Bowie was MRDDA's Acting Administrator from March 1995 until March 1996, and MRDDA's Administrator from March 1996 until at least 1999. *See* Bowie Dep. 1, 9:11–10:8, Pls.' Ex. 8, ECF No. 328-7 (recounting, in a 1999 deposition, Ms. Bowie's MRDDA employment).

### B.  Jane Doe I

On May 19, 1960, Jane Doe I was committed to the District's care and became a Forest Haven resident. *See* Def.'s Ex. 1, ECF No. 326-1 (finding in a court decree that Jane Doe I was "a[n] [intellectually disabled] person who requires supervision, control, and care," and committing her "to the District Training School [Forest Haven] as a public patient"); Def.'s Ex. 35, ¶ 2, ECF No. 340-1 (alleging, in a District petition from 1988 or shortly afterward, that Jane Doe I "was committed to Forest Haven in 1960"); First Am. Compl. ¶ 7, ECF No. 91;

Answer to the First Am. Compl. ¶ 7, ECF No. 90.[5] Jane Doe I resided at Forest Haven until at least the mid-1970s. *See Does I Through III v. District of Columbia*, 216 F.R.D. 5, 7 (D.D.C. 2003) ("From the time of [her] institutionalization through 1978, [Jane Doe I] resided in Forest Haven . . . ."); Def.'s Ex. 35, ¶ 2, ECF No. 340-1 (alleging that "[i]n 1977 [Jane Doe I] was outplaced to a group home"). She gave birth to a son in 1982. *See* Def.'s Ex. 8, ¶ 1, ECF No. 326-8 (noting, in findings of fact issued after a court hearing, that Jane Doe I "gave birth to her child on July 22, 1982" and "is learning by caring for her son"); Jane Doe I Dep. 10:2–7, Pls.' Ex. 24, ECF No. 328-22 (agreeing that Jane Doe I's son was born on July 22, 1982).

A District of Columbia Superior Court Hearing Commissioner reviewed Jane Doe I's commitment in an oral hearing on August 10, 1982. *See* Def.'s Ex. 8, ECF No. 326-8 (explaining that "[t]his matter came before the Hearing Commissioner for a six month review" and "[a]n oral hearing was held"). The Hearing Commissioner reported that, at the hearing, Jane Doe I "expressed a desire to have no more children." *Id.* ¶ 3. Because the Superior Court found that it "require[d] further medical, psychological and psychiatric information concerning the respondent's competence to decide on the use of alternative methods of birth control, specifically her competence to choose tubal ligation," the Superior Court ordered the District to "provide independent assessments" of Jane Doe I on that topic. *Id.* at 2527–28. The Superior Court

---

[5] The District alleges, without citation, that Jane Doe I was involuntarily committed at the time of the elective abortion upon which she sues, but that her commitment status later became voluntary. *See* Def.'s Mem. P. & A. Supp. Mot. Summ. J. 4, ECF No. 326 [hereinafter Def.'s Mem.]. A copy of a petition that the District filed in the District of Columbia Superior Court appears to corroborate this claim. *See* Def.'s Ex. 35, ECF No. 340-1 (reproducing the District's petition, which the District appears to have filed in 1988 or later, and which sought "an order appointing a guardian ad litem and . . . determination of whether an abortion should be performed"). The petition states that, "[o]n or about July 22, 1986," Jane Doe I was found to be only "mildly mentally retarded" and so she was discharged from her commitment. *Id.* ¶ 4. It further states that, on that date, Jane Doe I "then voluntarily admitted herself to the District of Columbia for habilitation and care after having been found competent to do so." *Id.* ¶ 4.

required the District's independent assessments to "address whether [Jane Doe I's] decision to have no more children [was] temporary or permanent." *Id.* at 2528.

Jane Doe I's case came before the District of Columbia Superior Court again on October 10, 1984, "pursuant to a request for a Court order authorizing the performance of an abortion." Def.'s Ex. 9, ECF No. 326-9; *see* Def.'s Ex. 11, ECF No. 326-11 (documenting, in docket notes for Jane Doe I, a hearing on October 10, 1984 about the "decision to have a therapeutic abortion"); Def.'s Statement ¶ 17; Pls.' Statement ¶ 19. Although the Superior Court's order implies that Jane Doe I made the request, Jane Doe I's former counsel believes that the District filed the request with the court. *Compare* Def.'s Ex. 9 (noting in the Superior Court's order that the "request for a Court order authorizing the performance of an abortion" was "requested by [Jane Doe I]"), *with* Rosenau Dep. 21:18–22, 26:14–27:5, 51:13–52:10, Pls.' Ex. 16, ECF No. 328-15 (explaining that Mr. Rosenau represented Jane Doe I at her October 1984 hearing, and recalling that a "praecipe," which only the District typically filed, initiated the matter); *and* Def.'s Ex. 11 (implying, in docket notes for Jane Doe I, that a "Praecipe" was filed on October 2, 1984).

After considering evidence, the Superior Court found that Jane Doe I was competent "to make a knowing, voluntary and informed choice regarding her pregnancy" and "to decide at [that] time whether an abortion [was] in her best interest." Def.'s Ex. 9, at ¶¶ 1–2. The Superior Court then ordered on October 11, 1984 "that the request for authorization for an abortion [was] granted." *Id.* at 2665. Notwithstanding this Superior Court order, the parties in this case have previously represented that Jane Doe I has never had the mental capacity to make medical decisions. *See Doe ex rel. Tarlow v. District of Columbia*, 489 F.3d 376, 378–79 (D.C. Cir. 2007) (explaining that, before the D.C. Circuit, the parties agreed that Plaintiffs all lacked

sufficient mental capacity to appreciate the nature and implications of a medical decision); *Doe ex rel. Tarlow v. District of Columbia*, 920 F. Supp. 2d 112, 126 (D.D.C. 2013) ("No one suggests that Jane Does I and III were competent to consent to their abortions; indeed, their counsel conceded their incompetence on appeal.").

Less than a week after the Superior Court's order, on October 16, 1984, Forest Haven Superintendent Reginald Wells signed a form consenting to Jane Doe I's abortion. *See* Pls.' Ex. 35, ECF No. 330-2. In signing the consent form, Mr. Wells followed his customary process: he spoke with the medical staff recommending the procedure; he did not speak with Jane Doe I, with her lawyer, or with a court. *See* Wells 2014 Dep. 23:14–26:1, 28:17–29:20, 54:12–20, Pls.' Ex. 14, ECF No. 328-13; *see also* Pls.' Ex. 22, ECF No. 331-3 (compiling similar consent forms Mr. Wells signed). Although the consent form implied that the abortion was "required," there is no evidence that the abortion was medically necessary for Jane Doe I. *Compare* Pls.' Ex. 35, ECF No. 330-2 ("I hereby give my consent for the *required* medical treatment or surgical operation . . . ." (emphasis added)), *with* Joint Status Report, ¶ 1, ECF No. 316 (indicating the parties' agreement that "[t]here is no evidence that Jane Doe I's abortion in 1984 was medically necessary"). On October 19, 1984, Jane Doe I's abortion was performed at Howard University Hospital. *See* Pls.' Ex. 25, ECF No. 328-23 (noting Jane Doe I's October 19, 1984 arrival and departure date in her recovery room record).

In 2014, Jane Doe I testified that she did not request an abortion in 1984, that she had not wanted the abortion, and that she had wanted to have her baby. *See* Jane Doe I Dep. 7:12–20, 9:10, 10:6–11:10, 14:18–15:6, Pls.' Ex. 24, ECF No. 328-22; *see also* Piechowski Decl. ¶ 16, Def.'s Ex. 12, ECF No. 326-12 (indicating that she made similar representations in a 2014

psychological examination).[6] However, an examining psychologist reports that, in a

psychological examination of Jane Doe I, Jane Doe I stated, without prompting, "that she did not

know she had had the [1984] abortion[] until her attorney found this information in her records

and told her about it approximately ten years ago." Piechowski Decl. ¶ 20.

### C.  Jane Doe II

Jane Doe II was committed to the District's care on May 13, 1955. *See* Def.'s Ex. 2, ECF

No. 326-2 (finding in a court decree that Jane Doe II was "a[n] [intellectually disabled] person

who requires supervision, control, and care," and committing her "to the District Training School

[Forest Haven] as a public patient"); Def.'s Ex. 27, ECF No. 326-27 (reporting May 13, 1955 as

Jane Doe II's date of admission in a 1981 Forest Haven medical assessment). She became a

Forest Haven resident, and she resided at Forest Haven for periods of time until at least the

mid-1970s. *See Does I Through III v. District of Columbia*, 216 F.R.D. 5, 7 (D.D.C. 2003); Pls.'

Ex. 30, ¶ 6, ECF No. 329-4 (recounting Jane Doe II's institutional history in the class action

complaint filed in *Evans v. Washington*, 459 F. Supp. 483 (D.D.C. 1978)); First Am. Compl. ¶ 7,

ECF No. 91; Answer to the First Am. Compl. ¶ 7, ECF No. 90. Jane Doe II's commitment status

was involuntary from 1976 (or earlier) until 2007. Pls.' Ex. 1, ¶ 6, ECF No. 328-2.

The record indicates that Jane Doe II's mother, Theresa Felton, was Jane Doe II's

"mental retardation advocate." *See* Def.'s Ex. 21, ¶ 7, ECF No. 326-21 (reproducing Findings of

Fact from a District of Columbia Superior Court review hearing on Jane Doe II's case); *id.* at

---

[6] The District objects that Jane Doe I and Jane Doe III are not competent witnesses and argues that the Court should exclude their testimony from consideration. *See* Def.'s Mem. 21–33; Def.'s Opp'n Statement ¶ 21. Because the Court will not rely on Jane Doe I or on Jane Doe III's testimony to decide the parties' motions, the Court does not address the merits of the District's objections, aside from noting that the Federal Rules of Evidence presume that "[e]very person is competent to be a witness." Fed. R. Evid. 601.

3070 (noting that Jane Doe II's mother was Jane Doe II's "appointed advocate by the Court");

*see also* Def.'s Ex. 20, ECF No. 326-20 (showing that, in correspondence on Jane Doe II's

behalf, Ms. Felton typed "Mother/Advocate" below her signature). According to her brother,

Duery Felton, Jr., Jane Doe II's family regularly visited Jane Doe II during her time at Forest

Haven and afterward. Felton Dep. 9:22–11:2, Pls.' Ex. 29, ECF No. 329-3. Mr. Felton also

recalls that Ms. Felton, in particular, regularly communicated with the District and its staff about

Jane Doe II's care. *See id.* at 11:3–12:1, 21:15–24:8; *see also* Def.'s Ex. 27, at 4150, ECF

No. 326-27 (reporting that "Mrs. Theresa Felton (mother) is very actively involved with frequent

visits").

The record refers to several medical procedures Jane Doe II underwent while in the

District's care. First, Mr. Felton recalls that, at some point between 1979 and 1983, the District

authorized a tooth extraction for Jane Doe II without consulting Jane Doe II's family. *See* Felton

Dep. 22:13–24:2. Second, in 1987, MRDDA's Acting Administrator consented on Jane Doe II's

behalf to an "esophago-gastro-duodenoscopy under general anesthesia." *See* Def.'s Ex. 14, ECF

No. 326-14. Third, on March 3, 1994, Clifford Hubbard was MRDDA's Acting Administrator,

and he signed a consent form on Jane Doe II's behalf for the eye surgery that is the focus of Jane

Doe II's claims. *See* Def.'s Ex. 17, ECF No. 326-17; Second Am. Compl. ¶¶ 47–49, ECF No.

219. The surgery intended to correct Jane Doe II's exotropia, which is a condition in which one

eye deviates from the other. *See* Def.'s Ex. 18, at 1, ECF No. 326-18 (noting Jane Doe II's

diagnosis); Hermann M. Burian, *Strabismus*, 60 Am. J. Nursing 653, 654 (1960) ("If the

nonfixating eye is turned templeward, the patient has . . . exotropia."). The eye surgery was

performed the next day, on March 4, 1994. *See* Def.'s Ex. 18 (reproducing the operative report).

According to the hospital records, Ms. Felton was present for the surgery, spoke with the operating surgeon, and accompanied Jane Doe II when she was discharged. *See* Def.'s Ex. 19, ECF No. 326-19 (reproducing the recovery room nurses' report); Pls.' Statement ¶ 23. Mr. Felton claims nonetheless that Ms. Felton did not know about the surgery beforehand, because Ms. Felton did not inform Jane Doe II's family about the surgery before it happened, which was her typical practice. Felton Dep. 31:3–32:1, 57:2–58:7, 60:18–61:5, 62:13–17, Pls.' Ex. 29, ECF No. 329-3. He also recalls that Ms. Felton was upset after the surgery and felt that Jane Doe II should not have had the surgery. *Id.* at 30:11–31:2, 58:10–59:3, 61:6–15.

After Jane Doe II's eye surgery, Ms. Felton wrote a letter, dated March 29, 1994, to the organization providing services to Jane Doe II. *See* Def.'s Ex. 20, ECF No. 326-20. In the letter, Ms. Felton acknowledged that she was present for the surgery and lodged complaints about Jane Doe II's post-operative care at the facility where Jane Doe II lived. *See id.* At a District of Columbia Superior Court review hearing on July 27, 1994, the Superior Court noted Jane Doe II's successful March 4, 1994 eye surgery. Def.'s Ex. 21, ¶ 5, ECF No. 326-21.[7]

Fourth, in November 1994, Mr. Hubbard consented on Jane Doe II's behalf to a "cystoscopy, [a] bilateral retrograde pyelogram and [an] examination performed under anesthesia." *See* Def.'s Ex. 15, ECF No. 326-15. The District has no record of an attempt to

---

[7] A handwritten "Summary Report of Court Hearing" indicates that Ms. Felton's "only concern" at the hearing was whether she had the right to review Jane Doe II's medical records. *See* Def.'s Ex. 21, at 3070, ECF No. 326-21. Because the Court does not rely on this evidence in its disposition of the parties' motions for summary judgment, the Court will not address the merits of Plaintiffs' hearsay objection to this piece of evidence. *See* Statement of Disputed Material Facts ¶ 29, ECF No. 337-20 [hereinafter Pls.' Opp'n Statement] (raising their hearsay objection); *infra* Part V.A.2.a.iii (relying on Ms. Felton's March 29, 1994 letter, not the Superior Court summary report, to find a genuine dispute of material fact on the issue of whether Ms. Felton consented to Jane Doe II's eye surgery).

contact Jane Doe II's family before Mr. Hubbard signed the consent form. Exton Dep.

41:2–42:9, 46:19–47:21, Pls.' Ex. 3, ECF No. 328-4.[8]

Fifth, on January 17, 1996, Francis Bowie had become MRDDA's Acting Administrator,

and she consented on Jane Doe II's behalf to a "[p]elvic exam with pap smear under anesthesia."

*See* Def.'s Ex. 16, ECF No. 326-16. As with the November 1994 medical procedure, the District

has no record of an attempt to contact Jane Doe II's family before Ms. Bowie signed the consent

form. *See* Exton Dep. 53:11–54:17, Pls.' Ex. 3, ECF No. 328-4.

For all these procedures, no record evidence exists of any consent forms that Ms. Felton

signed on Jane Doe II's behalf. Def.'s Statement ¶ 30 (citing to Mr. Felton's deposition

transcript, in which Mr. Felton could not recall seeing any consent forms Ms. Felton signed);

Statement of Disputed Material Facts ¶ 30, ECF No. 337-20 [hereinafter Pls.' Opp'n Statement].[9]

---

[8] The parties disagree about the extent to which testimony offered by the District's witnesses, designated to testify on the District's behalf under Federal Rule of Civil Procedure 30(b)(6), may bind the District. *See* Def.'s Mem. P. & A. Opp'n Pls.' Mot. Partial Summ. J. 17–19, ECF No. 335 [hereinafter Def.'s Opp'n] (discussing witnesses Lataunja Beckwith and Robin Exton); Pls.' Reply Supp. Mot. Partial Summ. J. 20–22, ECF No. 342 [hereinafter Pls.' Reply] (same). In this opinion, the Court cites to Robin Exton's testimony to support facts only when the District does not contend that her testimony is inappropriate evidence. *See* Pls.' Statement ¶¶ 46, 49; Def.'s Opp'n Statement ¶¶ 46, 49 (omitting any objection arguing that Ms. Exton's testimony is inappropriate evidence for whether the District attempted to contact Jane Doe II's family about particular medical procedures); *see also* Def.'s Opp'n 18 (explaining that Ms. Exton was designated to testify on the steps taken by the District when it made its decision to consent to Jane Doe II's teeth extractions, cystoscopy, bilateral retrograde pyelogram, and pap smear). The Court does not cite to Lataunja Beckwith's testimony at all. The Court therefore need not address the merits of the parties' dispute on this issue.

[9] Jane Doe II's claims in Plaintiffs' complaint principally relate to Jane Doe II's 1994 eye surgery. *See* Second Am. Compl. ¶¶ 47–49. Because Plaintiffs have not moved to amend their complaint to add Jane Doe II's other medical procedures as additional instances in which the District violated Jane Doe II's rights, the Court considers the evidence of the other medical procedures solely as factual evidence that could support or refute Jane Doe II's claims with respect to her eye surgery.

Jane Doe II died on January 15, 2007. Suggestion of Death of Jane Doe II, ECF No. 163.

Mr. Felton, as the personal representative for her estate, was substituted for Jane Doe II as a

plaintiff in this case. *See* Consent Motion for Substitution of Parties 2, ECF No. 165 (requesting

Mr. Felton's substitution); April 23, 2008 Minute Order (granting the motion).

### D.  Jane Doe III

Jane Doe III was committed to Forest Haven and to the District's care on May 24, 1967,

when she was ten years old. *See* Def.'s Ex. 3, ECF No. 326-3 (finding in a court decree that Jane

Doe III was "a[n] [intellectually disabled] person who requires supervision, control, and care,"

and committing her "to the District Training School [Forest Haven] as a public patient"); Def.'s

Ex. 22, at 2, ECF No. 326-22 (noting Jane Doe III's admission date and age of admission in a

Forest Haven medical evaluation).[10] Jane Doe III resided at Forest Haven until at least 1978. *See*

*Does I Through III v. District of Columbia*, 216 F.R.D. 5, 7 (D.D.C. 2003); First Am. Compl.

¶ 7, ECF No. 91; Answer to the First Am. Compl. ¶ 7, ECF No. 90.

A Forest Haven medical evaluation, dated June 19, 1981, indicates that Jane Doe III had

an abortion "in 9-79." *See* Def.'s Ex. 22, at 3, ECF No. 326-22 (stating that a "[u]terine

aspiration [was] performed in 9-79 at approximately 8 weeks' gestation with no complication or

aftereffects"). The medical evaluation also reported that Jane Doe III was "refusing to take

contraceptive pills" and "wishe[d] to become pregnant," and that Jane Doe III "[n]eed[ed]

counseling regarding [the] inadvisability of pregnancy." *See* Def.'s Ex. 22, at 1–3, ECF

---

[10] As with Jane Doe I, the District alleges, without citation, that Jane Doe III was
involuntarily committed at the time of the elective abortion upon which she sues, but that her
commitment status later became voluntary. *See* Def.'s Mem. 4, ECF No. 326. Some record
evidence does indicate that Jane Doe III was "[i]nstitutionalized at Forest Haven in Laurel,
Maryland for 20 years" and "released in 1988." Def.'s Ex. 25, at 1592, 1593, 1595, ECF
No. 326-25.

No. 326-22. Because the evaluation also refers to an episode of abdominal pain as occurring in 1978 and before the "subsequent pregnancy" and abortion, the date recorded for Jane Doe III's abortion ("9-79") appears to mean September 1979. *See id.* However, a District of Columbia Superior Court order notes that Jane Doe III's abortion occurred "[i]n September of 1978." *See* Def.'s Ex. 29, at 3, ECF No. 326-29.

No record evidence indicates that Jane Doe III's abortion, whether it occurred in 1978 or 1979, was medically necessary. *See* Pls.' Statement ¶ 36; Def.'s Resp. Pls.' Statement of Undisputed Material Facts ¶ 36, ECF No. 335-1 [hereinafter Def.'s Opp'n Statement]. The District has no documents about who gave consent for Jane Doe III's abortion or about the process used to obtain consent for Jane Doe III's abortion. *See* Def.'s Status Report ¶ 2, ECF No. 314; Lewis Dep. 55:12–56:8, Pls.' Ex. 19, ECF No. 328-18.

Later events provide additional details about Jane Doe III and about her abortion. Jane Doe III gave birth in 1982 to a son, who was put into foster care and later adopted. Def.'s Statement ¶ 32; Pls.' Opp'n Statement ¶ 32; *accord* Pls.' Ex. 48, at 1, 4, ECF No. 337-11. Jane Doe III later requested a sterilization procedure, and the District of Columbia Superior Court granted her request on March 24, 1984. *See* Def.'s Ex. 29, at 1, 12, ECF No. 326-29. In granting Jane Doe III's request for a tubal ligation, the Superior Court noted that her request arose from (1) her recognition "that she cannot care for more than one child" and her wish to develop her skills to care for her existing son, and (2) "the severe problems she experienced with available, alternative methods of birth control." *Id.* at 2, 11. After considering an independent psychiatric report, witness testimony, and a discussion with Jane Doe III herself, the Superior Court found by clear and convincing evidence that Jane Doe III was "legally competent" to make an informed and voluntary decision to undergo a sterilization procedure, had "carefully considered all of the

risks and benefits for several years," and had "been consistent in her desire for the tubal ligation for at least one year." *Id.* at 1–2, 11–12. The Superior Court also discussed Jane Doe III's 1978 (or 1979) abortion briefly, noting that "records and testimony indicate that [it] was a very traumatic experience for her, bringing on one of [Jane Doe III]'s most disturbed emotional periods." *Id.* at 3. Even though the Superior Court in 1984 found Jane Doe III legally competent to decide whether to undergo a sterilization procedure, the parties in this case have previously represented that Jane Doe III—like Jane Doe I—never had the mental capacity to make health care decisions. *See Doe ex rel. Tarlow v. District of Columbia*, 489 F.3d 376, 378–79 (D.C. Cir. 2007); *Doe ex rel. Tarlow v. District of Columbia*, 920 F. Supp. 2d 112, 126 (D.D.C. 2013).

A clinical neuropsychologist performed a clinical evaluation of Jane Doe III in 2001. *See* Morote Decl. 1, Pls.' Ex. 47, ECF No. 337-10. The psychologist reported that, during her meeting with Jane Doe III, Jane Doe III "consistently mentioned that having the abortion was not her choice." *Id.* at 2. Likewise, in a 2005 deposition, Jane Doe III testified that she had wanted to have her baby and that the abortion was against her will. *See* Jane Doe III Dep. 10:7–17, 11:7–12:11, Pls.' Ex. 26, ECF No. 328-24. And after an independent psychiatrist examined Jane Doe III, as well as her caretaker at the time, on July 15, 2005, the psychiatrist reported that Jane Doe III "spoke clearly and vividly about her anger and resentment about being forced to undergo that abortion" and "wanted to have that baby." Pls.' Ex. 48, at 2, 4, ECF No. 337-11. The psychiatrist also noted that, according to Jane Doe III's caretaker, Jane Doe III "spoke often of the forced abortion and having wanted to have the baby." *Id.* at 5.

Jane Doe III died on August 16, 2006. Suggestion of Death of Jane Doe III, ECF No. 164. Linda Tarlow, as the personal representative for her estate, was substituted for Jane

Doe III as a plaintiff in this case. *See* Consent Motion for Substitution of Parties 2, ECF No. 165

(requesting Ms. Tarlow's substitution); April 23, 2008 Minute Order (granting the motion).

## III.  PROCEDURAL HISTORY

Plaintiffs brought suit against the District of Columbia in 2001 and charged the District

with constitutional violations under 42 U.S.C. § 1983. *See* Compl. ¶¶ 29–41, ECF No. 1. On

behalf of themselves and a putative class of similarly situated individuals, Plaintiffs alleged that

> the District was not authorized to consent on Plaintiffs' behalf to their medical procedures;
>
> the District "failed to ascertain plaintiffs' intent," failed "to have proper informed consent obtained on their behalf," and "did not provide plaintiffs with any legal process whatever"; and
>
> it was District policy to "unlawfully authorize medical and surgical procedures for [intellectually] disabled individuals" in this manner.

*See id.* ¶¶ 22–32. Plaintiffs contended that the District therefore violated their constitutionally

protected substantive and procedural due process rights. *See id.* ¶¶ 37–40. Plaintiffs sought

damages as well as declaratory and injunctive relief. *See id.* at 10–11.

Plaintiffs' initial allegations reached a judgment in 2005. *See Does I Through III v.*

*District of Columbia*, 232 F.R.D. 18, 34 (D.D.C. 2005), *rev'd sub nom. Doe ex rel. Tarlow v.*

*District of Columbia*, 489 F.3d 376 (D.C. Cir. 2007). After certifying a plaintiff class of "[a]ll

persons with [intellectual] disabilities who receive, will receive, or have in the past received,

habilitation services from the District of Columbia, and for whom District of Columbia officials

have consented to or will consent to any elective surgical procedure since 1970," this Court

granted Plaintiffs' motion for partial summary judgment and enjoined the District from

consenting to elective surgical procedures for MRDDA consumers under its policy at the time.

*See id.* at 30–34. The Court held that, because the District's 2003 medical consent policy

neglected to require subjective inquiry into Plaintiffs' wishes or values when the District signed medical consent forms on their behalf, the policy violated Plaintiffs' due process rights. *See id.* at 33. The Court accordingly found summary judgment appropriate against the District on the issue of its liability. *See id.*

On appeal, the D.C. Circuit reversed the Court's decision and vacated the injunction. *See Doe ex rel. Tarlow*, 489 F.3d at 384. The appellate court held that the District's 2003 policy complied with District law and did not violate Plaintiffs' procedural and substantive due process rights. *See id.* at 380–84. On appeal, the parties had represented that Plaintiffs had "always lacked 'sufficient mental capacity to appreciate the nature and implications of a health-care decision, make a choice regarding the alternatives presented or communicate that choice in an unambiguous manner.'" *Id.* at 379 (quoting D.C. Code § 21-2202(5)). The parties agreed on this point, even though some evidence, now available, calls into question the notion that Jane Doe I and Jane Doe III have always lacked the capacity to make medical decisions. *See* Def.'s Ex. 9, at ¶¶ 1–2, ECF No. 326-9 (finding, in an October 11, 1984 District of Columbia Superior Court order, that Jane Doe I was competent "to decide . . . whether abortion [was] in her best interest"); Def.'s Ex. 29, at 11, ECF No. 326-29 (reproducing a District of Columbia Superior Court opinion, which found by clear and convincing evidence on March 24, 1984 that Jane Doe III was "legally competent" to make an informed and voluntary decision to undergo a sterilization procedure); *see also* Mem. P. & A. Supp. Pls.' Mot. Partial Summ. J. 1, ECF No. 328 [hereinafter Pls.' Mem.] (taking the position that Jane Doe I and Jane Doe III "possessed capacity to consent to surgery").

Relying on the parties' mutual representations about Plaintiffs' lack of capacity to make medical decisions, the D.C. Circuit then concluded that, for Plaintiffs' procedural due process

claims, "[c]onsideration of the wishes of patients who are not and have never been competent [to make medical decisions] is . . . not required by the Supreme Court's procedural due process cases." *Doe ex rel. Tarlow*, 489 F.3d at 382. The court also found Plaintiffs' substantive due process claims meritless because Plaintiffs did not show "that consideration of the wishes of a never-competent patient is 'deeply rooted in this Nation's history and tradition' and 'implicit in the concept of ordered liberty,' such that 'neither liberty nor justice would exist if the asserted right were sacrificed.'" *Id.* at 383–84 (brackets omitted) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997)).

But despite how conclusively the D.C. Circuit ruled against Plaintiffs, their claims did not disappear. On remand, the Court granted Plaintiffs leave to amend their complaint

> to "argue that the abortions performed on Jane Does I and III were unauthorized because . . . only a court can properly consent to the performance of an abortion on an incompetent woman" and to "allege that the District of Columbia had a policy or custom of authorizing abortions without such an order,"

> to "maintain . . . that Jane Doe II's surgery was performed under an illegal policy or custom of failing to obtain consent from or ignoring the wishes of family members and guardians," and

> to "allege that all three surgeries at issue here were batteries, and that they all violated the Mentally Retarded Citizens Constitutional Rights and Dignity Act of 1978."

*Does I Through III v. District of Columbia*, 815 F. Supp. 2d 208, 213–21 (D.D.C. 2011); *see also* Second Am. Compl. ¶¶ 13–78, ECF No. 219 (bringing substantive due process, procedural due process, battery, and statutory claims on behalf of all three plaintiffs). Plaintiffs' amended complaint sought damages, but not declaratory or injunctive relief. *See* Second Am. Compl. 15. In their altered form, Plaintiffs' claims survived a motion to dismiss and are still before the Court. *See Doe ex rel. Tarlow v. District of Columbia*, 920 F. Supp. 2d 112, 127 (D.D.C. 2013).

Plaintiffs have not filed a motion for class certification, and so only Jane Doe I, Jane Doe II, and Jane Doe III's individual claims are at issue.

The parties now seek summary judgment on the District's liability for Plaintiffs' due process and battery claims. *See* Def.'s Mem. P. & A. Supp. Mot. Summ. J. 37, ECF No. 326 [hereinafter Def.'s Mem.]; Pls.' Mem. 32. They also move for summary judgment on the District's liability for Plaintiffs' claims brought under D.C. Code § 7-1305.14, which provides a statutory cause of action for civil rights deprivations based on an individual's intellectual disability. *See* D.C. Code § 7-1305.14(a) ("No person shall be deprived of any civil right . . . solely by reason of  . . . having received services, voluntarily or involuntarily, for an intellectual disability."); Def.'s Mem. 37; Pls.' Mem. 1. And the District moves for summary judgment on Plaintiffs' claims brought under D.C. Code § 7-1305.13, which provides a statutory cause of action to compel the District to provide any rights guaranteed to intellectually disabled individuals under the District's Mentally Retarded Citizens Constitutional Rights and Dignity Act of 1978. *See* D.C. Code § 7-1305.13(a) ("Any interested party shall have the right to initiate an action . . . to compel the rights afforded persons with intellectual disabilities under [the Mentally Retarded Citizens Constitutional Rights and Dignity Act of 1978]."); Def.'s Mem. 37.

## IV.  LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, a court must grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one capable of affecting the substantive outcome of the litigation. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if there is enough evidence for a reasonable jury to return a verdict for the non-movant. *See Scott v. Harris*, 550 U.S. 372, 380

(2007). The inquiry under Rule 56 is essentially "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

The principal purpose of summary judgment is to streamline litigation by disposing of factually unsupported claims or defenses and determining whether there is a genuine need for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). The movant bears the initial burden of identifying portions of the record that demonstrate the absence of any genuine issue of material fact. *See* Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 323. In response, the non-movant must point to specific facts in the record that reveal a genuine issue that is suitable for trial. *See* Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 324. The non-movant may not rest upon mere allegations or denials but must instead present affirmative evidence. *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987) (citing *Anderson*, 477 U.S. at 257).

In considering a motion for summary judgment, a court must "eschew making credibility determinations or weighing the evidence," *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007), and all underlying facts and inferences must be analyzed in the light most favorable to the non-movant, *see Anderson*, 477 U.S. at 255. Nevertheless, conclusory assertions offered without any evidentiary support do not establish a genuine issue for trial. *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

## V.  ANALYSIS

### A.  Due Process

The Court first addresses Plaintiffs' constitutional claims. Alleging substantive and procedural due process violations, Plaintiffs bring their constitutional claims under 42 U.S.C. § 1983. Second Am. Compl. ¶¶ 3, 21–33, 56–67.

Section 1983 provides a remedy against any person who "under color of state law, deprives another of rights protected by the Constitution." *Collins v. City of Harker Heights*, 503 U.S. 115, 120 (1992); *see* 42 U.S.C. § 1983. To hold a municipality like the District of Columbia liable under § 1983, a plaintiff must show both a predicate violation of her constitutional rights and that the violation resulted from a government policy or custom. *See Warren v. District of Columbia*, 353 F.3d 36, 38 (D.C. Cir. 2004); *see also Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–95 (1978) (emphasizing that "it is when execution of a government's policy or custom . . . inflicts the injury that the government as an entity is responsible under § 1983"). Thus, "proper analysis requires" a court "to separate two different issues when a § 1983 claim is asserted against a municipality: (1) whether plaintiff's harm was caused by a constitutional violation, and (2) if so, whether the city is responsible for that violation." *Collins*, 503 U.S. at 120. The Court performs this two-step analysis for Jane Doe I and Jane Doe III first.

1. Jane Doe I and Jane Doe III's Abortion Claims

*a. Predicate Due Process Violations*

The Fifth Amendment's Due Process Clause declares that "[n]o person shall . . . be deprived of . . . liberty . . . without due process of law." U.S. Const. amend. V.[11] This language grounds two types of due process claims actionable under § 1983. First, through its "substantive component," it "bars certain arbitrary, wrongful government actions 'regardless of the fairness of

---

[11] Instead of the Fourteenth Amendment's Due Process Clause, the Fifth Amendment's Due Process Clause applies in the District of Columbia, a political entity created by the federal government. *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954); *Propert v. District of Columbia*, 948 F.2d 1327, 1330 n.5 (D.C. Cir. 1991). Although courts typically analyzes due process violations under the Fourteenth Amendment's Due Process Clause, "due process protections under the Fifth and Fourteenth Amendments are the same." *English v. District of Columbia*, 717 F.3d 968, 972 (D.C. Cir. 2013) (discussing procedural due process); *see also Butera v. District of Columbia*, 235 F.3d 637, 645–46 & n.7 (D.C. Cir. 2001) (discussing substantive due process).

the procedures used to implement them.'" *Zinermon v. Burch*, 494 U.S. 113, 126 (1990) (quoting

*Daniels v. Williams*, 474 U.S. 327, 331 (1986)). Second, through its "guarantee of fair

procedure," it bars state actors from depriving an individual of a constitutionally protected liberty

interest without constitutionally adequate procedures. *Id.* Intellectually disabled individuals, like

Plaintiffs here, retain both kinds of due process protections. *See generally City of Cleburne v.*

*Cleburne Living Ctr.*, 473 U.S. 432, 447 (1985) ("[T]he mentally retarded, like others, have and

retain their substantive constitutional rights in addition to the right to be treated equally by the

law.").

Plaintiffs claim that the District violated Jane Doe I and Jane Doe III's substantive *and*

procedural due process rights by authorizing Jane Doe I and Jane Doe III's abortions. *See* Second

Am. Compl. ¶ 63 (alleging that the District violated Jane Doe I and Jane Doe III's *substantive*

due process rights); *id.* ¶ 64 (alleging that the District violated Jane Doe I and Jane Doe III's

*procedural* due process rights). Because the two types of due process claims are analytically

distinct, the Court analyzes them separately. *Compare, e.g.*, *Zinermon*, 494 U.S. at 127–28

(explaining analytical principles governing procedural due process claims), *with Obergefell v.*

*Hodges*, 135 S. Ct. 2584, 2597–98 (2015) (same, for substantive due process claims); *Cruzan v.*

*Dir., Mo. Dep't of Health*, 497 U.S. 261, 278–79 (1990) (also discussing substantive due

process).

i.  Liberty Interest

As an initial step for both substantive and procedural due process claims, however,

plaintiffs must allege that the defendant deprived them of a constitutionally cognizable liberty or

property interest. *See Washington v. Glucksberg*, 521 U.S. 702, 720–22 (1997) (explaining that

the Supreme Court's "established method of substantive-due-process analysis" creates a

"threshold requirement . . . that a challenged state action implicate a fundamental right"); *see Roberts v. United States*, 741 F.3d 152, 161 (D.C. Cir. 2014) (explaining that plaintiffs must also allege that the defendant deprived them of a cognizable liberty or property interest for procedural due process claims, because procedural due process exists "to protect a substantive interest to which the individual has a legitimate claim of entitlement" (quoting *Olim v. Wakinekona*, 461 U.S. 238, 250 (1983))).[12] The Supreme Court has recognized "a general liberty interest in refusing medical treatment." *Cruzan*, 497 U.S. at 278 (citing *Vitek v. Jones*, 445 U.S. 480, 494 (1980); and *Parham v. J.R.*, 442 U.S. 584, 600 (1979)). This liberty interest includes, for instance, the "interest in avoiding the unwanted administration of antipsychotic drugs." *Id.* (quoting *Washington v. Harper*, 494 U.S. 210, 221–22 (1990)).

Here, Jane Doe I and Jane Doe III's due process claims center on their allegedly forced abortions. *See* Second Am. Compl. ¶¶ 13–33. The parties agree that Jane Doe I and Jane Doe III's interests in avoiding those abortions are constitutionally cognizable under the Due Process Clause. *See* Def.'s Mem. 15 ("A personal decision relating to procreation or contraception is a protected liberty interest."); Pls.' Mem. 5 ("The liberty interest in the right to refuse unwanted medical treatment is . . . recognized by federal law."). The Court readily concurs. After all, a forced abortion is more intrusive than "avoiding the unwanted

---

[12] To establish a substantive due process violation, plaintiffs' alleged liberty or property interest must also meet a higher standard: it must be "'deeply rooted in this Nation's history and tradition,' and 'implicit in the concept of ordered liberty,' such that 'neither liberty nor justice would exist if [it was] sacrificed.'" *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997) (citations omitted) (quoting *Moore v. City of E. Cleveland*, 431 U.S. 494, 503 (1977) (plurality opinion); *Palko v. Connecticut*, 302 U.S. 319, 325, 326 (1937)).

As discussed below, the Court finds that Plaintiffs merit summary judgment on Jane Doe I and Jane Doe II's procedural due process claims, so the Court does not discuss Jane Doe I and Jane Doe II's substantive due process claims. *See infra* note 18. The Court likewise will not here discuss whether Jane Doe I and Jane Doe III's alleged liberty interest meets the higher standard required for substantive due process violations.

administration of antipsychotic drugs," which the Supreme Court found to be a liberty interest

protected under the Due Process Clause. *Harper*, 494 U.S. at 221–22; *see also* Pls.' Reply Supp.

Mot. Partial Summ. J. 5, ECF No. 342 [hereinafter Pls.' Reply] (contending that *Harper* involved

"less substantial bodily intrusions"). *See generally Youngberg v. Romeo*, 457 U.S. 307, 313–14

n.14 (1982) (characterizing "surgical intervention" as a "severe" intrusion on individual dignity).

The Court next analyzes, briefly, whether the District deprived Jane Doe I and Jane Doe III of

their liberty interest in avoiding a forced abortion. *See Roberts v. United States*, 741 F.3d 152,

220 (D.C. Cir. 2014) ("[T]he plaintiff must show the Government *deprived* her of a 'liberty or

property interest' . . . ." (emphasis added) (quoting *Ky. Dep't of Corr. v. Thompson*, 490 U.S.

454, 460 (1989))).

ii.  Liberty Interest Deprivation

The parties do not dispute whether Jane Doe I and Jane Doe III's abortions occurred, and

evidence in the record repeatedly confirms that the abortions did occur. *See* Pls.' Ex. 25, ECF

No. 328-23 (reproducing medical records documenting Jane Doe I's abortion); Def.'s Ex. 35,

¶¶ 7–8, ECF No. 340-1 (recounting Jane Doe I's 1984 abortion in a petition that the District filed

in the District of Columbia Superior Court); *see also* Def.'s Ex. 22, at 3, ECF No. 326-22 (noting

that Jane Doe III had an abortion in "9-79," or September 1979); Def.'s Ex. 29, at 3, ECF

No. 326-29 (noting that Jane Doe III had an abortion in September 1978).

The District does, however, imply that Jane Doe I and Jane Doe III might have

themselves requested the abortions they underwent. *See* Def.'s Mem. 21–22 (arguing that "Jane

Doe I requested the abortion"); *id.* at 25 ("There is . . . no corroborating evidence that the District

forced Jane Doe III to have an abortion against her will." (emphases omitted)). But that theory of

the facts cannot survive in the face of one of the principles that has controlled this case ever since

the D.C. Circuit's 2007 decision: the idea that Jane Doe I and Jane Doe III have always lacked the capacity to make medical decisions. *See Doe ex rel. Tarlow v. District of Columbia*, 489 F.3d 376, 379, 381 (D.C. Cir. 2007). If Jane Doe I and Jane Doe III lacked capacity to make medical decisions, then their abortions could not have flowed from their own desires but must necessarily have originated from the District's consent to the abortions on Jane Doe I and Jane Doe III's behalf. Given the clear record that the abortions occurred, and given the parties' longstanding adherence to the idea that Jane Doe I and Jane Doe III lacked capacity to make medical decisions, the Court finds that Jane Doe I and Jane Doe III did suffer a deprivation of their liberty interest in avoiding a forced abortion.

The Court acknowledges that some evidence, now available, supports the District's theory of the facts. *See* Def.'s Ex. 9, at ¶¶ 1–2, ECF No. 326-9 (finding Jane Doe I "competent to decide . . . whether an abortion [was] in her best interest"); Def.'s Ex. 29, at 11, ECF No. 326-29 (finding Jane Doe III "legally competent" to make an informed and voluntary decision to undergo a sterilization procedure). But neither Plaintiffs nor the District explicitly ask this Court to revisit its previous decisions on this issue, which adopted the parties' previous representations and the D.C. Circuit's view of the matter.[13] Accordingly, the Court will not disturb the idea that Jane Doe I and Jane Doe II have always lacked the capacity to make medical decisions. *See Doe ex rel. Tarlow v. District of Columbia*, 489 F.3d 376, 379, 381 (D.C. Cir. 2007). That is the law

---

[13] *See, e.g.*, *Doe ex rel. Tarlow v. District of Columbia*, 920 F. Supp. 2d 112, 126 (D.D.C. 2013) ("No one suggests that Jane Does I and III were competent to consent to their abortions; indeed, their counsel conceded their incompetence on appeal."); *Does I Through III v. District of Columbia*, 593 F. Supp. 2d 115, 122 (D.D.C. 2009) (incorporating into the Court's analysis the fact that "Jane Doe I . . . [and] Jane Doe III . . . have never had the mental capacity to make health care decisions"); *cf., e.g.*, Def.'s Mem. 14–36 (declining to explicitly ask the Court to reconsider the issue); Mem. P. & A. Supp. Pls.' Mot. Partial Summ. J. 1–30, ECF No. 328 [hereinafter Pls.' Mem.] (same).

of the case, and the District is judicially estopped from arguing otherwise.[14] The Court therefore proceeds to an analysis of whether the District provided constitutionally adequate procedures before depriving Jane Doe I and Jane Doe III of their liberty interest in avoiding a forced abortion.

### iii.  Procedural Due Process Principles

The Court analyzes Jane Doe I and Jane Doe III's due process claims under procedural due process principles. Although claims relating to abortions often sound in substantive due process, *see, e.g.*, *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 846–53 (1992) (plurality opinion); *Roe v. Wade*, 410 U.S. 113, 152–56 (1973), Jane Doe I and Jane Doe III's principal constitutional arguments here sound in procedural due process, not substantive due process. *See* Pls.' Mem. 11–27 (arguing, after discussing the liberty interest at stake, that "due process requires a judicial hearing and application of the clear and convincing standard" and that "Plaintiffs were denied procedural due process" (capitalization omitted)). And, given that this case involves women who concededly have never been competent to make medical decisions, *see Doe ex rel. Tarlow v. District of Columbia*, 489 F.3d 376, 379, 381 (D.C. Cir. 2007), Jane Doe I and Jane Doe III's right to choose whether to have an abortion is not at issue in this case. *Cf. Casey*, 505 U.S. at 846 (recognizing "the right of the woman to choose to have an abortion before viability"). After all, the D.C. Circuit's opinion in this case foreclosed

---

[14] *See generally Crocker v. Piedmont Aviation, Inc.*, 49 F.3d 735, 739 (D.C. Cir. 1995) (explaining that the "law-of-the-case doctrine" "refers to a family of rules embodying the general concept that a court involved in later phases or a lawsuit should not re-open questions decided (i.e., established as the law of the case) by that court or a higher one in earlier phases"); *see also Abtew v. U.S. Dep't of Homeland Sec.*, 808 F.3d 895, 899–900 (D.C. Cir. 2015) ("[T]he rule of judicial estoppel 'generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase.'" (quoting *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001))).

any claim based on the District's obligation to defer to Plaintiffs' wishes, given the parties'

mutual representations about how Plaintiffs had always lacked the capacity to make medical

decisions. *See Doe ex rel. Tarlow*, 489 F.3d at 381–84 ("Consideration of the wishes of patients

who are not and have never been competent is . .  not required by the Supreme Court's

procedural due process cases."). Thus, the question of women's choice—so fundamental to the

constitutional analysis in a typical abortion case—is not present here.

Instead, accepting that Jane Doe I and Jane Doe III have never been competent to make

medical decisions, the Court focuses its inquiry on what procedures were required to ensure that

the decisions that the District made on their behalf, including any decisions about abortions, were

constitutional. To that end, a procedural due process analysis is appropriate. *See Washington v.*

*Harper*, 494 U.S. 210, 220 (1990) ("The procedural [due process] issue concerns the minimum

procedures required by the Constitution for determining that the individual's liberty interest . . .

is outweighed in a particular instance." (internal quotation mark omitted) (quoting *Mills v.*

*Rogers*, 457 U.S. 291, 299 (1982))).

Courts evaluate procedures' adequacy under the Due Process Clause by weighing several

factors:

> First, the private interest that will be affected by the official action; second, the
> risk of an erroneous deprivation of such interest through the procedures used, and
> the probable value, if any, of additional or substitute procedural safeguards; and
> finally, the Government's interest, including the function involved and the fiscal
> and administrative burdens that the additional or substitute procedural
> requirement would entail.

*Zinermon v. Burch*, 494 U.S. 113, 127 (1990) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335

(1976)). This analysis "is flexible and calls for such procedural protections as the particular

situation demands." *Mathews*, 424 U.S. at 334 (internal quotation mark omitted) (quoting

*Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)). Put another way, "[w]hat process is

30

constitutionally due cannot be divorced from the nature of the ultimate decision that is being made." *Parham v. J.R.*, 442 U.S. 584, 608 (1979).

On multiple occasions, the Supreme Court has articulated procedural due process principles that apply when the state seeks to forcibly administer antipsychotic medication to individuals committed to the state's care. *See Sell v. United States*, 539 U.S. 166, 177–85 (2003) (articulating principles governing situations in which the government seeks to "involuntarily to administer antipsychotic drugs to a mentally ill defendant facing serious criminal charges in order to render that defendant competent to stand trial"); *Riggins v. Nevada*, 504 U.S. 127, 133–38 (1992) (same, but in the context of a record that "narrowly define[d] the issues" before the Supreme Court); *Washington v. Harper*, 494 U.S. 210, 228–36 (1990) (articulating principles governing when the government may forcibly medicate a mentally ill prisoner to mitigate his dangerousness). Given that an abortion is at least as intrusive as antipsychotic medication, *see generally Youngberg v. Romeo*, 457 U.S. 307, 313–14 n.14 (1982), the Court summarizes the procedures that the Constitution requires for forced administration of antipsychotic medication, as set forth by the Supreme Court. The Supreme Court's antipsychotic medication cases and Jane Doe I and Jane Doe III's constitutional claims all address the constitutionally required procedures for administering medical treatment to a mentally disabled individual. Procedures required for antipsychotic medication therefore establish a baseline of constitutionally adequate procedures that the District should have provided to Jane Doe I and Jane Doe III before their abortions.

In the Supreme Court's antipsychotic medication cases, the Supreme Court has balanced the private interest in "avoiding the unwanted administration of antipsychotic drugs" with the government's interests (1) in maintaining safety and (2) in rendering a mentally ill defendant

competent to stand trial. *See Sell*, 539 U.S. at 178 (noting individuals' "significant" liberty interest in "avoiding the unwanted administration of antipsychotic drugs," and summarizing how the Supreme Court in *Harper* balanced that interest with the government's interest in medicating an inmate who "is dangerous to himself or others" (internal quotation marks omitted) (quoting *Harper*, 494 U.S. at 221)); *id.* at 179–83 (prescribing a similar but different analysis when the government asserts an interest in rendering a mentally ill defendant competent to stand trial). For each of these two separate balancing inquiries, the Supreme Court examined the strengths of the interests at stake and the circumstances presented before concluding that particular procedures would be constitutionally sufficient to justify unwanted administration of antipsychotic medication. *See id.* at 178–83; *see also United States v. Dillon*, 738 F.3d 284, 290 (D.C. Cir. 2013) (distinguishing the *Sell* inquiry from the *Harper* inquiry).

In *Washington v. Harper*, the Supreme Court held that administering unwanted antipsychotic medication to treat a dangerous inmate is constitutionally permissible when

(A)   A psychiatrist determines that the inmate "(1) suffers from a 'mental disorder' and (2) is 'gravely disabled' or poses a 'likelihood of serious harm' to himself, others, or their property";

(B)   The government provides the inmate with a hearing before "a special committee consisting of a psychiatrist, a psychologist, and the Associate Superintendent of the [Medical] Center, none of whom may be, at the time of the hearing, involved in the inmate's treatment or diagnosis";

(C)   The inmate receives twenty-four hours' notice of the Medical Center's intent to convene that hearing, during which time the government may not medicate him;

(D)   The inmate receives "notice of the tentative diagnosis, the factual basis for the diagnosis, and why the [medical] staff believes medication is necessary";

(E)   The inmate may attend, present evidence and witnesses, and cross-examine opposing witnesses at the hearing;

(F)   The inmate receives, at the hearing, "the assistance of a lay adviser who has not been involved in his case and who understands the psychiatric issues involved";

(G)   The government keeps minutes of the hearing and provides a copy to the inmate;

(H)   A majority of the special committee at the hearing determines "that the inmate suffers from a mental disorder and is gravely disabled or dangerous," provided that the psychiatrist is in the majority;

(I)   The inmate has the right to appeal the committee's decision to the Medical Center's Superintendent within twenty-four hours;

(J)   The Superintendent decides the appeal within twenty-four hours after its receipt;

(K)   The inmate can seek judicial review of the committee's decision in state court; and

(L)   A special committee "composed of a nontreating psychiatrist, a psychologist, and the [Medical] Center's Associate Superintendent" reviews the inmate's case periodically after the government begins administering involuntary medication.

*See Harper*, 494 U.S. at 215–16 (discussing procedures that the State of Washington provided to the inmate Walter Harper); *id.* at 217 (reporting that the committee convened to assess Mr. Harper's case found that he "was a danger to others as a result of a mental disease or disorder"); *id.* at 233 (finding Washington's procedures constitutionally adequate).

Although the Supreme Court held in *Harper* that the government need not furnish a judicial decisionmaker, the Court emphasized the "independence of the decisionmaker" as a requirement for constitutionally adequate procedures before the government administers unwanted antipsychotic medication. *See id.* at 231–33. And though a "clear, cogent, and convincing" standard of proof is unnecessary at the committee hearing, the Supreme Court emphasized the importance of the inmate's "notice" of the adversary hearing, "the right to be present" at the hearing, and the inmate's "right to present and cross-examine witnesses." *Id.* at

235. Likewise, though the government need not provide an attorney to advise the inmate, the Supreme Court noted with approval the government's "provision of an independent lay adviser who understands the psychiatric issues involved." *Id.* at 236. The Supreme Court later summarized its opinion in *Harper* as holding that, generally, "forcing antipsychotic drugs on a convicted prisoner is impermissible absent a finding of overriding justification and a determination of medical appropriateness." *Riggins v. Nevada*, 504 U.S. 127, 135 (1992).

In *Sell v. United States*, the Supreme Court performed a similar but different inquiry in a case in which the government's asserted interest was not in maintaining safety because of a dangerous and mentally ill inmate, but instead in rendering a mentally ill criminal defendant competent to stand trial. *See* 539 U.S. 166, 177–83 (2003) (performing a procedural due process inquiry into when the government may administer unwanted antipsychotic medication "solely for trial competence purposes," and distinguishing the analysis in *Sell* from the analysis in *Harper*). The Supreme Court held that the government may administer unwanted antipsychotic medication to render a mentally ill defendant competent to stand trial for serious criminal charges under limited circumstances: the treatment must be "medically appropriate," "substantially unlikely to have side effects that may undermine the fairness of the trial," and, "taking account of less intrusive alternatives, . . . necessary significantly to further important governmental trial-related interests." *Id.* at 179.

The Supreme Court further articulated four key findings that a court must make to authorize the administration of unwanted antipsychotic medication for these purposes:

> "First, the court must find that *important* governmental interests are at stake" after considering whether the government accuses the individual "of a serious crime," the possibility of civil commitment to restore the defendant's competence, and the effect that commitment might have on an eventual trial.
>
> "Second, the court must conclude that involuntary medication will *significantly further*" those important governmental interests, because the medication will

"likely . . . render the defendant competent to stand trial" and is "unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense."

"Third, the court must conclude that involuntary medication is *necessary* to further those interests," "must find that any alternative, less intrusive treatments are unlikely to achieve substantially the same results," and "must consider less intrusive means for administering the drugs, *e.g.*, a court order to the defendant backed up by the contempt power, before considering more intrusive methods."

"Fourth, . . . the court must conclude that administration of the drugs is *medically appropriate*, *i.e.*, in the patient's best medical interest in light of his medical condition," and may consider the "specific kinds of drugs at issue," as well other kinds of antipsychotic drugs and their respective side effects and success rates.

*Id.* at 180–82 (emphases in original).

Under *Harper* and *Sell*, therefore, the government must satisfy several key prerequisites before administering unwanted antipsychotic medication to an individual in its custody. The government must identify an important government interest, such as maintaining safety, or restoring a criminal defendant's competence so that he can stand trial for a serious crime. *See id.* at 180; *Riggins*, 504 U.S. at 135 (explaining that, under *Harper*, the government must establish "a finding of overriding justification"). The government must find that the medication would further that interest, such as by reducing an individual's dangerousness or by having a substantial likelihood of rendering a criminal defendant competent to stand trial. *See Sell*, 539 U.S. at 181; *Harper*, 494 U.S. at 236 (upholding Washington's policy for administering unwanted antipsychotic medication as a means of "providing appropriate medical treatment to reduce the danger than an inmate suffering from a serious mental disorder represents to himself and others"). The government must establish that the medication is in the individual's best medical interest and that no less intrusive treatments would achieve substantially the same results. *See Sell*, 539 U.S. at 181; *Riggins*, 504 U.S. at 135 (explaining that, under *Harper*, the government should demonstrate "that treatment with anti-psychotic medication was medically appropriate

and, considering less intrusive alternatives, essential for the sake of [the individual's] own safety or the safety of others"). And, to ensure that administering the medication is constitutional, the government should meet all these prerequisites by means of appropriate procedures, which should at least include procedures that provide the individual with (1) advance notice of a hearing on these issues, (2) the right to be present at the hearing, (3) the right to present and cross-examine witnesses, (4) an advisor who understands the psychiatric issues involved, and (5) an independent decisionmaker to make the ultimate determination about whether to administer unwanted antipsychotic medication. *See Harper*, 494 U.S. at 233–36.

iv.  Procedures Provided to Jane Doe I and Jane Doe III

Having described the baseline procedural requirements that the District should have provided to Jane Doe I and Jane Doe III in advance of their abortions, the Court now analyzes whether the District satisfied those requirements. Because an abortion is at least as intrusive as antipsychotic medication, *see generally Youngberg v. Romeo*, 457 U.S. 307, 313–14 n.14 (1982), the Due Process Clause required the District to provide Jane Doe I and Jane Doe III with at least the procedural protections they would have received if the District had sought to administer antipsychotic medication to them. The Court addresses each of the prerequisites that the Court has derived from the Supreme Court's antipsychotic medication cases. *See supra* Part V.A.1.a.iii (discussing *Sell v. United States*, 539 U.S. 166 (2003); *Riggins v. Nevada*, 504 U.S. 127 (1992); and *Washington v. Harper*, 494 U.S. 210 (1990)).

First, the District must identify an important government interest or overriding government justification that Jane Doe I and Jane Doe III's abortions served. *See Sell*, 539 U.S. at 180; *Riggins*, 504 U.S. at 135; *see also United States v. Weston (Weston II)*, 255 F.3d 873, 880 (D.C. Cir. 2001) (explaining that, to "medicate" a criminal defendant, the government must

prove that doing so "is necessary to accomplish an essential state policy"); *United States v. Weston (Weston I)*, 206 F.3d 9, 13 (D.C. Cir. 2000) (same). But here, the District has advanced no government interest, compelling or otherwise, to justify Jane Doe I and Jane Doe III's abortions. *See, e.g.*, Def.'s Mem. 20–22, 25–30 (arguing merely that a court hearing provided Jane Doe I with due process and that no competent evidence exists to show that Jane Doe III did not receive due process, without asserting any government interest as a reason for the abortions); Def.'s Opp'n 6–8 (same); Def.'s Reply 4, 7–11 (same). Indeed, the District has conceded that no evidence exists to show that Jane Doe I and Jane Doe III's abortions were medically necessary, and so any justification for their abortions would not be medical. *See* Joint Status Report, ¶ 1, ECF No. 316 (indicating the parties' agreement that "[t]here is no evidence that Jane Doe I's abortion in 1984 was medically necessary"); Pls.' Statement ¶ 36 ("There is no evidence indicating that it was medically necessary to perform an abortion on Jane Doe III in 1978 or 1979."); Def.'s Opp'n Statement ¶ 36 (conceding the lack of evidence of medical necessity for Jane Doe III's abortion). Nor has the District made any attempt to argue that abortions were necessary for the benefit of the public. The District thus has not established even the first procedural prerequisite to Jane Doe I and Jane Doe III's abortions.

Second, assuming that the District had identified an important government interest that Jane Doe I and Jane Doe III's abortions served, the District would have had to establish that the abortions actually served that interest. *See Sell*, 539 U.S. at 181; *Harper*, 494 U.S. at 236. Having identified no government interest that Jane Doe I and Jane Doe III's abortions served, the District also has not shown that the abortions actually served any government interest.

Third, the District must show that the abortions were in Jane Doe I and Jane Doe III's best medical interest and that no less intrusive treatments would achieve substantially the same

results. *See Sell*, 539 U.S. at 181; *Riggins*, 504 U.S. at 135; *see also Weston II*, 255 F.3d at 882–87 (engaging in an exhaustive analysis of possible "alternative means for the government to satisfy its essential policy). As noted above, the District concedes that no evidence exists to show that the abortions were medically necessary—thus implicitly also conceding that no evidence exists to show that the abortions were in Jane Doe I and Jane Doe III's best medical interest. *See* Joint Status Report, ¶ 1, ECF No. 316; Pls.' Statement ¶ 36; Def.'s Opp'n Statement ¶ 36. Furthermore, even if the District were to allege that the abortions served the District's interest in reducing "fiscal and administrative burdens," *Zinermon v. Burch*, 494 U.S. 113, 127 (1990) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)), the record also lacks evidence showing that the District considered less intrusive alternatives and found them "unlikely to achieve substantially the same results," *Sell*, 539 U.S. at 181. *See generally, e.g.*, Pls.' Ex. 35, ECF No. 330-2 (reproducing the District's consent form for Jane Doe I's abortion, which has neither an analysis of why a "[p]regnancy [t]ermination" was appropriate nor an assessment of alternatives to a pregnancy termination). On this point, the record indicates that, despite the potential fiscal and administrative burdens on government resources, the District has accommodated a less intrusive alternative to abortion: in 1982, Jane Doe III gave birth to a child, who was then placed in foster care. *See* Def.'s Ex. 29, at 3, ECF No. 326-29 (recounting Jane Doe III's relationship with her son in a District of Columbia Superior Court opinion on Jane Doe III's request for a sterilization procedure). In light of the record, therefore, the District has neither established that Jane Doe I and Jane Doe III's abortions were in their best medical interest nor established that no less intrusive treatments could have served the District's interest in authorizing the abortions.

Fourth, even assuming that the District had made a preliminary showing of the first three prerequisites, the District must show that it satisfied those prerequisites by means of constitutionally appropriate procedures. *See Harper*, 494 U.S. at 228 ("[P]rocedural protections are necessary to ensure that the decision to medicate . . . is neither arbitrary nor erroneous . . . ."). To that end, the District should at least show (1) that it provided to Jane Doe I and Jane Doe III with advance notice of hearings to determine whether abortions were appropriate for them; (2) that it allowed Jane Doe I and Jane Doe III the right to be present at any hearings convened for that purpose; (3) that it allowed Jane Doe I and Jane Doe III to present and cross-examine witnesses at those hearings; (4) that it provided Jane Doe I and Jane Doe III with advisors who understood the issues involved at those hearings; and (5) that an independent decisionmaker, unaffected by "any institutional biases," made the decision to proceed with their abortions. *See id.* at 233–36.

The record, however, does not indicate that any "hearings" on Jane Doe I and Jane Doe III's abortions ever occurred. With respect to Jane Doe I, the record indicates that, when Forest Haven Superintendent Reginald Wells consented to Jane Doe I's abortion, he merely spoke with medical staff recommending the procedure; he did not speak with Jane Doe I, with her lawyer, or with a court. *See* Wells 2014 Dep. 23:14–26:1, 28:17–29:20, 54:12–20, Pls.' Ex. 14, ECF No. 328-13; *see also* Pls.' Ex. 35, ECF No. 330-2 (reproducing the consent form Mr. Wells signed for Jane Doe I's abortion). And though the District argues that "the District provided [Jane Doe I] with the full due-process protection of a court hearing, where she was represented by counsel," Def.'s Mem. 21, that court hearing did not address the issues that are relevant to the procedural due process analysis here: whether the District had an important government interest that justified Jane Doe I's abortion, whether an abortion would serve that

interest, whether the abortion was in Jane Doe I's best medical interest, and whether no less intrusive treatments would achieve substantially the same results. *See Sell*, 539 U.S. at 180 (discussing findings necessary to justify the government's "involuntary administration of drugs"); *cf.* Def.'s Ex. 9, at ¶¶ 1–2, ECF No. 326-9 (finding, in an October 11, 1984 District of Columbia Superior Court order, only that Jane Doe I was competent to make decisions about her pregnancy and a possible abortion).[15] Jane Doe I's court hearing thus did not provide Jane Doe I with the procedural due process necessary to justify the District's decision to authorize her abortion.

With respect to Jane Doe III, the District admittedly has no documents about who gave consent for Jane Doe III's abortion or about the process used to obtain consent for that abortion. *See* Def.'s Status Report ¶ 1, ECF No. 314; Lewis Dep. 55:12–56:8, Pls.' Ex. 19, ECF No. 328-18. But the District does not dispute that, during the time period in which Jane Doe III had her 1978 or 1979 abortion, a District official would "sign consent forms for elective surgery without having been appointed guardian and without consulting with the person having surgery." *Does I Through III v. District of Columbia*, No. 01-2398, 2006 WL 2864483, at *1 (D.D.C. Oct. 5, 2006); *accord* Def.'s Statement ¶¶ 5–6; Pls.' Statement ¶¶ 4–6.

On this record, the undisputed facts require the Court to conclude, as a matter of law, that no "hearing" on Jane Doe I and Jane Doe III's abortions occurred. In the same vein, the undisputed facts require the Court to conclude, as a matter of law, (1) that Jane Doe I and Jane

---

[15] As discussed earlier, the Court proceeds under the parties' previous representation that Jane Doe I has always lacked capacity to make medical decisions. *See supra* Part V.A.1.a.ii. Proceedings cited to show deference to Jane Doe I's wishes do not, in these circumstances, have any relevance to the due process analysis. *See Doe ex rel. Tarlow v. District of Columbia*, 489 F.3d 376, 382–84 (D.C. Cir. 2007) ("Consideration of the wishes of patients who are not and have never been competent is . . . not required by the Supreme Court's . . . due process cases.").

Doe III never were afforded the right to be present at any proceeding in which they, or a representative acting on their behalf, could influence the District officials deciding whether to authorize their abortions; (2) that they never were afforded the right to present or cross-examine witnesses at a proceeding for that purpose; and (3) that they never received the benefit of an advisor to help them navigate any such proceedings. Given the significant possibility that District officials like Mr. Wells were affected by "institutional biases," such as the desire to keep the Forest Haven population low or the desire to reduce medical costs and administrative burdens, *see Harper*, 494 U.S. at 233, Jane Doe I and Jane Doe III likely did not receive an independent decisionmaker either. *See* Pls.' Ex. 13, at 2, ECF No. 328-12 (reproducing Mr. Wells's resume, which states that from May 1984 through January 1986, Mr. Wells "reduced the resident census [at Forest Haven] by 30%," "as mandated by court order"); Pls.' Ex. 35, ECF No. 330-2 (showing that Mr. Wells authorized Jane Doe I's abortion on October 16, 1984); *see also* Def.'s Ex. 22, at 3, ECF No. 326-22 (noting, in the record from a 1981 medical evaluation of Jane Doe III, that Forest Haven officials recommended "counsel[]ing regarding [the] inadvisability of pregnancy").

The Court acknowledges that, in *Washington v. Harper*, the Supreme Court did not specify the minimum procedures required under the Due Process Clause. *See Harper*, 494 U.S. at 228–36 (concluding merely that "[t]he Due Process Clause does require certain essential procedural protections, all of which [were] provided by the regulation" that the Supreme Court considered). Thus, the Supreme Court could possibly find antipsychotic medication procedures constitutional, even if they are less elaborate than those *Harper* outlined. (The procedures at issue in *Harper* included an independent decisionmaker, "notice, the right to be present at an adversary hearing, . . . the right to present and cross-examine witnesses," and "an independent

lay adviser who understands the psychiatric issues involved." *Id.* at 233–36.) But, even so, the District must still provide some way for the Court to confirm that the District had an important government interest that justified Jane Doe I and Jane Doe III's abortions, that their abortions served that interest, that the abortions were in Jane Doe I and Jane Doe III's best medical interests, and that no less intrusive treatments would achieve substantially the same results. *See Sell*, 539 U.S. at 180 (discussing findings necessary to justify the government's "involuntary administration of drugs").

To that end, other courts have, in pre-*Harper* decisions, suggested that medical records could suffice, if the records address the relevant individual's history, his or her present condition, and the various treatments available. *See United States v. Charters*, 863 F.2d 302, 312–13 (4th Cir. 1988) (en banc) ("[T]he basis for the decision should be supported by adequate documentation, not only because of normal professional requirements, but as a potential aid to judicial review.");[16] *Rennie v. Klein*, 653 F.2d 836, 848 (3d Cir. 1981) (discussing the panoply of medical considerations that the due process decisionmaker should consider) (en banc), *vacated,* 102 S. Ct. 3506 (1982) (remanding the case "for further consideration in light of *Youngberg v. Romeo*, 457 U.S. 307 . . . (1982)"). The District, however, has not produced any medical records

---

[16] In another case, the Fourth Circuit suggested that *Harper* overruled its opinion in *Charters*, but a later opinion in that case vacated the previous one and explained that *Harper* "did not address[] what process might be required before state prison authorities may administer an antipsychotic drug in an emergency circumstance," which was the question at issue there. *Hogan v. Carter*, 85 F.3d 1113, 1116 (4th Cir. 1996) (en banc); *see also Hogan v. Carter*, No. 94-7037, 1995 WL 674574, at *4 (4th Cir. 1995) ("*Harper* requires more than *Charters* . . . ."), *vacated*, 85 F.3d 1113 (4th Cir. 1996) (en banc). In any event, because *Charters* addressed the administration of unwanted antipsychotic medication to render a criminal defendant competent to stand trial, *see Charters*, 863 F.2d at 304–05, the Supreme Court's decision in *Sell v. United States*, 539 U.S. 166 (2003), supersedes the Fourth Circuit's analysis in *Charters*. Furthermore, as discussed below, the District has not produced even the medical records that *Charters* contemplated.

that show a reasoned analysis of whether to authorize Jane Doe I and Jane Doe III's abortions.

*Cf.* Def.'s Ex. 22, ECF No. 326-22 (reproducing the record of a medical evaluation that post-dated Jane Doe III's abortion by two or three years, but not records that preceded Jane Doe III's abortion); Pls.' Ex. 25, ECF No. 328-23 (reproducing medical records from Jane Doe I's abortion, but not medical records that preceded the decision to authorize the abortion). Given that no evidence shows that Jane Doe I and Jane Doe III received the procedural due process that they were due with respect to the District's decision to authorize their abortions, the undisputed facts in this case require the Court to conclude, as a matter of law, that Jane Doe I and Jane Doe III never received any constitutionally adequate procedures before the District authorized their abortions.[17]

---

[17] The Court previously contemplated two other means by which the District could prevail on Jane Doe I and Jane Doe III's procedural due process claims, but the Court now determines that the District cannot prevail by those means on the record presented.

First, the Court previously observed that, under *Youngberg v. Romeo*, 457 U.S. 307 (1982), "the state may (sometimes and for some reasons) physically restrain" involuntarily committed individuals; in those situations, "the minimal procedural protections to which an involuntary patient is entitled before being restrained—the exercise of appropriate professional judgment, and nothing more—are constitutionally tolerable only because he has necessarily had the benefit of a prior due process proceeding." *Doe ex rel. Tarlow v. District of Columbia*, 920 F.2d 112, 124 (D.D.C. 2013) (internal quotation mark omitted). Thus, constitutionally adequate procedures for Jane Doe I and Jane Doe III's abortions might include (1) previous constitutionally adequate due process proceedings that authorized their commitment to the District's care, and (2) the exercise of professional judgment when later authorizing their abortions. But, given the early stage of Plaintiffs' amended claims at the time of the Court's earlier opinion, the Court did not address what "the exercise of professional judgment" might entail. *See id.* at 120–21, 124–25. The Supreme Court's antipsychotic medication cases do. *See, e.g., Washington v. Harper*, 494 U.S. 210, 228–36 (1990) (holding that, though the state need not provide a judicial decisionmaker and could provide a medical professional as the decisionmaker, the state must still provide "procedural protections . . . to ensure that the decision . . . is neither arbitrary nor erroneous"). As discussed above, the District lacks evidence to support that its procedures met the requirements outlined in the Supreme Court's antipsychotic medication cases.

Second, the Court previously noted that "the District could . . . prevail by showing . . . that Jane Does I and III in fact consented to their abortions." *Doe ex rel. Tarlow*, 920 F. Supp. 2d at 126. But the Court also specifically foreclosed this theory because, at the time, "[n]o one

In sum, on the evidence presented, the Court must conclude, as a matter of law, that the

District did not provide Jane Doe I and Jane Doe III with constitutionally adequate procedures

before authorizing abortions on their behalf. The evidence reveals no government interest that

justifies the abortions, no indication that abortions furthered any government interest, no analysis

of whether the abortions were in Jane Doe I and Jane Doe III's best medical interests, and no

consideration of whether less intrusive treatments would achieve substantially the same results.

And no evidence indicates that, when the District authorized Jane Doe I and Jane Doe III's

abortions, the District furnished Jane Doe I and Jane Doe III with an adversarial hearing before

an independent decisionmaker, which the Constitution requires. No evidence exists even to show

that the District made a reasoned decision based on medical considerations. On this record, the

Court must conclude, as a matter of law, that the District violated Jane Doe I and Jane Doe III's

constitutional rights and denied them procedural due process.[18]

---

suggest[ed] that Jane Does I and III were competent to consent to their abortions" and "their
counsel conceded their incompetence on appeal." *Id.* (citing *Doe ex rel. Tarlow v. District of
Columbia*, 489 F.3d 376, 378 (D.C. Cir. 2007)). On summary judgment, the District has not
asked the Court to hold otherwise. *See, e.g.*, Def.'s Mem. 14–36. Even if it did, the doctrine of
judicial estoppel would prevent the Court from granting that request. *See Abtew v. U.S. Dep't of
Homeland Sec.*, 808 F.3d 895, 899–900 (D.C. Cir. 2015) ("[T]he rule of judicial estoppel
'generally prevents a party from prevailing in one phase of a case on an argument and then
relying on a contradictory argument to prevail in another phase.'" (quoting *New Hampshire v.
Maine*, 532 U.S. 742, 749 (2001))). The District thus cannot prevail under a theory based on Jane
Doe I and Jane Doe III's consent.

[18] Because the Court must conclude, as a matter of law, that the District denied Jane
Doe I and Jane Doe III due process under the procedural component of the Due Process Clause,
the Court will not address the merits of Jane Doe I and Jane Doe III's claims under the
substantive component of the Due Process Clause. *See Zinermon v. Burch*, 494 U.S. 113, 125–26
(1990) (discussing the two components as alternative ways in which claims "may be brought
against the State under the Due Process Clause"). For this reason, the Court does not address the
parties' arguments, made under the substantive component of the Due Process Clause, about
whether the District's conduct "shocks the conscience," whether the District showed deliberate
indifference, or whether the District exercised professional judgment. *See, e.g.*, Def.'s Mem.
18–21; Pls.' Mem. 27–28. These considerations matter for substantive due process analysis, but
not for the procedural due process analysis that the Court discussed above. *See generally Cty. of*

*b.  Municipal Policy or Custom*

Having established that the Court must conclude, as a matter of law, that the District

denied Jane Doe I and Jane Doe III procedural due process, the Court now addresses whether

genuine disputes of material fact exist with respect to whether a District policy or custom caused

those constitutional violations. To hold a municipality liable under 42 U.S.C. § 1983 for the

constitutionally objectionable actions of its employees, a plaintiff must show not only a predicate

constitutional violation, but also how that municipality's policy or custom was the "moving

force" behind a constitutional violation. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658,

694–95 (1978); *Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003). The D.C.

Circuit has explained that

> [t]here are a number of ways in which a "policy" can be set by a municipality to
> cause it to be liable under § 1983: [1] the explicit setting of a policy by the
> government that violates the Constitution; [2] the action of a policy maker within
> the government; [3] the adoption through a knowing failure to act by a policy
> maker of actions by his subordinates that are so consistent that they have become
> "custom"; or [4] the failure of the government to respond to a need . . . in such a
> manner as to show "deliberate indifference" to the risk that not addressing the
> need will result in constitutional violations.

*Baker*, 326 F.3d at 1306 (citations omitted).

Here, the parties agree that the District had an official policy in place when both Jane

Doe I's abortion and Jane Doe III's abortion took place. Between 1978 until 1990, the District's

policy for intellectually disabled persons in its care allowed District officials to "sign consent

forms for elective surgery without having been appointed guardian and without consulting with

---

*Sacramento v. Lewis*, 523 U.S. 833, 845–47 (1998) (discussing the "shocks the conscience" test
in the context of substantive due process analysis); *Youngberg v. Romeo*, 457 U.S. 307, 314,
321–25 (1982) (discussing the professional judgment standard in the context of substantive due
process analysis); *Butera v. District of Columbia*, 235 F.3d 637, 651–52 (D.C. Cir. 2001)
(discussing how a government official's "deliberate indifference" may be conscience-shocking).

the person having surgery." *Does I Through III v. District of Columbia*, No. 01-2398, 2006 WL

2864483, at *1 (D.D.C. Oct. 5, 2006); *accord* Def.'s Statement ¶¶ 5–6; Pls.' Statement ¶¶ 4–6. In

1990, the policy was put in writing, but remained largely unchanged: although either an

intellectually disabled person's parent or the Forest Haven Superintendent could give informed

consent for the person's elective surgery, the Superintendent could also give consent alone, after

discussing the matter with a medical officer. *See Does I Through III*, 2006 WL 2864483, at *1

("In April 1990, [the District's] longstanding policy was put in writing."); *accord* Def.'s

Statement ¶¶ 6–7; Pls.' Statement ¶ 7; Pls.' Opp'n Statement ¶¶ 7–8.[19]

---

[19] In its filings, the District repeatedly relies on the assumption that, because the District's official medical consent policies were held constitutional on appeal, they cannot ground Plaintiffs' alleged due process violations now. *See* Def.'s Mem. 35; Def.'s Opp'n 10 n.6; Def.'s Reply 11–12 n.9. *See generally Doe ex rel. Tarlow v. District of Columbia*, 489 F.3d 376, 382–84 (D.C. Cir. 2007) (holding the District's policy, in its 2003 form, constitutional); *Does I Through III v. District of Columbia*, 593 F. Supp. 2d 115, 123–24 (D.D.C. 2009) (interpreting the D.C. Circuit's opinion as holding, by implication, that pre-2003 near-identical policies were also constitutional).

But, in doing so, the District misunderstands the scope of the D.C. Circuit's ruling in this case. The D.C. Circuit did not hold that the District's policies were constitutional in every case in which the District applied them. Instead, the D.C. Circuit addressed one particular challenge to the District's policy. Faced with the question of whether the District's policies were unconstitutional because they did not require the District "to consider an intellectually disabled patient's wishes in deciding whether to authorize surgery," the Circuit held that the alleged defect did not render the District's policies unconstitutional under the Due Process Clause. *See Doe ex rel. Tarlow*, 489 F.3d at 382–84.

The D.C. Circuit did not address the distinct challenges to the District's policies raised here: (1) the contention that the Constitution required the District to provide additional procedures to Jane Doe I and Jane Doe III before authorizing abortions on their behalf, and (2) the contention that the Constitution required the District to consult with or defer to Jane Doe II's family members before authorizing an elective surgery on her behalf. *See Does I Through III v. District of Columbia*, 815 F. Supp. 2d 208, 218–20 (D.D.C. 2011) (discussing Plaintiffs' new challenges to the District's policies); Second Am. Compl. ¶¶ 23, 57–58, ECF No. 219 (bringing those challenges). Accordingly, given that Plaintiffs are asserting challenges that are different from those that the D.C. Circuit addressed, the District's official policies can serve as a basis for Plaintiffs' constitutional claims here.

No evidence suggests that the District diverged from its official policy when it authorized Jane Doe I and Jane Doe III's abortions. In Jane Doe I's case, a District consent form shows that Reginald Wells, the Forest Haven Superintendent at the time, consented to the abortion on her behalf. *See* Pls.' Ex. 36, ECF No. 330-2. Mr. Wells testified that, in doing so, he followed his customary process, which he believed to be in keeping with the District's official medical consent policy. *See* Wells 2014 Dep. 23:14–26:1, 28:17–30:4, 54:12–20, Pls.' Ex. 14, ECF No. 328-13; *see also* Pls.' Ex. 22, ECF No. 331-3 (compiling similar consent forms Mr. Wells signed).

Likewise, in Jane Doe III's case, even though the record contains no contemporaneous consent form or medical records, nothing contradicts the notion that the District simply followed its established policy. The record creates a clear timeline of events with respect to Jane Doe III: in 1967, Jane Doe III was admitted to Forest Haven and committed to the District's care, *see* Def.'s Ex. 3, ECF No. 326-3; Def.'s Ex. 22, ECF No. 326-22; her abortion occurred in 1978 or 1979, *see* Def.'s Ex. 22, at 3, ECF No. 326-22; Def.'s Ex. 29, at 3, ECF No. 326-29; and Jane Doe III was released from Forest Haven in 1988, Def.'s Ex. 25, at 1592, 1593, ECF No. 326-25. Given this timeline and the lack of evidence suggesting otherwise, the undisputed facts require the Court to conclude, as a matter of law, that the District authorized Jane Doe III's abortion in keeping with the District's policy, in place since at least 1978, of "sign[ing] consent forms for elective surgery . . . without consulting with the person having surgery." *Does I Through III v. District of Columbia*, No. 01-2398, 2006 WL 2864483, at *1 (D.D.C. Oct. 5, 2006); *accord* Def.'s Statement ¶ 5; Pls.' Statement ¶¶ 4–6. *See generally Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987) (explaining that, on summary judgment, the non-movant must present affirmative evidence to show a genuine dispute of material fact).

On this record, the Court must conclude, as a matter of law, that the District adhered to its official policies when it authorized Jane Doe I and Jane Doe III's abortions in a manner that violated the Due Process Clause. The District's official policies were thus "the moving force of the constitutional violation[s]." *Monell*, 436 U.S. 694–95.

*   *   *

Because the undisputed facts require the Court to conclude as a matter of law (1) that the District denied Jane Doe I and Jane Doe III procedural due process, and (2) that the District's official policy caused that due process violation, the Court will enter judgment for Jane Doe I and Jane Doe III on their constitutional claims. *See generally Warren v. District of Columbia*, 353 F.3d 36, 38 (D.C. Cir. 2004) (indicating that, in order to prevail on § 1983 claim against a municipality, the plaintiff must establish "a violation of his rights under the Constitution or federal law" and "that the municipality's custom or policy caused the violation").

### 2.  Jane Doe II's Claim for Ignoring or Overriding Family Wishes

The Court now turns to Jane Doe II's constitutional claims. Plaintiffs claim that the District denied Jane Doe II due process when the District "did not obtain consent from and/or ignored the wishes of Jane Doe II's family" when it consented to her eye surgery. Second Am. Compl. ¶ 57. As the Court did for Jane Doe I and Jane Doe III's constitutional claims, the Court first addresses "whether plaintiff's harm was caused by a constitutional violation" before addressing "whether the city is responsible for that violation." *Collins v. City of Harker Heights*, 503 U.S. 115, 120 (1992).

#### a.  Predicate Due Process Violation

As explained before, the Due Process Clause has two components: a substantive one, which "bars certain arbitrary, wrongful government actions regardless of the fairness of the

48

procedures used to implement them," and a procedural one, which bars state actors from depriving an individual of a constitutionally protected liberty interest without constitutionally adequate procedures. *Zinermon v. Burch*, 494 U.S. 113, 125 (1990) (internal quotation mark omitted) (quoting *Daniels v. Williams*, 474 U.S. 327, 331 (1986)). Courts use different analytical principles when considering the two types of due process claims. *Compare, e.g.*, *id.* at 127–28 (discussing procedural due process), *with*, *e.g.*, *Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 278–79 (1990) (discussing substantive due process). But for both substantive and procedural due process claims, the plaintiff must first allege that the defendant deprived her of a constitutionally cognizable liberty or property interest. *See generally, e.g.*, *Washington v. Glucksberg*, 521 U.S. 702, 720–22 (1997); *Roberts v. United States*, 741 F.3d 152, 161 (D.C. Cir. 2014). Because the liberty interest required for substantive due process claims must meet a higher standard, *see generally Glucksberg*, 521 U.S. at 720–22, the Court discusses Jane Doe II's alleged liberty interest under substantive due process principles first.[20]

---

[20] For Jane Doe I and Jane Doe III's constitutional claims, the Court did not address substantive due process because Jane Doe I and Jane Doe II are entitled to summary judgment on procedural due process grounds—making any analysis of an alternative theory of due process liability unnecessary. *See supra* note 18. But, for Jane Doe II's due process claim, the Court does not find that Jane Doe II merits summary judgment at this time under either theory of due process liability. *See infra* Parts V.A.2.a.i–iv. The Court accordingly articulates the analysis under both theories below.

i.  Substantive Due Process Liberty Interest

Substantive due process "normally imposes only very slight burdens on the government to justify its actions," and "it imposes none at all in the absence of a liberty or property interest." *George Washington Univ. v. District of Columbia*, 318 F.3d 203, 207 (D.C. Cir. 2003). Here, Jane Doe II's asserted liberty interest is the right to have had her family members' wishes considered by the District when the District made medical decisions on her behalf. *See* Second Am. Compl. ¶¶ 57, 63.[21] Plaintiffs argue that substantive due process protects this liberty interest from government infringement because it derives from the constitutionally protected right to refuse medical treatment. *See* Pls.' Mem. 5–6.

To be sure, the Supreme Court has recognized that substantive due process protects the fundamental right to bodily integrity. *See Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) (citing *Rochin v. California*, 342 U.S. 165 (1952)). And it has assumed that substantive due process gives competent people a "constitutionally protected right to refuse lifesaving hydration and nutrition." *Id.* at 723 (internal quotation marks omitted) (quoting *Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 279 (1990)). The Court agrees with Plaintiffs that, "if the Due Process Clause protects the right to refuse *lifesaving* medical treatment, it also protects the right to refuse surgery that is merely elective." Pls.' Mem. 6.

---

[21] Plaintiffs' complaint is not worded precisely, and it may also claim a constitutional violation of Jane Doe II's right to have *her* wishes considered in the District's decisionmaking process. *See, e.g.*, Second Am. Compl. ¶ 65 (alleging that the District violated *Jane Doe II's* right to accept or refuse medical treatment). This claim is, however, foreclosed by the law of this case. *See Doe ex rel. Tarlow v. District of Columbia*, 489 F.3d 376, 382–83 (D.C. Cir. 2007) (holding that "[c]onsideration of the wishes of patients who are not and have never been competent" is not a cognizable liberty interest under either procedural or substantive due process precedents).

But the Supreme Court has also made clear that, though "[a]n incompetent person is not able to make an informed and voluntary choice to exercise a hypothetical right to refuse treatment," it "do[es] not think the Due Process Clause requires the State to repose judgment on these matters with anyone but the patient herself." *Cruzan*, 497 U.S. at 280, 286. A state may, of course, rely on family decisionmaking when determining the correct course of action for an incompetent person. *Id.* at 286. But that permissive rule is not a "constitutional *requirement* that the State recognize such decisionmaking." *Id.* (emphasis added). The Supreme Court expressly declined to require States "to repose a right of 'substituted judgment'" with an incompetent person's family members because "there is no automatic assurance that the view of close family members will necessarily be the same as the patient's would have been had she been confronted with the prospect of her situation while competent." *Id.* Substantive due process thus did not require the District to consult or defer to Jane Doe II's family members in determining the best course of action for Jane Doe II's medical treatment—the substantive component of the Due Process Clause simply does not protect that right.

Of course, in a case such as this one, there are still constitutional limits on the District's discretion. The Due Process Clause bars the District from acting arbitrarily, "unrestrained by the established principles of private right and distributive justice." *See Cty. of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998) (quoting *Hurtado v. California*, 110 U.S. 516, 527 (1884)). The District could not act on Jane Doe II's medical care "without any reasonable justification in the service of a legitimate governmental objective." *Id.* at 846. But though the District must always tether its actions to a legitimate governmental objective, substantive due process did not require it to provide Jane Doe II with the right she has described (*i.e.*, the right to have her family's wishes considered and followed). *See generally Glucksberg*, 521 U.S. at 721 (explaining that, in

substantive due process cases, the Supreme Court requires "a careful description of the asserted

fundamental liberty interest").

Even if the substantive component of the Due Process Clause does not protect Jane

Doe II's asserted liberty interest, however, Jane Doe II can still find refuge under another source

of law. Indeed, the District's Health-Care Decision Act of 1988 expressly protects the very

interest that Plaintiffs describe. *See* D.C. Code § 21-2210 (1994) (providing that, if someone has

been certified incapable to give informed consent for health care decisions and lacks a court-

appointed guardian, conservator, or intellectual disability advocate, family members shall grant,

refuse, or withdraw consent on her behalf). But because substantive due process does not seek to

supplant ordinary violations of local law, a violation of this Act is not necessarily a substantive

due process violation. *See generally Lewis*, 523 U.S. at 848–49 (explaining that substantive due

process liability "duplicates no traditional category of common-law fault"). After all, "it is *a*

*constitution* we are expounding." *Id.* at 846 (quoting *Daniels v. Williams*, 474 U.S. 327, 332

(1986)).

Because Jane Doe II has not alleged a viable liberty interest under the substantive

component of the Due Process Clause, the Court must enter summary judgment for the District

on this issue.[22] But even though the District's statutory procedures are not "*substantive* liberty

---

[22] This Court has assumed before that Plaintiffs have a liberty interest in bodily integrity, which could have been violated if the District consented on their behalf to elective surgeries "without first attempting to obtain consent from, or after ignoring the wishes of, those persons authorized to make medical decisions" on their behalf by the D.C. Code. *Does I Through III v. District of Columbia*, 593 F. Supp. 2d 115, 124–125 (D.D.C. 2009). But, in making this assumption, the Court did not specify whether that potential liberty deprivation was cognizable under substantive due process principles or procedural due process principles. *See id.* at 124. The Court now clarifies that, though Jane Doe II's constitutional claim is viable as a *procedural* due process claim, it does not allege a cognizable liberty interest under the *substantive* component of the Due Process Clause.

interests entitled to federal constitutional protection" under the Due Process Clause, *Ellis v. District of Columbia*, 84 F.3d 1413, 1421 n.6 (D.C. Cir. 1996) (emphasis added), liberty interests for purposes of a *procedural* due process claim "may arise from an expectation or interest created by state laws or policies," *Atherton v. D.C. Office of the Mayor*, 567 F.3d 672, 689 (D.C. Cir. 2009) (quoting *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005)). The Court next analyzes whether Jane Doe II's constitutional claim can proceed under *procedural* due process principles.

ii.  Procedural Due Process Liberty Interest

The procedural due process inquiry, like the substantive due process inquiry, requires the plaintiff to first allege the deprivation of a cognizable liberty or property interest. *See Roberts v. United States*, 741 F.3d 152, 161 (D.C. Cir. 2014) (explaining that this first element is "essential," because procedural due process exists "to protect a substantive interest to which the individual has a legitimate claim of entitlement" (quoting *Olim v. Wakinekona*, 461 U.S. 238, 250 (1983))). For a procedural due process claim, liberty interests "may . . . be located in the Constitution itself"—as they are for Jane Doe I and Jane Doe III—or they "may arise from an expectation or interest created by state laws or policies." *Atherton v. D.C. Office of the Mayor*, 567 F.3d 672, 689 (D.C. Cir. 2009) (internal quotation marks omitted) (quoting *Wilkinson v Austin*, 545 U.S. 209, 221 (2005)). Thus, state laws can ground a constitutionally protected liberty interest when they "contain substantive limitations on official discretion, embodied in mandatory statutory . . . language." *Id.* (internal quotation mark omitted) (quoting *Price v. Barry*, 53 F.3d 369, 370 (D.C. Cir. 1995) (per curiam)). The D.C. Circuit has explained that this kind of

---

Because Jane Doe II's substantive due process claim thus cannot proceed, the Court declines to address the parties' arguments about later steps in the substantive due process analysis. *See* Def.'s Mem. 18–21, 23–25 (indicating that the Court should use the deliberate indifference and professional judgment tests to determine whether the District's actions "shock the conscience"); Pls.' Mem. 27 (urging a simpler analysis).

"mandatory" statutory language typically finds expression in the word "shall"; the word "may"

typically signals discretionary language. *See Price*, 53 F.3d at 299 (finding mandatory language

in statutes declaring that parole boards "shall" order inmates' release in certain situations);

*accord Ellis v. District of Columbia*, 84 F.3d 1413, 1418 (D.C. Cir. 1996) (declining to revise

this interpretation).

Against this legal backdrop, Jane Doe II's constitutional claim is viable as a *procedural*

due process claim. Because Jane Doe II's asserted liberty interest corresponds with her rights

under a mandatory District statute in effect at the time of the deprivation, procedural due process

provides that interest with constitutional protection.

Jane Doe II's asserted liberty interest is the right to have her family members' wishes

considered by the District when the District makes medical decisions on her behalf. *See* Second

Am. Compl. ¶¶ 57, 63. This right corresponds with her rights under the District's Health-Care

Decisions Act of 1988, which, at the time of her eye surgery, created a clear right to substituted

consent for people that lacked the mental capacity to make a health-care decision:

> (a)  In the absence of a durable power of attorney for health care and provided that the incapacity of the principal has been certified in accordance with § 21-2204, the following individuals, in the order of priority set forth below, shall be authorized to grant, refuse or withdraw consent on behalf of the patient with respect to the provision of any health-care service, treatment, or procedure:
>
> > (1)  A court-appointed guardian or conservator of the patient, if the consent is within the scope of the guardianship or conservatorship;
> >
> > (2)  The spouse of the patient;
> >
> > (3)  An adult child of the patient;
> >
> > (4)  A parent of the patient;
> >
> > (5)  An adult sibling of the patient;

(5A)   A religious superior of the patient, if the patient is a member of a
religious order or a diocesan priest; or

(6)    The nearest living relative of the patient. . . .

(d)    If no individual in a prior class is reasonably available, mentally capable
and willing to act, responsibility for decisionmaking shall rest with the
next reasonably available, mentally capable, and willing person on the
priority list.

D.C. Code § 21-2210 (1994) (reflecting the statute as it was on March 4, 1994); Def.'s Ex. 18,

ECF No. 326-18 (showing March 4, 1994 as the date of Jane Doe II's surgery).

This District statute gave Jane Doe II an "expectation" that, if she was incapable of

giving informed consent to a medical procedure, the District would consult her family members

and would allow them to give or refuse informed consent on her behalf. *See Atherton v. D.C.*

*Office of the Mayor*, 567 F.3d 672, 689 (D.C. Cir. 2009) (explaining that an expectation created

by state law can be a liberty interest that procedural due process protects).[23] The evidence in the

---

[23] From the parties' arguments, the Court infers that they agree that Jane Doe II was
incapable of giving informed consent to medical treatment, and therefore could expect the
protections of D.C. Code § 21-2210—notwithstanding the statute's preliminary requirement that
persons eligible for its protections must have their incapacity certified under D.C. Code
§ 21-2204's procedures.

The District, for instance, notes that "there is no dispute that Jane Doe II has never been
competent to make medical decisions for herself," and proceeds to argue that it complied with
the statute because "[t]he most natural and likely inference to be drawn from all the evidence is
that Ms. Felton [Jane Doe II's mother] consented to the eye surgery." Def.'s Reply Supp. Mot.
Summ. J. 5–7, ECF No. 340 [hereinafter Def.'s Reply]; *see also* Def.'s Opp'n 7–8, ECF No. 335
(making the same argument).

Plaintiffs' complaint likewise focuses on whether the District consulted Jane Doe II's
family members before consenting to her eye surgery; it does not allege that Jane Doe II was
ever capable of giving informed consent to medical treatment. *See* Second Am. Compl.
¶¶ 46–49, 57; *see also* Pls.' Opp'n Def.'s Mot. Summ. J. 19, ECF No. 337 (focusing on the
allegation that "the District authorized Jane Doe II's surgery without obtaining consent or refusal
from her lawful healthcare proxy"). And now, after discovery, Plaintiffs have produced no
evidence indicating that Jane Doe II was capable of giving informed consent. In fact, the
evidence shows that, because Jane Doe II was nonverbal, she was likely never capable of giving

record shows that Jane Doe II was "non-verbal" and "unable to address her concerns"—and thereby unable to give informed consent to a medical procedure. Def.'s Ex. 20, at 3007, ECF No. 326-20; *accord* Felton Dep. 17:9–14, Pls.' Ex. 29, ECF No. 329-3; *see also* Def.'s Reply Supp. Mot. Summ. J. 5–7, ECF No. 340 [hereinafter Def.'s Reply] ("[T]here is no dispute that Jane Doe II has never been competent to make medical decisions for herself."). Under the statute, therefore, Jane Doe II had an expectation that one of the enumerated individuals would provide substituted consent on her behalf. Because the District does not argue that Clifford Hubbard, the person who signed Jane Doe II's consent form, was her court-appointed guardian or conservator, "responsibility for decisionmaking" would "rest with the next reasonably available, mentally capable, and willing person on the priority list." D.C. Code § 21-2210(a)(1), (d) (1994); *see* Pls.' Ex. 12, ECF No. 328-11 (showing that Mr. Hubbard signed Jane Doe II's consent form); Def.'s Mem. 23–25 (declining to argue that Mr. Hubbard was Jane Doe II's court-appointed guardian or conservator); Def.'s Mem. P. & A. Opp'n Pls.' Mot. Partial Summ. J. 7–8, ECF No. 335 [hereinafter Def.'s Opp'n] (same); Def.'s Reply 5–7 (same). And because no evidence exists that Jane Doe II had a spouse or an adult child, the next person on the priority list would have been Jane Doe II's parent. *See* D.C. Code § 21-2210(a)(1)–(4) (1994).

---

informed consent. *See* Def.'s Ex. 20, at 3007, ECF No. 326-20 ("[Jane Doe II] is non-verbal and unable to address her concerns."); Felton Dep. 17:9–14, Pls.' Ex. 29, ECF No. 329-3.

   The Court will therefore assume that D.C. Code § 21-2210 created an expectation that its provisions would apply to Jane Doe II, even if Jane Doe II never received a formal certification under D.C. Code § 21-2204 that she was incapable of giving informed consent to medical treatment. *Cf.* Pls.' Opp'n Def.'s Mot. Summ. J. 38 (arguing that the lack of formal certification is relevant, but in the context of whether the District had authority to consent, not in the procedural due process context). Jane Doe II's 2002 probate order, which found her incapable of managing her own property and appointed a conservator for her, is inapposite to this inquiry, because it does not make any determination about her capacity to give informed consent to a medical procedure. *See* Pls.' Reply Ex. A, ECF No. 126-2 (reproducing a probate order for Jane Doe II, dated January 18, 2002).

The statute thus indicated, in mandatory language, that Jane Doe II's mother, Theresa Felton, would exercise responsibility for medical decisionmaking on Jane Doe II's behalf. *See* D.C. Code § 21-2210(a) (1994) ("[T]he following individuals, in the order of priority set forth below, *shall* be authorized to grant, refuse or withdraw consent . . . ." (emphasis added)); *id.* § 21-2210(d) (1994) ("If no individual in a prior class is reasonably available, mentally capable and willing to act, responsibility for decisionmaking *shall* rest with the next reasonably available, mentally capable, and willing person on the priority list." (emphasis added)). Jane Doe II therefore had a constitutionally protected liberty interest in having her mother direct her medical treatment by making health care decisions on her behalf. *See Atherton*, 567 F.3d at 689 (explaining that, when a state regulation limits official discretion in mandatory statutory language, it creates a constitutionally protected liberty interest under the procedural component of the Due Process Clause). If Plaintiffs can show that the District deprived Jane Doe II of that liberty interest without providing her with appropriate procedural protections, then Jane Doe II can prevail on her procedural due process claim.

iii.  Deprivation of Procedural Due Process Liberty Interest

Before addressing whether Jane Doe II received adequate procedural protections, however, Plaintiffs must show that the District actually deprived Jane Doe II of the liberty interest. *See Roberts v. United States*, 741 F.3d 152, 220 (D.C. Cir. 2014) ("[T]he plaintiff must show the Government *deprived* her of a 'liberty or property interest' . . . ." (emphasis added) (quoting *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989))). On this issue, a genuine dispute of material fact exists. The record includes evidence both for and against the notion that Jane Doe II's mother, Ms. Felton, did indeed consent on Jane Doe II's behalf to the eye surgery.

As a preliminary matter, the Court addresses what words or conduct might be necessary to show that Ms. Felton consented to the eye surgery. As discussed above, under the Health-Care Decisions Act at the time of Jane Doe II's surgery, Jane Doe II had the right to have her mother "grant, refuse or withdraw consent" on her behalf. *See* D.C. Code § 21-2210(a) (1994); *supra* Part V.A.2.a.ii (discussing the statute and how it applied to Jane Doe II). The Health-Care Decisions Act did not include a definition for "consent." *See* D.C. Code § 21-2210(b), (c) (1994) (explaining what the decisionmaker should consider and requiring a witness for any decisions made, but without defining the means by which the decisionmaker would consent); *id.* § 21-2202 (1994) (providing definitions for the Health-Care Decisions Act, but without defining "consent"). Although Plaintiffs imply that the Court should interpret "consent" by using the definition of "informed consent" specified elsewhere in the D.C. Code, that definition applies only to a different chapter of the D.C. Code (Chapter 13 of Title 7), not to the Health-Care Decisions Act (which is codified in Chapter 22 of Title 21 of the D.C. Code). *See id.* § 7-1301.03 (2016) (defining only terms "used in this chapter," *i.e.*, Chapter 13 of Title 7); *id.* § 7-1301.03(15) (requiring "informed consent" to be "given in writing"); Pls.' Reply 19 (citing D.C. Code § 7-1301.03(15)). The Court accordingly will not introduce Plaintiffs' suggested "informed consent" definition into the Health-Care Decisions Act. *See Nova Univ. v. Educ. Inst. Licensure Comm'n*, 483 A.2d 1172, 1179–80 (D.C. 1984) (disapproving of a statutory construction that contravenes "the quite obvious fact that the statute does not contain the words [that a party] urges [the court] to insert").

To analyze whether Ms. Felton consented to Jane Doe II's eye surgery, however, the Court must determine whether the Health-Care Decisions Act required consent to be given in writing. If it did, then given the lack of evidence of any written consent that Ms. Felton gave for

Jane Doe II's eye surgery, the Court would have to conclude that Ms. Felton never consented to the eye surgery—and therefore that Jane Doe II was deprived of her liberty interest in having Ms. Felton give or withhold consent on Jane Doe II's behalf. *See* Def.'s Statement ¶ 30 ("There is no evidence suggesting that [Ms. Felton] ever explicitly consented . . . to any particular procedure proposed for Jane Doe II."); Pls.' Opp'n Statement ¶ 30 (raising no objection to the notion that no evidence exists of written consent that Ms. Felton gave for Jane Doe II's medical procedures).

To determine the meaning of "consent" in the Health-Care Decision Act, the Court adheres to the "settled principle of interpretation that, absent other indication, [the legislature] intends to incorporate the well-settled meaning of the common-law terms it uses." *Universal Health Servs., Inc. v. United States*, No. 15-0007, 2016 WL 3317565, at *7 (U.S. June 16, 2016) (internal quotation mark omitted) (quoting *Sekhar v. United States*, 133 S. Ct. 2720, 2724 (2013)); *see, e.g.*, *Tann v. United States*, 127 A.3d 400, 441 (D.C. 2015) (applying this principle in the criminal context); *Berryman v. Thorne*, 700 A.2d 181, 184 (D.C. 1997) (same, in the estate context); *Lenkin ex rel. 14th & Eye Streets Assocs. v. Beckman*, 575 A.2d 273, 276 (D.C. 1990) (same, in the property context). Because the District of Columbia Court of Appeals has, in the tort context, previously discussed similar issues with respect to consent to medical procedures, the Court interprets "consent" in light of common law tort principles. *See Bonner v. Moran*, 126 F.2d 121, 121–23 (D.C. 1941) (discussing consent in the context of "an action for damages for assault and battery" arising out of medical operations performed on a child).

Under those principles, consent is a defense to any claim sounding in tort law. *See Woodfield v. Providence Hosp.*, 779 A.2d 933, 937 (D.C. 2001) ("[T]he invasion of a person's interest cannot be a tort when such person is willing to have that invasion take place and has

legal capacity to consent to the invasion." (internal quotation marks omitted) (quoting 2 Fowler

V. Harper et al., *The Law of Torts* § 5.17, at 138 (2d ed. 1986))). And, contrary to Plaintiffs'

suggestion, consent "may be manifested by action or inaction and need not be communicated to

the actor." Restatement (Second) of Torts § 892(1) (Am. Law Inst. 1979); *accord Boyrie v.*

*E & G Prop. Servs.*, 58 A.3d 475, 477–78 (D.C. 2013) (explaining that consent to an alleged

trespass "can be express or implied"); *Martin v. George Hyman Constr. Co.*, 395 A.2d 63, 71

(D.C. 1978) (explaining that, to establish assumption of risk in the negligence context, a

defendant must prove that a plaintiff "voluntarily consents to incur a risk," though "[t]he consent

may be express . . . or implied by conduct"). Thus, "[i]f words or conduct are reasonably

understood by another to be intended as consent, they constitute apparent consent and are as

effective as consent in fact." Restatement (Second) of Torts § 892(2) (Am. Law Inst. 1979);

*accord Faniel v. Chesapeake & Potomac Tel. Co. of Md.*, 404 A.2d 147, 152–53 (D.C. 1979)

(imputing implied consent onto the plaintiff because of her actions). Here, therefore, Ms. Felton

could have legally consented to Jane Doe II's eye surgery either through words (written or

spoken) or through conduct. On review of the record, the Court finds that evidence exists both to

support and to undermine the idea that Ms. Felton consented to Jane Doe II's eye surgery.

On the one hand, the parties agree that Ms. Felton was present for the surgery. *See* Def.'s

Statement ¶ 23; Pls.' Opp'n Statement ¶ 23; *see also* Def.'s Ex. 19, ECF No. 326-19 (indicating

that Ms. Felton spoke with the operating surgeon on the day of the surgery); Def.'s Ex. 20, at

3006, ECF No. 326–20 (same). And when Ms. Felton wrote a letter complaining about Jane Doe

II's care after the surgery, she did not mention any objection to the decision to proceed with the

surgery in the first place. *See* Def.'s Ex. 20, at 3006–07. From this evidence, a reasonable jury

could infer that, at or before the appointment for Jane Doe II's surgery, Ms. Felton consented—

either through her words or through her conduct—to the eye surgery on Jane Doe II's behalf. If that were the case, no deprivation of Jane Doe II's rights under D.C. Code § 21-2210 would have occurred.

On the other hand, the record is clear that the District's MRDDA Acting Administrator, Clifford Hubbard, signed a form giving consent to Jane Doe II's surgery. *See* Pls.' Ex. 12, ECF No. 328-11; *see also* Def.'s Statement ¶ 21; Pls.' Statement ¶ 40. And Jane Doe II's brother's testimony recalls that Ms. Felton was upset after the surgery and felt that it should not have occurred. *See* Felton Dep. 30:11–31:2, 58:10–59:3, 61:6–15, Pls.' Ex. 29, ECF No. 329-3. His testimony also posits that Ms. Felton did not know about the surgery beforehand, because she did not inform Jane Doe II's family about the surgery before it happened, which was Ms. Felton's typical practice. *See id.* at 31:3–32:1, 57:2–58:7, 60:18–61:5, 62:13–17. From this evidence, a reasonable jury could infer that the District did not give Ms. Felton an opportunity to make a decision on Jane Doe II's behalf about the eye surgery, that Ms. Felton learned about Jane Doe II's scheduled eye surgery only just before it occurred, and that Ms. Felton was not aware of Jane Doe II's legal right to have Ms. Felton "refuse or withdraw consent" to the surgery on Jane Doe II's behalf. D.C. Code § 21-2210(a) (1994); *see* Pls.' Opp'n Def.'s Mot. Summ. J. 6–7 (making this argument). If that were the case, the District deprived Jane Doe II of her right under D.C. Code § 21-2210(a) to have her mother's wishes for Jane Doe II's medical treatment heeded.[24]

---

[24] If the jury accepts this version of the facts, any implied consent derived from Ms. Felton's presence at Jane Doe II's surgery would not be effective. *See* Restatement (Second) of Torts § 892B(2) (Am. Law Inst. 1979) ("If the person consenting . . . is induced to consent . . . by the other's misrepresentation, the consent is not effective for the unexpected invasion or harm.").

The Court cannot on summary judgment weigh the conflicting evidence in Jane Doe II's case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court accordingly cannot find that either party would necessarily prevail on Jane Doe II's predicate procedural due process claim.

iv.  Procedures Provided to Jane Doe II

To address the District's contention that "a mere violation of law does not give rise to a due process claim," Def.'s Mem. 17 (internal quotation mark omitted) (quoting *Am. Fed'n of Gov't Emps., Local 446 v. Nicholson*, 475 F.3d 341, 353 (D.C. Cir. 2007)), the Court briefly addresses the legal principles that would govern the remainder of the procedural due process analysis. The Court's preceding discussion addressed only the first element of a procedural due process claim: the requirement that the plaintiff establish that the government deprived the plaintiff "of a liberty or property interest to which she had a legitimate claim of entitlement." *Roberts v. United States*, 741 F.3d 152, 161 (D.C. Cir. 2014) (internal quotation mark omitted) (quoting *Ky. Dep't of Corr. v. Thompson*, 90 U.S. 454, 460 (1989)). But, to prevail on a procedural due process claim, the plaintiff must also show that "the procedures attendant upon that deprivation were constitutionally insufficient." *Id.* (brackets and internal quotation marks omitted) (quoting *Thompson*, 490 U.S. at 460). As noted earlier, courts evaluate procedures' constitutional adequacy by weighing the plaintiff's liberty interest, the countervailing government interest, and the value that procedural safeguards would provide. *See Zinermon v. Burch*, 494 U.S. 113, 127 (1990) (citing *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).

Thus, even if the District deprived Jane Doe II of her liberty interest under the Health-Care Decisions Act, the District's bare violation of that local law does not "give rise to a due process claim." *Nicholson*, 475 F.3d at 353. "In procedural due process claims, the

deprivation by state action of a constitutionally protected interest in 'life, liberty, or property' is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest *without due process of law*." *Zinermon*, 494 U.S. at 125. The constitutional violation "is not complete unless and until the State fails to provide due process." *Id.* at 126. Thus, Plaintiffs must establish that the District violated the Health-Care Decisions Act *and* that the District did so without providing Jane Doe II with appropriate procedural safeguards. Accordingly, the District could, for instance, show that its official policies allowed the District to violate the Health-Care Decisions Act in particular situations, after the District had followed particular procedures. *See, e.g.*, Def.'s Ex. 7, ¶ A.2, ECF No. 326–27 (reproducing Policy H-6, the District's policy from 1992, which indicated that "[i]n case of extreme emergency, the family will be contacted as soon as time permits and given a full explanation of the emergency and treatment administered"). The District must, of course, cite an important government interest as its justification for any decision to violate an individual's liberty interest. *See Sell v. United States*, 539 U.S. 166, 180 (2003).

Here, however, whether the District provided Jane Doe II with appropriate procedural safeguards—the last step of the procedural due process analysis—is intertwined with an earlier step: whether the District actually deprived Jane Doe II of her liberty interest in having her mother give or refuse consent to the surgery, which the Court discussed previously. *See supra* Part V.2.a.iii. As noted before, a reasonable jury could infer from the evidence in this case (1) that the District did not give Jane Doe II's mother, Ms. Felton, an opportunity to make a decision on Jane Doe II's behalf about the eye surgery; (2) that Ms. Felton learned about Jane Doe II's scheduled eye surgery only just before it occurred; and (3) that Ms. Felton was not aware of Jane Doe II's legal right to have Ms. Felton "refuse or withdraw consent" to the surgery on Jane Doe II's behalf. *See id.* Accepting this theory of events, a reasonable jury would likely

also find that, for reasons explained below, the District did not provide appropriate procedural safeguards before proceeding to authorize the surgery.

After all, "[a]n elementary and fundamental requirement of due process . . . is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Small v. United States*, 136 F.3d 1334, 1336 (D.C. Cir. 1998) (internal quotation marks omitted) (quoting *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950)); *accord United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 272 (2010). If Ms. Felton, Jane Doe II's mother and advocate, learned about Jane Doe II's surgery only just before it occurred, then she (and Jane Doe II, by implication) did not receive "notice reasonably calculated . . . to apprise interested parties" of the surgery in time to give them "an opportunity to present their objections." *Small*, 13 F.3d at 1336 (quoting *Mullane*, 339 U.S. at 314). *See generally* Def.'s Ex. 21, ¶ 7, ECF No. 326-21 (noting that Jane Doe II's mother was "her mental retardation advocate"); *id.* at 3070 (noting that Jane Doe II's mother was her "appointed advocate by the Court"). And if Ms. Felton was not aware of Jane Doe II's legal right to have Ms. Felton give or refuse consent to the surgery, then she and Jane Doe II likewise never received notice of the District's intention to deny Jane Doe II that right—nor an opportunity to present objections to that intention.[25] On these facts, if a reasonable jury were to find that Ms. Felton did not consent to Jane Doe II's surgery (and thereby deprived Jane Doe II of a constitutionally protected liberty interest), then the jury, absent any additional

---

[25] The District can find little protection here from the principle that, in certain cases, "due process does not require actual notice." *Jones v. Flowers*, 547 U.S. 220, 225 (2006). Because the record shows that Ms. Felton and the District communicated frequently, *see* Def.'s Ex. 27, at 4150, ECF No. 326-27; Felton Dep. 11:3–12:1, 21:15–24:8, Pls.' Ex. 29, ECF No. 329-3; *see, e.g.*, Def.'s Ex. 20, ECF No. 326-20, the Court would be skeptical of any claim that notice "reasonably calculated" to reach Ms. Felton (as Jane Doe II's advocate) did not actually reach her. *Small*, 13 F.3d at 1336 (quoting *Mullane*, 339 U.S. at 314).

evidence not presented here, would likely also find that Jane Doe II did not receive constitutionally adequate procedures to guard against that liberty deprivation.

Nonetheless, as discussed before, a genuine dispute of material fact exists regarding the predicate issue of whether the District even deprived Jane Doe II of her liberty interest under the Health-Care Decision Act. *See supra* Part V.2.a.iii. If Jane Doe II did not even suffer a liberty interest deprivation, then the District need not show that it provided her with appropriate procedural safeguards in the face of that deprivation.[26] Thus, on the facts presented, the earlier-mentioned dispute of fact—regarding whether Ms. Felton consented to Jane Doe II's surgery, *see supra* Part V.A.2.iii —prevents a summary judgment decision on both elements of Jane Doe II's procedural due process claim.  Because of that dispute of fact, the Court cannot decide on summary judgment (1) whether the District deprived Jane Doe II of her constitutionally protected liberty interest, *see id.*; and (2) whether Jane Doe II received constitutionally adequate procedural safeguards in the face of that liberty interest deprivation.

### b.  Municipal Policy or Custom

Of course, the District may nonetheless merit summary judgment on Jane Doe II's constitutional claim if no reasonable jury could find that a District policy or custom caused her alleged due process violation. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694–95 (1978) (holding that a municipality may be liable under 42 U.S.C. § 1983 only "when execution of a government's policy or custom . . . inflicts the injury"); *Baker v. District of Columbia*, 326 F.3d

---

[26] In other words, if Ms. Felton consented to Jane Doe II's surgery, then the District need not show that it provided Jane Doe II with procedures pertaining to any decision to proceed with the surgery in the absence of Ms. Felton's consent. By obtaining Ms. Felton's consent to the surgery, the District would have met its constitutional and statutory burden to obtain consent from Jane Doe II's parent. *See supra* Part V.A.2.ii (explaining that, under D.C. Code § 21-2210, Jane Doe II had a constitutionally protected liberty interest in having her mother give or refuse consent to her surgery).

1302, 1306–07 (D.C. Cir. 2003). However, as with Jane Doe I and Jane Doe III, the evidence on record indicates that the District authorized Jane Doe II's eye surgery in accordance with its longstanding policy or custom of "sign[ing] consent forms for elective surgery . . . without having been appointed guardian and without consulting with the person having surgery." *Does I Through III v. District of Columbia*, No. 01-2398, 2006 WL 2864483, at *1 (D.D.C. Oct. 5, 2006); Def.'s Statement ¶¶ 5–6; Pls.' Statement ¶¶ 5–6. A District consent form shows that Clifford Hubbard, the District's Acting Administrator for the MRDDA, consented to Jane Doe II's eye surgery on Jane Doe II's behalf. *See* Pls.' Ex. 12, ECF No. 328-11. This evidence suggests that Mr. Hubbard signed the consent form in accordance with District policy or custom, because Mr. Hubbard had signed other consent forms in a similar manner. *See* Pls.' Ex. 6, ECF No. 331-2 (including similar consent forms Mr. Hubbard signed). From this evidence alone, a reasonable jury could infer that Mr. Hubbard signed Jane Doe II's consent form—and thereby authorized her eye surgery—in keeping with District policy or custom.

To be sure, the explicit District policy does indicate that a District official should obtain informed consent "by the parent or [g]uardian" before medical procedures. *See* Def.'s Ex. 7, ECF No. 326-7 (stating, in the introduction to the policy, that "[i]nformed consent must be given by the parent or [g]uardian"). But despite the policy's apparent requirement that parents or guardians should give informed consent, the District's policy also states that the *MRDDA Administrator* "will sign the Informed Consent Form after being adequately advised of the need for the elective . . . surgical . . . treatments." *Id.* ¶ B.2 (emphasis added). And record evidence indicates that the District often would not make contact with—thus necessarily would not obtain informed consent from—an individual's family members or guardians before a medical procedure. *See* Hubbard Dep. 124:2–20, Def.'s Ex. 5, ECF No. 326-5 (indicating that the District

would look for a parent or relative to sign a consent form, but estimating that two-thirds of

intellectually disabled people in the District's care lacked a "next of kin" or guardian);

Washington Dep. 61:5–67:1, 122:15–18, Pls.' Ex. 53, ECF No. 337-15 (explaining how one

District employee attempted without success to contact an individual's family members).

Thus, even if the District's express policy might have required the District to obtain Jane

Doe II's mother's consent to Jane Doe II's surgery, there is a dispute of fact concerning whether

the District had, at the very least, a custom by which the District authorized surgeries without

obtaining consent from intellectually disabled individuals' parents or guardians. *See Baker v.

District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003) (explaining that a municipality may

be liable for a constitutional violation if the plaintiff shows "the adoption through a knowing

failure to act by a policy maker of actions by his subordinates that are so consistent that they

have become custom" (internal quotation mark omitted)). In Jane Doe II's case at least, a case in

which the District could consult with Jane Doe II's family members, *see supra* note 25, the

District concedes that it assumed responsibility for "[a]ll medical care and decisions." Def.'s

Mem. 17. To that end, as the District notes, "there is no evidence suggesting that [Jane Doe II's]

mother *ever* explicitly consented . . . to *any* procedure proposed for Jane Doe II." *Id.*; *see, e.g.*

Def.'s Exs. 14–17, ECF Nos. 326-14 to -17 (reproducing consent forms in which District

officials, not Jane Doe II's mother, Ms. Felton, consented to Jane Doe II's medical treatment).

The District thus implies that, pursuant to its custom, the District never sought consent from

Ms. Felton nor, presumably, from other parents as well. Nowhere does the District argue that any

failure to obtain Ms. Felton's consent (to the extent that it was not, in fact, obtained) was the

result of an isolated error or an individual employee's failure to follow policy. To the contrary,

what little evidence exists seems to indicate that there was nothing unusual in the authorization

that took place. On this scant record, a reasonable jury could infer that the District authorized

Jane Doe II's eye surgery, without her mother's consent, in accordance with the District's

custom of authorizing medical care without the required consent.

Furthermore, a reasonable jury could also infer for another reason that the District

consented with the imprimatur of municipal policy to Jane Doe II's eye surgery: Mr. Hubbard,

the MRDDA Acting Administrator, signed the consent form authorizing her eye surgery. *See*

Def.'s Ex. 17, ECF No. 326-17 (reproducing the consent form). Because Mr. Hubbard was the

person who had himself authorized the District's official policy in place at the time and who had

helped develop that policy, the jury could reasonably find Mr. Hubbard's written consent to Jane

Doe II's eye surgery was "a single decision taken by the highest official[] responsible for setting

policy in that area of the government's business"—and therefore that his consent was a decision

taken pursuant to a municipal policy. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988);

*see Baker*, 326 F.3d at 1306 (citing *Praprotnik*) (explaining that "policy" can be set by a

municipality through "the action of a policy maker within the government"); *see also* Pls.'

Ex. 11, ECF No. 328-10 (displaying Mr. Hubbard's signature beneath the official written policy,

dated January 15, 1992); Hubbard Dep. 106:16–108:11, Pls.' Ex. 4, ECF No. 328-5 (explaining

that Mr. Hubbard, with his executive staff and a special policy unit, developed the 1992 policy).

Of course, whether Mr. Hubbard's written consent was unconstitutional depends on whether it

was given with or without consent from Jane Doe II's mother, Ms. Felton. As already discussed,

a dispute of fact exists on that issue, which the Court cannot decide on summary judgment. *See*

*supra* Part V.2.a.iii.

Given this background, there is at least a dispute of fact about whether the District's

custom or policy was the "moving force" behind the deprivation of Jane Doe II's liberty interest

under the Health-Care Decision Act. *Monell*, 436 U.S. at 694.[27] The District therefore does not

merit summary judgment on Jane Doe II's due process claim.[28]

## B. Battery

Having addressed Plaintiffs' constitutional claims, the Court analyzes their other claims

only briefly. On Plaintiffs' battery claims, District of Columbia law is well-settled that "[a]

battery is an intentional act that causes a harmful or offensive bodily contact." *Evans–Reid v.*

*District of Columbia*, 930 A.2d 930, 937 (D.C. 2007) (internal quotation marks omitted) (quoting

*Jackson v. District of Columbia*, 412 A.2d 948, 955 (D.C. 1980)). For patients competent to

consent to a surgery, a surgery performed without the patient's consent is a viable battery claim.

*In re A.C.*, 573 A.2d 1235, 1243 (D.C. 1990). This principle is unchanged when the patient is

incompetent to consent, except that the patient's "substituted judgment," derived from decisions

made when competent before, generally controls. *See id.* at 1249. When the patient has never

been competent to consent to a surgery, a parent or guardian's consent is required, in

---

[27] The Court recognizes that the District's custom or policy might have at times allowed the District to authorize surgeries without family members' consent for justifiable reasons, given that many individuals in the District's care may have lacked a "next of kin" that the District could contact. *See* Hubbard Dep. 124:2–20, Def.'s Ex. 5, ECF No. 326-5. The Court does not here imply that the District might have violated the Constitution every time it authorized a surgery without making contact with or obtaining consent from a family member. After all, a viable procedural due process claim requires not just the deprivation of a constitutionally cognizable liberty interest, but also a showing that the government deprived the plaintiff of that liberty interest "*without due process of law*." *Zinermon v. Burch*, 494 U.S. 113, 125 (1990). For situations in which the District could not reach an individual's family member, therefore, the District's actions could have been constitutional if the District provided constitutionally adequate procedures (1) to identify family members authorized to give or deny consent on the individual's behalf, (2) to provide them with adequate notice, and (3) to give them the opportunity to exercise their authority to give or deny consent before the District proceeded to authorize the individual's surgery.

[28] Because at this time the Court will not enter summary judgment for the District on Plaintiffs' constitutional claims, the Court need not address the District's argument urging the Court to decline to exercise supplemental jurisdiction over Plaintiffs' other claims. *See* Def.'s Mem. 35–36.

non-emergency situations, to avoid liability for battery. *See Bonner v. Moran*, 126 F.2d 121,

121–23 (D.C. Cir. 1941) (explaining that, in an action for damages for assault and battery, "a

surgeon has no legal right to operate upon a child without the consent of his parents or guardian,"

though the consent may be express or implied); *accord Kozup v. Georgetown Univ.*, 851 F.2d

437, 439 (D.C. Cir. 1988); *Canterbury v. Spence*, 464 F.2d 772, 782 n.32, 789 n.92 (D.C. Cir.

1972).[29] As discussed above, under common law tort principles, a person can consent by words

or actions: when words or conduct "are reasonably understood by another to be intended as

consent, they constitute apparent consent and are as effective as consent in fact." Restatement

(Second) of Torts § 892(2) (Am. Law Inst. 1979); *see also supra* Part V.A.2.a.iii (citing *Boyrie v.*

*E & G Prop. Servs.*, 58 A.3d 475, 477–78 (D.C. 2013); *Faniel v. Chesapeake & Potomac Tel.*

*Co. of Md.*, 404 A.2d 147, 152–53 (D.C. 1979); and *Martin v. George Hyman Constr. Co.*, 395

A.2d 63, 71 (D.C. 1978)).

For Jane Doe II, the Court has already determined that a genuine dispute of fact exists

regarding whether Jane Doe II's mother provided implied or express consent to Jane Doe II's eye

surgery. *See supra* Part V.A.2.a.iii. The record indicates that Jane Doe II was never competent to

consent to her eye surgery and that the District was not her court-appointed guardian. *See id.*;

*supra* note 23. For Jane Doe II's battery claim, therefore, a genuine dispute of fact exists

regarding whether Jane Doe II's surgery proceeded with the consent of her parent or guardian.

---

[29] The D.C. Circuit's decision in this case did not discuss the validity of the District's
policies under common-law battery principles. *See Doe ex rel. Tarlow v. District of Columbia*,
489 F.3d 376, 380–82 (D.C. Cir. 2007) (finding that the District's 2003 medical consent policy
for intellectually disabled people in its care "complie[d] with D.C. law," but analyzing the policy
under just District of Columbia statutes). The Court thus does not include discussion of that
decision here. *Contra* Def.'s Mem. 36.

Accordingly, neither the District nor Plaintiffs merit summary judgment on Jane Doe II's battery claim.

Jane Doe I and Jane Doe III's battery claims call for a different analysis. As discussed repeatedly in this case and in this opinion, the Court accepts that Jane Doe I and Jane Doe III, like Jane Doe II, have never been competent to consent to a surgery. *See Doe ex rel. Tarlow v. District of Columbia*, 489 F.3d 376, 378 (D.C. Cir. 2007); *Doe ex rel. Tarlow v. District of Columbia*, 920 F. Supp. 2d 112, 126 (D.D.C. 2013); *supra* Part V.A.1.a.ii–iii. Thus, if the District did not obtain consent from an appropriate parent or guardian either for Jane Doe I's abortion or for Jane Doe III's abortion, then the District faces liability for battery. *See Bonner*, 126 F.2d at 121–23.

Here, the analysis of Jane Doe I and Jane Doe III's battery claims diverges from the analysis of Jane Doe II's battery claim. Jane Doe II had family members who could provide consent on her behalf, but, based on the evidence on record, Jane Doe I and Jane Doe III did not. *See* Def.'s Ex. 8, ¶ 1, ECF No. 326-8 (noting that Jane Doe I was placed at a "specialized foster care home" in 1982, two years before the abortion that is the subject of this suit); Def.'s Ex. 35, ¶ 2, ECF No. 340-1 (noting that Jane Doe I began living with a different foster family in 1984); Def.'s Ex. 22, ECF No. 326-22 (noting that many of Jane Doe III's relatives had been Forest Haven residents—and therefore likely incompetent to provide consent—and that Jane Doe III had lived in emergency care or foster care until she was ten years old). For Jane Doe I and Jane Doe III, therefore, only a guardian could have consented on their behalf to their abortions. Even though the District likely was not these two plaintiffs' court-appointed guardian, *see* Def.'s Mem. 5 ("[I]t was the policy of the District to sign consent forms . . . without having been appointed guardian . . . ."), the District would have been the only reasonable source of any

consent to a surgery on their behalf. *See generally Canterbury*, 464 F.2d at 788–89 (explaining that "a relative's consent"—*i.e.*, the consent of an interested third-party, akin to the District in Jane Doe I and Jane Doe III's cases—may be adequate when a patient is "incapable of consenting" to treatment, but without requiring that relative or interested third-party to be the patient's parent or court-appointed guardian). Their battery claims thus hinge on whether the District provided valid consent to their abortions.

As discussed at length earlier, the District could not constitutionally consent to Jane Doe I and Jane Doe III's abortions without providing Jane Doe I and Jane Doe III with more procedural protections than it did. *See supra* Part V.A.1. The District's consent to the abortions was therefore unconstitutional, *see id.*, and Jane Doe I and Jane Doe III's resulting abortions were not legally authorized.[30] Because they were not legally authorized, the Court must conclude as a matter of law that, with respect to Jane Doe I and Jane Doe III's abortions, the District is liable for battery. *See Bonner*, 126 F.2d at 122 ("[T]he [defendant] is liable in damages if the operation is unauthorized.").

This Court will accordingly enter summary judgment for Plaintiffs on Jane Doe I and Jane Doe III's battery claims. But, as discussed above with respect to Jane Doe II's battery claim, a genuine issue of material fact exists on the issue of whether Jane Doe II's mother provided implied or express consent to Jane Doe II's surgery—and thus on the ultimate issue of whether Jane Doe II's surgery was a battery. The Court will accordingly deny summary judgment to all parties on Jane Doe II's battery claim.

---

[30] After all, consent under mistake, misrepresentation, or duress is not effective consent. *See* Restatement (Second) of Torts § 892(B)(2), (3) (Am. Law Inst. 1979). *A fortiori*, consent obtained by unconstitutional means would not be effective consent either.

## C.  D.C. Code § 7-1305.14

D.C. Code § 7-1305.14 declares that "[n]o person shall be deprived of any civil right . . . solely by reason of his or her having received services, voluntarily or involuntarily, for an intellectual disability." D.C. Code § 7-1305.14(a). It also creates a private right of action to remedy deprivations of intellectually disabled individuals' civil rights. *See id.* § 7-1305.14(c) ("Any person who violates or abuses any rights or privileges protected by this chapter shall be liable for damages as determined by law, for Court costs and for reasonable attorneys' fees."); *Doe ex rel. Tarlow v. District of Columbia*, 920 F. Supp. 2d 112, 127 (D.D.C. 2013).

The success of Plaintiffs' claims under this statutory provision hinges on whether their constitutional claims succeed. Plaintiffs' elective surgeries, and the accompanying allegations of due process deprivations, arose from their commitment to the District's care for services relating to their intellectual disabilities. Thus, if they prevail on their due process claims, they will also show that they were deprived of civil rights "by reason of . . . having received services . . . for an intellectual disability," D.C. Code § 7-1305.14(a), entitling them to that provision's statutory remedy. No party suggests that the statutory analysis here differs from the constitutional due process analysis conducted previously. *See* Def.'s Mem. 37; Pls.' Mem. 35–36; Pls.' Opp'n Def.'s Mot. Summ. J. 43, ECF No. 337 [hereinafter Pls.' Opp'n]; *see also supra* Part V.A (analyzing Plaintiffs' due process claims).

Because the Court will enter judgment for Jane Doe I and Jane Doe III on their constitutional due process claims, *see supra* Part V.A.1, Jane Doe I and Jane Doe III have also

shown that they merit relief under D.C. Code § 7-1305.14. The Court will accordingly enter judgment for Jane Doe I and Jane Doe III on their claims under that provision.[31]

For Jane Doe II, however, a genuine dispute of material fact remains regarding her constitutional claim. *See supra* Part V.A.2 (explaining how a reasonable jury might find either that Jane Doe II's mother consented to Jane Doe II's eye surgery or that Jane Doe II's mother did not consent). That factual dispute also precludes summary judgment on Jane Doe II's claim under D.C. Code § 7-1305.14.

### D.  D.C. Code § 7-1305.13

D.C. Code § 7-1305.13 provides a different private right of action: one "to compel the rights afforded persons with intellectual disabilities" under Chapter 13 of Title 7 of the D.C. Code (the present codification of the Mentally Retarded Citizens Constitutional Rights and Dignity Act of 1978). *See* D.C. Code § 7-1305.13(a); *see also id.* § 7-1305.13(b) (declaring that the District may be liable for a "civil remedy in an amount not less than $25 per day . . . for each day" when an intellectually disabled individual lacks an appropriate habilitation program under the Act). *See generally* Mentally Retarded Citizens Constitutional Rights and Dignity Act of 1978, No. 2-297, 25 D.C. Reg. 5094 (Nov. 8, 1978) (act codified as amended at D.C. Code §§ 7-1301.01–7-1306.05). The District argues that the statute "provides a cause of action for *prospective* relief only," which would be inappropriate here because "Jane Does II and III have passed away, and Jane Doe I does not make any allegations that the District is *currently*

---

[31] Because the Court will enter judgment on Jane Doe I and Jane Doe III's D.C. Code § 7-1305.14 claims based on their successful constitutional claims, the Court need not assess whether Jane Doe I and Jane Doe III may also merit relief under that statute because the District "illegally consent[ed] to abortions and sterilizations without a court order" in violation of D.C. Code § 7-1305.08. Second Am. Compl. ¶ 40; *see also, e.g.*, Pls.' Mem. 14, 22–23 (discussing sterilization).

providing an inadequate program." Def.'s Mem. 36–37. Faced with this argument, Plaintiffs provide no response. *See* Pls.' Opp'n 42–43 (discussing battery and D.C. Code § 7-1305.14, but not D.C. Code § 7-1305.13).

The Court agrees with the District and finds that D.C. Code § 7-1305.13 intends to compel the District to secure appropriate *prospective* care for intellectually disabled persons in its care. *Accord Harvey v. Mohammed*, 841 F. Supp. 2d 164, 189 (D.D.C. 2012), *aff'd in part and rev'd in part on other grounds sub nom. Harvey v. District of Columbia*, 798 F.3d 1042 (D.C. Cir. 2015). Because Plaintiffs do not seek a prospective remedy, *see* Second Am. Compl. 15, and because they make no argument disputing the District's interpretation of the statute, *see* Pls.' Opp'n 42–43, the Court will enter judgment for the District on Plaintiffs' D.C. Code § 7-1305.13 claims.

## VI.  CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment (ECF No. 326) is **GRANTED IN PART** and **DENIED IN PART**, and Plaintiffs' motion for partial summary judgment (ECF No. 328) is **GRANTED IN PART** and **DENIED IN PART**. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  September 9, 2016                                   RUDOLPH CONTRERAS
                                                           United States District Judge